UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

| | |
|---|---|
| INNOVATIVE MATTRESS SOLUTIONS, LLC | CASE NO. 19-50042 |
| SLEEP OUTFITTERS OF ALABAMA LLC | CASE NO. 19-_____ |
| SLEEP OUTFITTERS OF INDIANA LLC | CASE NO. 19-_____ |
| SLEEP OUTFITTERS OF KENTUCKY, LLC | CASE NO. 19-_____ |
| SLEEP OUTFITTERS OF OHIO LLC | CASE NO. 19-_____ |
| SLEEP OUTFITTERS OF TENNESSEE LLC | CASE NO. 19-_____ |
| SLEEP OUTFITTERS OF WEST VIRGINIA, LLC | CASE NO. 19-_____ |
| SLEEP LIQUIDATORS LLC | CASE NO. 19-_____ |
| BROWN IMMOBILIEN LLC | CASE NO. 19-_____ |
| KNOPF SYSTEMS, LLC | CASE NO. 19-_____ |
| K. B. & ASSOCIATES, INCORPORATED | CASE NO. 19-_____ |
| | |
| DEBTORS IN POSSESSION | CHAPTER 11 |
| | |
| | (JOINT ADMINISTRATION REQUESTED) |

---

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING
PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1),
AND 364(e) AND (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;
(II) GRANTING ADEQUATE PROTECTION PURSUANT TO
11 U.S.C. §§ 361, 362, 363 AND 364; (III) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS TO POST-PETITION LENDER PURSUANT
TO 11 U.S.C. §§ 364 AND 507; (IV) SCHEDULING FINAL HEARING; AND (V)
GRANTING RELATED RELIEF**

---

Come Innovative Mattress Solutions, LLC ("iMS")[1] and its affiliated debtors and debtors

in possession (the "Debtors"), by counsel, and pursuant to sections 105, 361, 362, 363, 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), and 364(e) of title 11 of the United States Code, 11 U.S.C. §§

101-1532 (the "Bankruptcy Code"); Rules 2002, 4001, 6004, and 9014 of the Federal Rules of

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that Innovative Mattress Solutions, LLC $[14,000,000 Super-priority Senior Secured Debtor-In-Possession Revolving Credit Facility Summary of Terms and Conditions (the "Term Sheet"), attached hereto as Exhibit C.

Bankruptcy Procedure (the "Bankruptcy Rules"); and KYEB LBR 4001-2, respectfully request

by this motion ("Motion") entry of an interim order (the "Interim Order") and final order (the

"Final Order") (i) authorizing the Debtors to (a) obtain postpetition secured financing on a

superpriority basis (the "DIP Facility") pursuant to the terms and conditions described in the

Term Sheet substantially in the form attached hereto as Exhibit A, by and among iMS as

Borrower, the iMS affiliates as Guarantors[2] (together with the Borrower, the "DIP Obligors"),

and Tempur World, LLC ("TSI") as lender (the "DIP Lender"); and (b) use cash collateral; (ii)

granting adequate protection to the Debtors' prepetition secured lender (the "Prepetition

Lender"); (iii) granting liens and providing superpriority administrative expense status to the DIP

Lender; and (iv) scheduling a hearing to consider approval of the Motion on a final basis (the

"Final Hearing").    The facts and circumstances supporting this Motion are set forth in the

concurrently filed *Declaration of Kim Knopf in Support of the Debtors' Chapter 11 Petitions and*

*First Day Pleadings* (the "First Day Declaration").  In further support of this Motion, the Debtors

respectfully state as follows:

## JURISDICTION AND VENUE

1.      On January 11, 2019 (the "Petition Date"), the Debtors filed voluntary petitions

for relief with this Court under Chapter 11 of the Bankruptcy Code.  The Debtors are operating

their businesses as debtors and debtors in possession pursuant to §§ 1107(a) and 1108 of the

Bankruptcy Code.

2.      This Court has jurisdiction over these Chapter 11 cases under 28 U.S.C. §§ 157

and 1334.  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (M).

---

[2] Guarantors include the following entitles: (i) Knopf Systems, LLC; (ii) KB & Associates, Inc., (iii) Brown
Immobilien LLC, (iv) Sleep Outfitters of KY, LLC, (v) Sleep Outfitters of OH, LLC, (vi) Sleep Outfitters of TN,
LLC, (vii) Sleep Outfitters of AL, LLC, (viii) Sleep Outfitters of IN, LLC, (ix) Sleep Liquidators, LLC, and  (x)
Sleep Outfitters of WVA, LLC.

3.     The Debtors are Delaware limited liability companies except for K&B Associates, Inc, which is a West Virginia corporation. Debtor iMS maintains its principal business location in Lexington, Kentucky.  The other Debtors are affiliates of iMS. Accordingly, venue for the Debtors' Chapter 11 cases is proper in this District under 28 U.S.C. § 1408 and 1409.

4.     No trustee or examiner has been appointed in this Chapter 11 case, and no official committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code ("Creditors' Committee") or other official committee has been appointed. The Debtors have sought joint administration of their cases under the lead case of iMS.

## RULE 4001 STATEMENT

Pursuant to Bankruptcy Rule 4001(b) and (c) and KYEB LR 4001-2, the Debtors provide the following summary of the terms for postpetition financing and use of cash collateral:

## I.     Rule 4001(b) Statement

(a)     Name of Each Entity That May Claim an Interest in Prepetition Cash Collateral (also referred to as the "Cash Collateral Creditor"):  TSI, in its capacity as Prepetition Lender,[3] may claim an interest in cash collateral pledged to secure the prepetition obligations owed under the Prepetition Credit Documents ("Prepetition Cash Collateral") pursuant to the Prepetition Facilities, which encumbers the Prepetition Collateral securing the Prepetition Obligations.

(b)     Purposes for the Use of Prepetition Cash Collateral:  As set forth in more detail in the DIP budget attached hereto as Exhibit B (the "DIP Budget"), the Debtors propose to use Prepetition Cash Collateral to meet their postpetition obligations and to pay their general and administrative operating expenses, including (i) payment of amounts due under certain leases, certain employee-related, maintenance and other expenses of the Borrower, (ii) restructuring costs and professional fees of the Borrower and Guarantors related to the Chapter 11 Cases, (iii) interest, premiums, fees and expenses payable hereunder to TSI in its capacity as DIP Lender, and payable to TSI in such capacity under the DIP Loan Documents and the DIP Orders, (iv) adequate protection payments

---

[3] At the time of the filing of this Motion, Tempur World, LLC and United Bank, Inc., the current lender under the Prepetition Loan Agreements, have reached an agreement-in-principle under which Tempur World, LLC would be assigned all rights and obligations of United Bank, Inc. under the Prepetition Loan Agreements.  The parties continue to finalize and document this agreement and expect to provide notice of this assignment in advance of the hearing to consider the Motion.

provided to the Pre-Petition Lender (including amounts for the Roll-up) and (v) and other items, all of the foregoing strictly in accordance with the allowed disbursements set forth in the DIP Budget.

(c)    <u>Terms and Duration</u>:  The Debtors seek authority to use Prepetition Cash Collateral in the amounts as set forth on the DIP Budget for the interim period through any final hearing date, and in addition to or pursuant to subsequent proposed budgets to be filed with the Court. There are no payments to insiders other than the salaries of Kimberly Knopf, Kenneth Knopf and Karrie Knopf who respectively earn $5769, $3846 and $3538 biweekly. Expenses are related to preservation of the Debtors' ongoing retail operations. The Debtors seek to use Prepetition Cash Collateral as set forth on the DIP Budget; provided, however, that the Debtors do not exceed the total DIP Budget amount by more than ten percent (10%) as provided under the Variance Covenant in the Term Sheet.

(c)    <u>Adequate Protection</u>:  The Prepetition Lender is entitled, pursuant to sections 361, 363(e), and 364(d)(1) of the Bankruptcy Code, to adequate protection of its respective interests in the Prepetition Collateral, in exchange for the Debtors' use of such Prepetition Collateral, to the extent of the diminution in value, if any, of the Prepetition Collateral, including, without limitation, any diminution in value resulting from the sale, lease or use by the Debtors (or other decline in value) of any Prepetition Collateral (collectively, the "<u>Diminution Claim</u>"), and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.

## II.    **Rule 4001(c) Statement**

1.      The Debtors seek authority to obtain immediate postpetition financing pursuant to the terms and conditions of the Term Sheet (as the same may be amended, supplemented, restated or otherwise modified from time to time, the "<u>DIP Term Sheet</u>") substantially in the form attached hereto and incorporated herein by reference as <u>Exhibit A</u>.

2.      The basic terms of the DIP Term Sheet include the following:

(a)      Pursuant to 11 U.S.C. § 364(c)(2), 364(c)(3) and 364(d)(1), the DIP Lender will provide Debtors with a $14,000,000 post-petition DIP Facility secured by a first-priority priming lien on substantially all of the assets of the Debtors ("<u>DIP Collateral</u>") as more specifically set forth in the DIP Financing Agreement.   Amounts drawn under the DIP Facility will bear interest at the 3-month LIBOR rate plus 10.00% per annum (as further described in the DIP Financing Agreement).

(b)      The loan proceeds will be made available to the Debtors within two business days after entry of the Interim Order and the satisfaction of all other conditions precedent under the DIP Financing Agreement, in order to allow the Debtors to satisfy their obligations to pay ongoing operating costs and the costs of their bankruptcy cases.

(c)     The Debtors have or shall use the loan proceeds for the payment of post-petition operating expenses limited to operating expenses and costs of administration as set forth on the DIP Budget.

(d)     The DIP Loans will mature on the Maturity Date (as defined in the DIP Financing Agreement) and will be immediately due and payable on the earliest to occur of any of the following: (i) 120 days after the Petition Date; (ii) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default; (iii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and becomes effective prior thereto or contemporaneous therewith; (iv) conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, unless otherwise consented to in writing by the DIP Lender; (v) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the DIP Lender; (vi) the date of consummation of a sale of all, substantially all or a material portion of the DIP Collateral; and (vii) the effective date of any Debtors' plan of reorganization confirmed in the Chapter 11 Cases.

(e)     Pursuant to 11 U.S.C. § 364(c) and 503(b), the DIP Lender shall be entitled to a superpriority administrative expense claim, subject to the Carve-out for U.S. Trustee fees and professional fees, which Carve-out is more fully described in the DIP Financing Agreement.

## **PRELIMINARY STATEMENT**

1.     As set forth in the First Day Declaration, the Debtors have faced certain operational and financial challenges over the past several years, which led them in October, 2018 to hire Conway Mackenzie, Inc. ("Conway") to provide certain restructuring management and advisory services.  Although the Debtors are able to fund a certain level of operations out of cash flow, they determined, in consultation with Conway, that additional financing was required to ensure a smooth bankruptcy sale process.

2.     The Debtors initiated a process of seeking financing, including discussions with their existing secured lender and their main supplier, which has culminated in a commitment for a $14 million revolving DIP Facility, financed by the Debtors' Prepetition Lender and main supplier, TSI.  The DIP Facility will allow the Debtors to pursue a sale of substantially all of their assets in a controlled and deliberate manner, and provide the Debtors with critical liquidity throughout the process.

3.      Access to the DIP Facility and Prepetition Cash Collateral will allow the Debtors to continue normal business operations in the Chapter 11 Cases, including by maintaining vendor and supply relationships, continuing to pay their employees, and satisfying other working capital and operational requirements.  Satisfaction of these key obligations is necessary to preserve and maintain the going-concern value of the enterprise and effectuate a successful reorganization or sale of substantially all of the Debtors' assets.  Accordingly, the Debtors respectfully submit that the DIP Facility should be approved.

## BACKGROUND OF THE DEBTORS

## II.      THE DEBTORS' PREPETITION INDEBTEDNESS

4.      The Debtors' primary prepetition secured liabilities consist of: (i) a term note credit facility; and (ii) a line of credit facility.

*(a)      Prepetition Term Loan*

5.      The Debtors[4] are party to that certain Promissory Note and Security Agreement, dated as of April 12, 2012, as supplemented by a Business Loan Agreement, dated as of November 22, 2013, and as modified by a Forbearance Agreement, dated as of December 21, 2018 (together, and as amended, modified or supplemented prior to the date hereof, the "Prepetition Term Loan").

6.      The commitment under the Prepetition Term Loan was in the amount of $2,015,000.00, which bore interest at an initial annual rate of 4.5% until April 12, 2017, at which point the rate could change daily to a rate based on the prime rate plus 1%. The Prepetition Term Loan matures on October 12, 2027.  The Prepetition Term Loan is secured by a first-priority lien

---

[4] iMS is the borrower, and K. B. & Associates, Inc., Kimberly B. Knopf, Knopf Systems, LLC, Sleep Outfitters of Kentucky, LLC, Sleep Outfitters of Ohio LLC, Sleep Outfitters of Tennessee, LLC, Sleep Outfitters of Alabama LLC, Sleep Outfitters of Indiana, LLC and Brown Immobilien LLC are each guarantors, as stated in a forbearance agreement related to the Prepetition Term Loan.

on the Prepetition Collateral.  As of the Petition Date, approximately $1.3 million was due under the Prepetition Term Loan.

*(b)    Prepetition Line of Credit*

7.    The Debtors are also party to that certain Commercial Line of Credit Agreement and Note, dated as of August 20, 2003, as supplemented by a Business Loan Agreement of even date, as further amended by a Commercial Line of Credit Renewal Agreement and Note, dated as of January 22, 2016, as modified by a Change in Terms Agreement dated April 20, 2018; as further modified by a Change in Terms Agreement dated July 20, 2018, and most recently modified by a Forbearance Agreement, dated as of December 21, 2018 (together, and as amended, modified or supplemented prior to the date hereof, the "Prepetition LOC Loan," and with the Prepetition Term Loan, the "Prepetition Loan Agreements").

8.    The commitment under the Prepetition LOC Loan was in the amount of $2,500,000.00, which bore interest at an initial variable annual rate based on the prime rate, with a floor of 4%. The Prepetition LOC Loan matures on October 12, 2027.  The Prepetition LOC Loan is also secured by the Prepetition Collateral.  As of the Petition Date, approximately $2.4 million was due under the Prepetition LOC Loan.

**RELIEF REQUESTED**

9.    By this Motion, the Debtors request entry of the Interim and Final Orders, substantially in the forms attached hereto as Exhibit C and Exhibit D, respectively:

(a)    authorizing iMS to obtain, as borrower (the "Borrower"), secured superpriority postpetition loans, advances, and other financial accommodations pursuant to the terms of the DIP Term Sheet by and among the Borrower and the DIP Lender;

(b)    authorizing Debtors to execute and deliver in form and substance acceptable to the DIP Lender, a definitive credit agreement (the "DIP Credit Agreement") and related security agreement(s), guarantees, pledge agreements, mortgages, and other agreements, opinions, instruments and

documents required by the DIP Lender (collectively, with the DIP Term Sheet, the "DIP Loan Documents"), and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;

(c)       authorizing Debtors, subject to the terms, conditions, and limitations set forth in the DIP Financing Agreement, the DIP Loan Documents, and the Interim Order, to borrow up to an aggregate principal amount of $6,000,000.00 upon entry of the Interim Order, and up to an additional principal amount of $8,000,000.00 upon entry of the Final Order.

(d)       authorizing Debtors to use Prepetition Cash Collateral as contemplated by section 363 of the Bankruptcy Code on the terms and conditions set forth in the DIP Financing Agreement and the Interim Order and any Final Order;

(e)       authorizing Debtors to grant adequate protection to the Prepetition Lender with the relative priorities set forth herein, consisting of replacement liens and superpriority claims, as well as the Roll-up;

(f)       providing the DIP Lender with superpriority administrative expense claim status pursuant to section 364(c)(1) of the Bankruptcy Code;

(g)       granting to the DIP Lender perfected security interests in and liens on all of the DIP Collateral, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, to secure all of the DIP Obligations (as defined below), subject to any  (i) valid, binding, enforceable, non-avoidable, and perfected liens in existence on the Petition Date other than the Pre-Petition Security Interests and (ii) valid, enforceable and non-avoidable liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code other than any Pre-Petition Security Interests ("Permitted Priority Liens") and payment of the Carve-out;

(h)       vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Term Sheet and the Interim Order (and, upon its entry, the Final Order and the other DIP Loan Documents); and

(i)       scheduling a Final Hearing to consider the relief requested in this Motion on a final basis no later than 30 days following entry of the Interim Order.

## DIP FACILITY OVERVIEW

**I.    PREPETITION EFFORTS TO OBTAIN FINANCING**

10.    As more fully described in the First Day Declaration, the Debtors are unable to maintain much of their normal operations based on operating cash flow.  In consultation with their advisor Conway MacKenzie and their main supplier, Tempur Sealy, the Debtors determined that additional funding would be necessary to finance postpetition operations, including payroll and other essential payments, as well as other administrative costs in a bankruptcy.

11.    The Debtors' critical financial situation required them to seek immediate access to credit to enable the continuation of normal business operations and the preservation of value of their estates for the benefit of all stakeholders until a going-concern sale of substantially all of the Debtors' assets could be completed.  The absence of such immediate working capital would irreparably harm the Debtors, their estates, and stakeholders by compromising the Debtors' ability to finance basic operations, maintain business relationships, and pay employees while simultaneously pursuing efforts to maximize value for the estate.

12.    Prior to the Petition Date, the Debtors, with the assistance of their professional advisors, evaluated strategic and financial options to improve postpetition liquidity.  The efforts of the Debtors and Conway MacKenzie to raise new capital are more fully described in the First Day Declaration. Before agreeing to enter into the DIP Financing Agreement with the DIP Lender, the Debtors approached a number of potential debtor-in-possession financing lenders in the hopes of soliciting meaningful debtor-in-possession proposals.

13.    The Debtors evaluated prospective lenders on a number of factors, including economic terms, financing certainty, proposed restrictions on the operation of the Debtors' business and the use of proceeds, and the security packages requested.  The Debtors ultimately

determined that, given the amount of their funded debt, which is secured by substantially all assets, the financing proposal by their main supplier provided the best postpetition financing option on the most favorable terms.  Following arm's length negotiations with the DIP Lender, the Debtors reached an agreement on the terms set forth in the DIP Term Sheet and described in this Motion.

14.    Throughout these efforts, the Debtors were unable to obtain the necessary financing on an unsecured, administrative expense basis under section 503(b)(1) of the Bankruptcy Code.  The Debtors have further been unable to obtain credit on an unsecured basis, but enjoying (a) "superiority" over that of administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code; (b) secured solely by a lien on property of the Debtors' estates that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors' estates that is subject to other liens.  Although the Debtors attempted to secure financing from their Prepetition Lender on better terms, the Prepetition Lender was were unwilling to extend additional funding.  The Debtors also sought to secure financing from their DIP Lender without obtaining superpriority claim status, perfected security interests in liens on the Debtors' existing and after-acquired assets with the priorities set forth in the Interim Order, and the other protections set forth in the Interim Order.

15.    Without the DIP Financing and the authorized use of Prepetition Cash Collateral, the Debtors do not have sufficient available sources of working capital to finance their business operations in the ordinary course of business or to fund other administrative expenses in the Chapter 11 Cases.  The DIP Lender has agreed to provide liquidity that the Debtors believe is an essential component of their efforts to preserve their business as a going concern, maximize the value of their estates in anticipation of a sale of substantially all of the Debtors' assets, and

successfully administer the Chapter 11 Cases.  As a result, by this Motion, the Debtors seek

authorization to obtain postpetition financing pursuant to the terms set forth in this Motion, the

DIP Term Sheet, the Interim Order, and the Final Order.

## II.      MATERIAL TERMS OF THE DIP FACILITY

16.      Pursuant to Bankruptcy Rule 4001(c)(1) and KYEB LR 4001-2, the significant
terms of the DIP Term Sheet are set forth in the Term Sheet attached hereto as Exhibit
A.[5]

## III.      Additional Provisions

17.      In accordance with KYEB LR 4001-2(d) and (e), the following provisions of the

DIP Financing Agreement are highlighted below:

**a. Provisions that acknowledge the validity, amount, perfection, priority, extent or enforceability of a secured claim, if binding on any party except the debtors.**

There are no such provisions, although a challenge period for any third party to question these issues is hereby requested.

**b. Provisions that release liability for creditor's prepetition torts or breaches of contract, waiver of avoidance actions or waiver of defenses by the debtor or estate representative.**

The Debtors are agreeing to broad releases of the Prepetition Lender, the DIP Lender, and its affiliates, directors, officers, shareholders, agents, and representatives.

**c. Provisions that grant a postpetition lien which secures a claim for replacement or extension of prepetition credit, or for diminution in value that occurred prior to the Petition Date.**

The DIP Term Sheet provides for the provision of adequate protection payments to be provided to the Prepetition Lender, including amounts for the Roll-up (as defined above) as well as replacement liens and superpriority claims.

---

[5] For a complete description of the terms and conditions of the DIP Facility, reference is made to the DIP Financing Agreement and the proposed Interim Order, the terms of which shall control in all respects.  This summary is qualified entirely by the provisions of the DIP Financing Agreement and the Interim Order, and interested parties are strongly encouraged to read the operative documents and such orders.

**d. Provisions that grant a security interest in any avoidance powers available to a trustee.**

The DIP Collateral shall not include, and the security interests created by the Term Sheet and the other DIP Credit Documents shall not extend to claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code (collectively "Avoidance Actions") (but shall extend to proceeds of Avoidance Actions).

**e. Provisions that grant relief from the automatic stay without further order or hearing upon the breach of a cash collateral, adequate protection of DIP financing order or agreement.**

The DIP Financing Agreement provides for relief from the stay if the Debtors do not cure an Event of Default, but allows a period of 5 days for the Debtors to seek a hearing to avoid such a result.

## BASIS FOR RELIEF REQUESTED

**I.      APPROVAL OF THE DIP FACILITY IS APPROPRIATE
UNDER SECTION 364 OF THE BANKRUPTCY CODE**

18.      Section 364 of the Bankruptcy Code gives bankruptcy courts the power to authorize postpetition financing for a chapter 11 debtor in possession.  To the extent a debtor requires credit, but is unable to obtain such credit on unsecured terms, the Bankruptcy Code offers a debtor in possession flexibility to provide various protections to induce a postpetition lender to extend credit to a debtor in possession.  Specifically, a postpetition lender can be granted a superpriority administrative expense claim, a lien on unencumbered property, a junior lien on encumbered property, and, if the court finds that the interests of the holders of existing liens are adequately protected, a priming lien on encumbered property.  11 U.S.C. § 364(c), (d). *See In re Defender Drug Stores, Inc.*, 126 B.R. 76, 81 (Bankr. D. Ariz. 1991), *aff'd*, 146 B.R. 312 (B.A.P. 9th Cir. 1992) (quoting *Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 603 (6th Cir. 1987)) ("Having recognized the natural reluctance of lenders to extend credit to a company in

bankruptcy, Congress designed [section] 364 to provide 'incentives to the creditor to extend postpetition credit.'"). The DIP Financing Agreement satisfies applicable standards for approval under section 364 of the Bankruptcy Code.

(a)    *The DIP Financing Agreement Satisfies Section 364(c) of the Bankruptcy Code*

19.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re The Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Section 364 of the Bankruptcy Code does not impose upon a debtor in possession the onerous duty to seek unsecured credit from every possible lender before concluding that such credit is not available. See *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). This is true especially when time is of the essence. See, e.g., *id.*; *In re Reading Tube Indus.*, 72 B.R. 329, 333 (Bankr. E.D. Pa. 1987).

20.    As described in this Motion and in the First Day Declaration, the Debtors are in critical need of postpetition debtor-in-possession financing. Throughout the Chapter 11 Cases, the Debtors' operating expenses will exceed their cash generation from postpetition operations alone. In order to continue paying for basic business operating expenses, the Debtors needed to search for postpetition financing. The Debtors searched for such financing on the most favorable terms in an effort to solicit meaningful debtor-in-possession financing proposals. The Debtors

submit that the terms and conditions of the DIP Facility are fair, reasonable, and consistent with market terms.   Throughout these efforts, the Debtors were unable to obtain the necessary financing on an unsecured, administrative expense basis under section 503(b)(1) of the Bankruptcy Code.    Although the Debtors attempted to secure financing from their DIP Lender on better terms, the DIP Lender was unwilling to extend funding without obtaining superpriority claim status, perfected security interests in liens on the Debtors' existing and after-acquired assets with the priorities and protections set forth in the Interim Order.

21.    As a condition to extending the DIP Facility the Debtors need, the DIP Lender requires the protections contained in sections 364(c) and 364(d) of the Bankruptcy Code. Specifically, the DIP Facility will be secured, in each case subject to any Permitted Priority Liens and the Carve-out, by (i) first priority perfected liens and security interests in all of the Debtors' unencumbered assets pursuant to section 364(c)(2) of the Bankruptcy Code, and (ii) perfected liens in all of the Debtors' assets pursuant to section 364(c)(3) of the Bankruptcy Code. In addition, the DIP Lenders will receive a superpriority claim under section 364(c)(1), which will have priority over all administrative expense and unsecured claims, other than expenses provided for by the Carve-out.   The Debtors submit that the terms and conditions of the DIP Facility presented herein was the most favorable financing available under the circumstances.

22.    The DIP Facility provides the funding necessary for the Debtors to reorganize or sell substantially all of their assets as a going concern.   Without the DIP Facility, the Debtors may be required to cease payments to fund critical business operating expenses, such as payroll and vendor payments, which would destroy a substantial portion of the going concern value of the Debtors' estates.

(b)    *The DIP Financing Agreement Satisfies Section 364(d) of the Bankruptcy Code*

23.    The DIP Financing Agreement also includes priming liens on all Prepetition Collateral for the benefit of the DIP Lender, and therefore is subject to approval under section 364(d) of the Bankruptcy Code.  Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured priming liens if: (a) the debtor is unable to obtain such credit otherwise, and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected.  As described above, the Debtors are unable to obtain viable financing on terms more favorable than the DIP Financing Agreement.  Further, as described below, the Interim Order contemplates a fair adequate protection package which was consented to by the Prepetition Lender.  Accordingly, the Debtors submit that the proposed DIP Facility satisfies the requirements of section 364(d) of the Bankruptcy Code.  In addition, the Prepetition Lender consents to the priming liens on all Prepetition Collateral for the benefit of the DIP Lender.

## II.    THE COURT SHOULD APPROVE THE DEBTORS' USE OF CASH COLLATERAL

24.    Section 363 of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral, providing, in pertinent part, that "The trustee may not use, sell, or lease cash collateral . . . unless – (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Pursuant to section 363(c)(2) of the Bankruptcy Code, the Court may authorize the Debtors to use cash collateral so long as the applicable secured creditor consents or is adequately protected.  See *In re McCormick*, 354 B.R. 246, 251 (Bankr. C.D. Ill. 2006) (to use the cash collateral of a secured creditor, the debtor must have the consent of the secured creditor or must establish to that the secured creditor's interest in

the cash collateral is adequately protected); see also *Matter of Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 721 (Bankr. D. Del. 1996) (holding that creditors were adequately protected and allowing debtor to use cash collateral).

25.     The Debtors have satisfied the requirements of section 363(c)(2) of the Bankruptcy Code and should be authorized to use the Prepetition Cash Collateral.   The Prepetition Lender has consented to the use of the Prepetition Cash Collateral.   In addition, the Prepetition Lenders' interests in the Prepetition Cash Collateral will be adequately perfected, as described further below.   Based upon the foregoing, the Debtors request that the Court authorize the Debtors to use of the Prepetition Cash Collateral in accordance with the terms set forth in the Interim Order and the DIP Facility Documents.

### III.     THE COURT SHOULD AUTHORIZE THE DEBTORS TO PROVIDE ADEQUATE PROTECTION TO THE PREPETITION SECURED LENDER

26.     Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property used . . . or proposed to be used . . . by [a debtor in possession], the court, with or without a hearing, shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest."   11 U.S.C. § 363(e).   The propriety of adequate protection is determined on a case-by-case basis.   See *Resolution Trust Corp. v. Swedeland Dev. Grp (In re Swedeland Dev. Grp)*, 16 F.3d 552, 564 (3d Cir. 1994) (citing *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*), 808 F.2d 1393, 1397 (10th Cir. 1987)); *In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). Adequate protection shields a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See *In re Continental Airlines, Inc.*, 154 B.R. 176, 180-181 (Bankr. D. Del. 1993).

27.    Adequate protection is not expressly defined in the Bankruptcy Code. Rather, section 361 of the Bankruptcy Code provides a non-exclusive list of examples of adequate protection. The flexibility provided by section 363 provides the Court with discretion in fashioning the protection provided to a secured party.  See *In re Swedeland*, 16 F.3d at 564. Adequate protection may be provided through a "replacement lien" or "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property. 11 U.S.C. § 361(2), (3).

28.    The Debtors believe that the measures of protection set forth in the DIP Facility constitute adequate protection, both for the granting of replacement liens and for the use of Prepetition Cash Collateral, to protect the Prepetition Lender from any diminution in value from the priming of its liens and use of its prepetition collateral.  The Debtors have obtained the consent of the Prepetition Lender to the priming liens provided in the DIP Facility by offering the following adequate protection package: (i) additional liens upon all of the DIP Collateral, in each case, subject and subordinate to the Carve Out (as defined below), the DIP Liens  and any liens that have priority over the DIP Liens (such liens, the "Pre-Petition  Adequate Protection Liens"); (ii) super-priority claims as provided for in section 507(b) of the Bankruptcy Code, junior in priority only to the DIP Superpriority Claims; (iii) the Roll-up; and (iv) additional benefits, such as, subject to the Challenge Period Termination Date, various waivers, releases, and acknowledgements, as described more fully above and in the Interim Order.

29.    Preservation of value generally constitutes the "adequate protection" needed to prime existing liens.  See, e.g., Norton, et al., 2 *Norton Bankruptcy Law and Practice 2d.* § 38:7, p. 38-17 (1994) (addressing the § 364(d) determination, "[f]actors influencing a court's decision will be the viability of the debtor's business and the need to protect assets against a sharp decline

in value"); *Snowshoe*, 789 F.2d at 1087 (§ 364(d) order affirmed on appeal where "the trustee reported that the resort [the collateral] would lose from 50% to 90% of its fair market value if it ceased operations"); *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (funds from lender given "priming" lien used to improve collateral is transferred into value. "This value will serve as adequate protection. . . ."); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996); *In re Devlin*, 185 B.R. 376, 378 (Bankr. M.D. Fla. 1995) (chapter 11 debtor-motel operator authorized to incur debt with superpriority status to replace air-conditioning unit, boiler, and hot water heaters because such expenses were necessary to preserve value and maintain operations). In any event, the only party that the Debtors are aware of whose liens are being primed is the Prepetition Lender, who has consented to the priming lien to preserve the going-concern value of their collateral and have been provided with acceptable adequate protection, as discussed above.

30. The Debtors believe that the foregoing adequate protection reasonably balances the Debtors' need to use the collateral of the estate and the Prepetition Lenders' right to adequate protection under the Bankruptcy Code. As a result, the Debtors request authority to provide adequate protection to the Debtors' Prepetition Lenders in the form described above.

**IV.    APPROVAL OF THE DIP FACILITY IS SUPPORTED BY THE EXERCISE OF THE DEBTORS' SOUND BUSINESS JUDGMENT**

31. Generally, courts give broad deference to business decisions of a debtor in possession. See, e.g., *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, a bankruptcy court generally will respect a debtor in possession's business judgment regarding the need for and the proposed use of funds. As the court noted in *In re Ames Dep't Stores, Inc.*:

> [T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest., 115 B.R. 34, 40 (Bankr. S.D.N.Y 1990).

Without the ability to incur secured debt, the debtor in possession would be placed at a competitive disadvantage and its efforts to reorganize could be seriously impaired.

32.     Here, the Debtors believe that the terms and conditions of the DIP Facility are fair and reasonable.  The Debtors' decision to obtain financing pursuant to the terms of the DIP Facility represents an exercise of sound business judgment in the Debtors' continued effort to maximize the value of their estates as a going concern for all their stakeholders.  Absent such postpetition financing, the Debtors' ability to continue business operations and maintain the value of its assets prior to closing on a sale of those assets would be severely compromised.

## V.     THE DIP LENDER IS ENTITLED TO THE PROTECTIONS OF SECTION 364(E) OF THE BANKRUPTCY CODE

33.     Section 364(e) of the Bankruptcy Code provides that the "reversal or modification on appeal of an authorization . . . to obtain credit or incur debt . . . does not affect the validity of any debt so incurred or any priority or lien so granted, to an entity that extended such credit in good faith." 11 U.S.C. § 364(e).  As previously discussed herein, the terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors and the DIP Lender.  Moreover, the terms and conditions of the DIP Facility are fair and reasonable, and the Debtors' entry into the DIP Term Sheet is in the best interests of their estates and creditors.  Accordingly, the DIP Lender should be provided with the benefit and protection of section 364(e) of the Bankruptcy Code, such that if any of the provisions of the DIP Facility are later modified, vacated, stayed or terminated by subsequent order of this or any Court, the DIP Lender will be fully protected with respect to any amounts previously disbursed.

## VI.      MODIFICATION OF THE AUTOMATIC STAY IS WARRANTED

34.      The DIP Facility and proposed Interim Order contemplate that the automatic stay arising under section 362 of the Bankruptcy Code shall be vacated or modified to the extent necessary to permit the DIP Lender to exercise, upon the occurrence and during the continuation of any Event of Default (as defined in the DIP Term Sheet), all rights and remedies provided for in the DIP Term Sheet, and to take various other actions without further order of or application to the Court.  The Interim Order provides, however, that the DIP Lender must provide the Debtors with at least 5 business days prior written notice before exercising any enforcement rights or remedies (other than to step extending credit under the DIP Facility and to block withdrawals from any bank accounts that are part of the DIP Collateral), which will allow the Debtors to seek an expedited hearing before the Court in opposition to the DIP Lender's exercise of its rights and remedies.

35.      Stay modification provisions of this sort are ordinary features of DIP facilities and, in the Debtors' business judgment, are reasonable under the circumstances.  The provision provides the Debtors and other parties reasonable time to cure an event of default if possible and entitles the Debtors and any Committee to an emergency hearing before the Court.  Accordingly, the Debtors request that the Court authorize the modification of the automatic stay in accordance with the terms set forth in the Interim Order.

## VII.     IMMEDIATE RELIEF IS JUSTIFIED

36.      Pursuant to Bankruptcy Rule 4001(b) and (c), a final hearing on a motion to use cash collateral or obtain postpetition financing may not be commenced earlier than fourteen days after service of such motion.  The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such fourteen-day period and to authorize the debtor to obtain credit to

the extent necessary to avoid immediate and irreparable harm to the debtor's estate. The

Debtors' cash needs are immediate. Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtors

therefore request that the Court (i) authorize the Debtors to obtain and use financing on an

interim basis pursuant to the terms of the Interim Order and (ii) schedule a final hearing no later

than 30 days from entry of the Interim Order to consider approval of the Debtors' request to

obtain and use financing on a final basis pursuant to the terms of the Final Order.

37.     As described above and in the First Day Declaration, the Debtors submit that

without access to the DIP Facility, the Debtors will be unable to maintain ongoing operations and

will face immediate and irreparable harm to their estates. In light of the foregoing, the Debtors

submit that the requirements of Bankruptcy Rule 4001(b) and (c) have been satisfied and the

immediate availability of the DIP Facility pending the entry of the Final Order is appropriate.

Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## VIII.   NOTICE PROCEDURES AND FINAL HEARING

38.     Pursuant to KYEB LR 4001-2(c), the Debtors served a notice that this Motion had

been filed upon a) all creditors who assert an interest in the collateral and their counsel; b) any

taxing authority with a claim against the Debtors; c) unsecured creditors on the list filed pursuant

to Bankruptcy Rule 1007(d); d) all parties who have requested service of pleadings in this case;

and e) the U.S. Trustee. In addition, the Debtors shall promptly mail copies of the Interim Order

and notice of the Final Hearing, which fixes the time, date, and manner for the filing of

objections, to the same parties and any known party affected by the terms of the Interim Order

and/or Final Order. The Debtors request that any objection to the relief sought at the Final

Hearing shall (i) be made in writing setting forth with particularity the grounds thereof, and (ii)

filed with the Court and served so as to be actually received no later than seven (7) days prior to

the Final Hearing at 5:00 p.m. ET by the following: (a) proposed counsel to the Debtors, DelCotto Law Group PLLC, 200 North Upper Street, Lexington, KY 40507 (Attn: Laura Day DelCotto and Dean A. Langdon); (b) counsel to the DIP Lender, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, (Attn: James L. Bromley, Margaret Schierberl and Benjamin S. Beller); (c) counsel to the DIP Lender, Stoll Keenon Ogden LLP, 500 West Jefferson Street, Suite 2000, Louisville, KY 40202 (Attn: Lea Goff); (d) counsel to United Bank, Inc., Fowler Bell, 300 West Vine Street, Sixth Floor, Lexington, KY 40507, Attn: Taft A. McKinstry, and Steptoe & Johnson PLLC, P O Box 1588, Charleston, WV 25326-1588, Attn: Joseph G. Bunn; (e) the Office of the United States Trustee, 100 East Vine Street, Suite 500, Lexington, KY 40507; and (f) any Creditors' Committee appointed in these cases.

## WAIVER OF BANKRUPTCY RULE 6004(h) REQUIREMENTS

39.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Debtors require immediate relief to avoid immediate irreparable harm and continue ordinary business operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## RESERVATION OF RIGHTS

40.     Nothing in this Motion: (i) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors or their estates; (ii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates to contest the validity, priority, or

amount of any claim against the Debtors or their estates; (iii) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors or their estates with respect to any and all claims or causes of action against any third party; or (iv) shall be construed as a promise to pay a claim or continue any applicable payments postpetition, which decision shall be in the discretion of the Debtors. Any payment made pursuant to an order of the Court granting the relief requested herein is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and Final Order, in substantially the forms attached hereto as <u>Exhibit C</u> and <u>Exhibit D</u>, respectively, granting the relief requested herein and granting such other relief as the Court deems just and proper.

Respectfully submitted,

DELCOTTO LAW GROUP PLLC

/s/ Dean A. Langdon_____
Laura Day DelCotto
KY Bar No. 81763
Dean A. Langdon
KY Bar No. 40104
200 North Upper Street
Lexington, KY 40507
Telephone:  (859) 231-5800
Facsimile:   (859) 281-1179
ldelcotto@dlgfirm.com
dlangdon@dlgfirm.com
COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION
(UNDER PENDING APPLICATION)