UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE:

INNOVATIVE MATTRESS SOLUTIONS, LLC *et al.*[1]        CASE NO. 19-50042

DEBTORS IN POSSESSION        CHAPTER 11
                             JOINTLY ADMINISTERED

---

## NOTICE OF FILING OF AMENDED, BLACKLINE
## ASSET PURCHASE AGREEMENT AND PROPOSED SALE ORDER

---

Innovative Mattress Solutions, LLC and its affiliated debtors and debtors in possession in the above captioned chapter 11 cases (collectively, the "Debtors"), by counsel, hereby give notice of the filing of blackline versions of (A) an Asset Purchase Agreement with the Stalking Horse Bidder; and (B) a proposed Order (I) Approving the Asset Purchase Agreement Among Sellers and Purchasers; (II) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Leases in Connection Therewith and (IV) Granting Related Relief as provided for in the Bid Procedures Order entered February 25, 2019 [ECF No. 334]. The Debtors reserve all rights to submit additional modifications and amendments to these documents prior to a hearing to approve the proposed sale.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Innovative Mattress Solutions, LLC – 1096; Sleep Outfitters of Alabama LLC – 2914; Sleep Outfitters of Indiana LLC – 6006; Sleep Outfitters of Kentucky, LLC – 2729; Sleep Outfitters of Ohio LLC – 9814; Sleep Outfitters of Tennessee LLC – 1127; Sleep Outfitters of West Virginia, LLC – 6079; Sleep Liquidators LLC – 5703; Brown Immobilien LLC – 6617; Knopf Systems, LLC – 1096; and K. B. & Associates, Incorporated – 3479.

Respectfully submitted,

DELCOTTO LAW GROUP PLLC

/s/Dean A. Langdon
KY Bar No. 40104
200 North Upper Street
Lexington, KY  40507
Telephone:  (859) 231-5800
Facsimile:   (859) 281-1179
dlangdon@dlgfirm.com
COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

## CERTIFICATE OF SERVICE

    This Notice was served electronically by the Court's ECF System on all parties receiving notice thereunder on March 18, 2019.

/s/Dean A. Langdon, Esq.
COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

**ASSET PURCHASE AGREEMENT**

**AMONG**

**TEMPUR WORLD, LLC,**

**INNOVATIVE MATTRESS SOLUTIONS, LLC,**

**AND**

**THE OTHER SELLERS LISTED ON ANNEX 1 HERETO**

**Dated as of February 12, 2019**

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS .................................................................................................. ~~8~~5

    1.1      Certain Definitions ........................................................................................ ~~8~~5
    1.2      Other Definitional and Interpretive Matters ............................................... ~~22~~20

ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ~~23~~20

    2.1      Purchase and Sale of Assets ......................................................................... ~~23~~20
    2.2      Excluded Assets ............................................................................................ ~~25~~23
    2.3      Assumption of Liabilities ............................................................................. ~~26~~24
    2.4      Excluded Liabilities ...................................................................................... ~~27~~25
    2.5      Assignment and Assumption of Contracts .................................................. ~~28~~26
    2.6      Bulk Sales Laws ........................................................................................... ~~30~~28
    2.7      Termination of Affiliate Arrangements. ...................................................... ~~30~~28

ARTICLE III CONSIDERATION ........................................................................................ ~~31~~29

    3.1      Purchase Price ............................................................................................... ~~31~~29
    3.2      Determination of Final Purchase Price ........................................................ ~~32~~30
    3.3      Withholding and Tax Certifications. ............................................................ ~~32~~30

ARTICLE IV CLOSING AND TERMINATION .................................................................. ~~32~~30

    4.1      Closing Date .................................................................................................. ~~32~~30
    4.2      Deliveries by the Sellers .............................................................................. ~~33~~31
    4.3      Deliveries by Purchaser ............................................................................... ~~33~~31
    4.4      Termination of Agreement ........................................................................... ~~34~~32
    4.5      Procedure Upon Termination ....................................................................... ~~35~~33
    4.6      Effect of Termination ................................................................................... ~~35~~33
    4.7      Forfeiture of Purchaser Deposit .................................................................. ~~35~~33
    4.8      Break-Up Fee ............................................................................................... ~~36~~34

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS ........................ ~~36~~34

    5.1      Organization and Good Standing ................................................................. ~~36~~34
    5.2      Authorization of Agreement ........................................................................ ~~37~~35
    5.3      Conflicts; Consents of Third Parties ........................................................... ~~37~~35
    5.4      Title to Purchased Assets; Sufficiency of Assets ....................................... ~~38~~36
    5.5      Taxes ............................................................................................................. ~~38~~36
    5.6      Real Property ................................................................................................ ~~40~~38
    5.7      Tangible Personal Property .......................................................................... ~~40~~38
    5.8      Intellectual Property ..................................................................................... ~~40~~38
    5.9      Material Contracts. ....................................................................................... ~~42~~40
    5.10    Employee Benefits ....................................................................................... ~~43~~41
    5.11    Labor ............................................................................................................. ~~44~~42

1

| | | |
|---|---|---|
| 5.12 | Litigation | ~~44~~42 |
| 5.13 | Compliance with Laws; Permits | ~~44~~42 |
| 5.14 | Environmental Matters | ~~45~~43 |
| 5.15 | Financial Advisors | ~~45~~43 |
| 5.16 | Financial Statements | ~~45~~43 |
| 5.17 | Insurance | ~~46~~44 |
| 5.18 | Absence of Certain Changes | ~~46~~44 |

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** ~~46~~44

| | | |
|---|---|---|
| 6.1 | Organization and Good Standing | ~~46~~44 |
| 6.2 | Authorization of Agreement | ~~46~~44 |
| 6.3 | Conflicts; Consents of Third Parties | ~~47~~45 |
| 6.4 | Litigation | ~~47~~45 |
| 6.5 | Financial Advisors | ~~47~~45 |
| 6.6 | Financial Capability | ~~48~~46 |

**ARTICLE VII BANKRUPTCY COURT MATTERS** ~~48~~46

| | | |
|---|---|---|
| 7.1 | Competing Bids | ~~48~~46 |
| 7.2 | Bankruptcy Court Filings | ~~48~~46 |
| 7.3 | Adequate Assurances | ~~48~~46 |
| 7.4 | Purchaser Deposit | ~~48~~46 |

**ARTICLE VIII COVENANTS** ~~49~~47

| | | |
|---|---|---|
| 8.1 | Access to Information | ~~49~~47 |
| 8.2 | Conduct of the Business Pending the Closing | ~~49~~47 |
| 8.3 | Consents | ~~51~~49 |
| 8.4 | Regulatory Approvals | ~~51~~49 |
| 8.5 | Further Assurances | ~~52~~50 |
| 8.6 | Delivery of Monthly Financial Statements.. | ~~53~~51 |
| 8.7 | Preservation of Records | ~~53~~51 |
| 8.8 | Publicity | ~~54~~52 |
| 8.9 | Intellectual Property Matters | ~~54~~52 |
| 8.10 | Schedules | ~~54~~52 |
| 8.11 | WARN Act | ~~55~~53 |
| 8.12 | Section 363(b)(1)(A) | ~~55~~53 |
| 8.13 | Transfer of Personally Identifiable Information.. | ~~55~~53 |
| 8.14 | Trade Payables. | ~~55~~53 |
| 8.15 | Transition Services. | 53 |

**ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS** ~~55~~54

| | | |
|---|---|---|
| 9.1 | Transferred Employees | ~~55~~54 |
| 9.2 | Employee Benefits. | ~~55~~54 |

**ARTICLE X CONDITIONS TO CLOSING** ~~56~~54

| | | |
|---|---|---|
| 10.1 | Conditions Precedent to Obligations of Purchaser | ~~56~~54 |

2

10.2     Conditions Precedent to Obligations of the Sellers                        ~~57~~55
10.3     Conditions Precedent to Obligations of Purchaser and the Sellers           ~~58~~56
10.4     Frustration of Closing Conditions                                         ~~58~~56

**ARTICLE XI SURVIVAL; INDEMNIFICATION**                                          ~~58~~57

11.1     Survival of Representations and Warranties                                 ~~58~~57
11.2     Indemnification.                                                          ~~58~~57
11.3     Limitation on Indemnification..                                           ~~59~~57

**ARTICLE XII TAXES**                                                             ~~59~~57

12.1     Transfer Taxes                                                            ~~59~~57
12.2     Other Taxes.                                                              ~~59~~58
12.3     Purchase Price Allocation                                                 ~~59~~58
12.4     Cooperation                                                               ~~60~~59

**ARTICLE XIII MISCELLANEOUS**                                                    ~~61~~59

13.1     Expenses                                                                  ~~61~~59
13.2     Injunctive Relief                                                         ~~61~~59
13.3     Submission to Jurisdiction; Consent to Service of Process                 ~~61~~60
13.4     WAIVER OF RIGHT TO TRIAL BY JURY                                          ~~62~~61
13.5     Entire Agreement; Amendments and Waivers                                  ~~62~~61
13.6     Governing Law                                                             ~~62~~61
13.7     Notices                                                                   ~~63~~61
13.8     Severability                                                              ~~63~~62
13.9     Binding Effect; Assignment                                                ~~64~~62
13.10    Counterparts                                                              ~~64~~62
13.11    No Interpretation Against Drafter                                         ~~64~~62

**ANNEX**

1          Affiliates of the Company

**SCHEDULES**

1.1(a)      Knowledge of the Sellers
1.1(b)      Retained Properties
2.1(i)      Purchased Permits
2.1(v)      Purchased Bank Accounts
2.2(h)      Other Excluded Assets
2.3(b)      Product Warranty, Returns and Rebates Liabilities
2.3(h)      Transferred Employees Liabilities
2.3(i)      Gift Card, Merchandise Credit, Coupon, Rewards Programs and Sales Promotions
            Liabilities
2.3(k)      Customer Deposits, Layaway, Special Order and Delivery Liabilities
2.5(a)(i)   Purchased Contracts

2.5(a)(ii)   Excluded Contracts
2.5(b)       Cure Schedule
3.1          Wind Down Payments
5.3(a)       Conflicts (Seller)
5.3(b)       Consents
5.4(a)       Title to Purchased Assets
5.5(a)       Taxes; Pending Tax Actions
5.6(b)       Leased Real Property
5.6(c)       Defaults Under Real Property Leases
5.7          Tangible Personal Property
5.8(a)       Owned Intellectual Property
5.9(a)       Material Contracts
5.9(c)       Material Contracts Full Force and Effect
5.9(d)       Material Contract Defaults
5.10(a)      Employee Benefit Plans
5.10(h)      Effect of Execution of this Agreement
5.12         Litigation
5.13(b)      Permits
5.14         Environmental Matters
5.15         Financial Advisors
5.16         Financial Statements
5.17(a)(i)   Insurance Policies
5.17(a)(ii)  Material Disputed Insurance Claims
5.17(b)      Cancelled Insurance Policies
5.18         Absence of Certain Changes
6.3(a)       Conflicts (Purchaser)
8.9          Seller Marks
9.2(a)       Enhanced Severance Benefits

**EXHIBITS**

A       Form of Bill of Sale
B       Form of Assignment and Assumption Agreement
C       Form of Intellectual Property Assignment Agreement
D       Form of Short Form Trademark Assignment Agreement
E       Form of Assignment and Assumption Agreement (Real Property)
F       Form of Bidding Procedures Order
G       Purchased Intellectual Property Assignment Agreement

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of February 12, 2019 (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), by and among Innovative Mattress Solutions, LLC, a Delaware limited liability company (the "Company"), the Affiliates (as defined below) of the Company listed on Annex 1 (together with the Company, the "Sellers") and Tempur World, LLC, a Delaware limited liability company ("Purchaser").

## RECITALS

WHEREAS, on January 11, 2019, the Sellers filed voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), on or around January 11, 2019 (the "Petition Date") in the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court") (such cases, collectively, the "Bankruptcy Cases");

WHEREAS, the Sellers operate a chain of retail mattress stores in West Virginia, Kentucky, Ohio, Indiana, Tennessee,  and Alabama and engage in related operations (the "Business");

WHEREAS, subject to the terms and conditions hereof, the Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from the Sellers, all of the Purchased Assets and Assumed Liabilities;

WHEREAS, the board or applicable governing body of each Seller has determined that a sale of the assets of its applicable Seller is necessary to maximize value and it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein and has approved this Agreement;

WHEREAS, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bidding Procedures Order (as defined below) and, if Purchaser is the Successful Bidder, the Sale Order (as defined below) to be entered by the Bankruptcy Court in the Bankruptcy Cases; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1.

NOW, THEREFORE, in consideration of the promises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

# ARTICLE I

## DEFINITIONS

1.1    <u>Certain Definitions</u>.

For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

"<u>Administrative Expenses</u>" means any and all costs of the Bankruptcy Cases entitled to priority under 11 U.S.C. § 503, including legal and financial advisory fees and costs incurred by professionals retained by the Sellers and any official committee appointed in the Bankruptcy Cases, regardless of whether such professionals have been officially retained prior to or after the Closing and regardless of whether such fees and costs are approved by the Bankruptcy Court prior to or after the Closing.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.  For purposes of this Agreement, Purchaser and its Affiliates shall be deemed not to be "<u>Affiliates</u>" of any Seller and the Sellers and their respective Affiliates shall be deemed not to be "<u>Affiliates</u>" of Purchaser and its Affiliates.

"<u>Agreement</u>" has the meaning set forth in the <u>Preamble</u> hereto.

"<u>Allocation Dispute</u>" has the meaning set forth in <u>Section 12.2(a)</u>.

"<u>Allocation Dispute Notice</u>" has the meaning set forth in <u>Section 12.2(a)</u>.

"<u>Alternative Transaction</u>" means a sale of any material portion of the Purchased Assets to a Person or Persons other than Purchaser or an Affiliate of Purchaser pursuant to the Auction.

"<u>Ancillary Agreements</u>" means any other agreement, document or instrument that any Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby (including the Seller Documents and the Purchaser Documents).

"<u>Antitrust Laws</u>" has the meaning set forth in <u>Section 8.4(b)</u>.

"<u>Assignable Contract</u>" means any Contract to which any Seller is a party, but excluding, in each case, this Agreement and the Ancillary Agreements, the Sale Order, the DIP Facility Agreement and any ancillary agreements related thereto, and any engagement letters or agreements between any Seller and any estate professionals retained by such Seller.

"Assignment and Assumption Agreement(s)" means the Assignment and Assumption Agreement(s) in substantially the form annexed hereto as Exhibit B evidencing the assignment to and assumption by Purchaser of all rights and obligations under the Purchased Contracts.

"Assumed § 503(b)(9) Claims" means any claim of the Purchaser or any of its Affiliates allowed against any of the Debtors pursuant to 11 U.S.C. § 503(b)(9) by Bankruptcy Court order or otherwise resolved pursuant to the authority of the Debtors.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Taxes" means (i) Post-Closing Straddle Period Taxes or Taxes relating to the Business or the Purchased Assets in respect of a taxable period beginning after the Closing Date, (ii) Transfer Taxes borne by the Purchaser pursuant to Section 12.1 and (iii) the lesser of (A) $1,200,000 or (B) any sales, payroll, employment, withholding or other Taxes of the Sellers with respect to taxable periods or portions thereof ending on or prior to the Closing Date (including, for the avoidance of doubt, the obligation to deposit any employee-side payroll or employment Taxes, but only to the extent the Sellers have properly withheld such Taxes and were not required to deposit such amounts with an applicable Tax Authority on or prior to the Closing Date) that are either set forth in (x) Exhibit A to Debtors' Motion For Entry of Interim and Final Orders Authorizing the Debtors to Remit and Pay Certain Prepetition Taxes and Fees, filed with the United States Bankruptcy Court in the Eastern District of Kentucky, Lexington Division on January 11, 2019 by the Company and its affiliated debtors and debtors in possession or (y) Debtors' Motion for an Order Authorizing Debtors to Pay and Honor Prepetition Wages and Related Items, filed with the United States Bankruptcy Court in the Eastern District of Kentucky, Lexington Division on January 11, 2019 by the Company and its affiliated debtors and debtors in possession, to the extent, in the case of each of (x) and (y), that such Taxes are not yet due and payable (or, in the case of employee-side payroll or employment Taxes, not yet required to be deposited) as of the Closing Date.

"Auction" shall mean the auction as contemplated by the Bidding Procedures Order.

"Avoidance Actions" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller arising under or pursuable through Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) and all proceeds thereof.

"Backup Bidder" has the meaning set forth in the Bidding Procedures Order.

"Bankruptcy Cases" has the meaning set forth in the Recitals hereto.

"Bankruptcy Code" has the meaning set forth in the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Base Purchase Price" has the meaning set forth in Section 3.1(a)

"Bid Procedures" has the meaning set forth in the Bidding Procedures Order.

"Bidding Procedures Order" means the bidding procedures order of the Bankruptcy Court in the Bankruptcy Cases substantially in the form attached as Exhibit F and otherwise reasonably acceptable to Purchaser and Sellers.

"Borrower" has the meaning set forth in the DIP Facility Agreement.

"Break-Up Fee" has the meaning set forth in Section 4.8.

"Burdensome Condition" has the meaning set forth in Section 8.4(c).

"Business" has the meaning set forth in the Recitals hereto.

"Business Day" means any day of the year other than a Saturday, Sunday or a day on which national banking institutions in New York, New York are required or authorized to close.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble hereto.

"Consent" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

"Contract" means any contract, agreement, indenture, note, bond, lease, Personal Property Lease, Real Property Lease or other lease, license, sublicense, purchase or sale order, warranties, commitments, or other written or oral agreement.

"Copyrights" has the meaning set forth in the definition of "Intellectual Property."

"Credit Bid Amount" means an amount equal to the DIP Credit Bid Amount *plus* the Prepetition Credit Bid Amount, if any.

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure defaults, if any, under the Purchased Contracts so that they may be assumed and assigned to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code.

"Cure Payments Adjustment Amount" means an amount equal to (i) the Cure Amounts *minus* (ii) the Estimated Cure Amounts, which amount may be a positive or negative amount.

"Debtors" has the meaning set forth in the DIP Facility Agreement.

8

"Default" has the meaning set forth in the DIP Order.

"Designation Rights Period" means, for all executory contracts other than unexpired Real Property Leases, the period of thirty (30) days from and after the Closing Date, and, for any unexpired Real Property Lease, the period of thirty (30) days from and after the Closing Date, unless (i) such date is after the date by which the Debtors must assume or reject any unexpired Real Property Lease pursuant to Section 365(d)(4) of the Bankruptcy Code and (ii) the Bankruptcy Court has not extended such date at the request of the Debtors in accordance with Section 2.5(d)(vi), in which case the Designation Rights Period shall be the period from the Closing Date to the last date on which the Debtors may assume or reject such Lease in accordance with Section 365(d)(4) of the Bankruptcy Code

"DIP Budget" has the meaning set forth in the DIP Order.

"DIP Credit Bid Amount" means an amount equal to the DIP Outstanding Amount.

"DIP Facility Agreement" means that certain Super-Priority Senior Secured Debtor-in-Possession Revolving Credit Agreement and Pledge and Security Agreement, substantially in the form as filed on the docket of the Debtors' cases at Docket No. 213, to be entered into by and among the Sellers, the lenders party thereto promptly following the entry of the DIP Order (as amended, supplemented or modified from time to time).

"DIP Lender" means "Lender" as defined in the DIP Facility Agreement.

"DIP Loan" means "Loan" as defined in the DIP Facility Agreement.

"DIP Motion" means the motion filed by the Debtors on January 11, 2019 at ECF No. 4 in the Bankruptcy Cases seeking interim authority to incur post-petition financing.

"DIP Order" means any order of the Bankruptcy Court then in-effect authorizing Sellers to obtain post-petition financing in the Bankruptcy Cases.

"DIP Outstanding Amount" means an amount equal to (i) all Obligations (as defined under the DIP Facility Agreement) outstanding under (i) the DIP Term Sheet and (ii) the DIP Facility Agreement as of 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced, plus (ii) the increase in the amount of any Obligations outstanding under the DIP Term Sheet and DIP Facility Agreement from 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced through and including the Closing Date (including any amounts which become due and payable upon the Closing), such increase reduced by any amounts paid in respect thereof prior to the Closing Date.

"DIP Term Sheet" means that certain Summary Terms and Conditions of the DIP Facility dated January 17, 2019 by and among Sellers and DIP Lender and approved by the Bankruptcy Court on an interim basis through the interim DIP Order (as amended, supplemented or modified from time to time thereafter).

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, supplier lists, stationery, forms, labels, regulatory filings, data, operating data and plans, technical documentation (specifications, functional requirements, operating instructions and procedures, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, catalogs, flyers, pamphlets, web pages, art work, photographs, etc.), lists, and particulars of customers and suppliers, marketing methods and procedures, any other technical, industrial and commercial information and techniques in any tangible form and other similar materials owned or used by any Seller or held for use in connection with the Business, in each case, whether or not in electronic form.

"Employee Benefit Plans" means all "employee benefit plans," as defined in Section 3(3) of ERISA, and all other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs maintained by the Sellers or to which any Seller contributed or is obligated to contribute thereunder for current or former employees of the Sellers or under which any Seller has any liability.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by any Seller, together with individuals who are hired in the Ordinary Course of Business after the date hereof and prior to the Closing, and excluding individuals who are terminated in the Ordinary Course of Business after the date hereof and prior to the Closing.

"Environmental Claim" means any and all complaints, summons, citations, directives, orders, claims, litigation, investigations, notices of violation, judgments, administrative, regulatory or judicial actions, suits, demands or proceedings, or notices of noncompliance or violation by any Governmental Body or Person involving or alleging potential liability arising out of or resulting from (i) violations of Environmental Laws, (ii) Remedial Action (iii) any Release of a Hazardous Material or (iv) exposure to, handling, reporting, labeling, treatment, storage, disposal or recycling of any Hazardous Material.

"Environmental Law" means any foreign, federal, state or local statute, regulation, ordinance, Order, published policy or guidance, or rule of common law relating to the protection of human health or safety, Hazardous Materials or to the indoor or outdoor environment or natural resources including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601 et seq.), the Hazardous Materials Transportation Act (49 U.S.C. App. § 1801 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et seq.), the Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.), the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq.), and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), and including the laws of nuisance and trespass, and the regulations promulgated pursuant thereto.

"Equipment" means the tangible personal property owned, used or held for use by any Seller on the Closing Date, including, but not limited to, the physical assets and all fixtures, leasehold improvements, furnishings, equipment, appliances, machinery, tools, supplies, spare parts, molds, trucks, cars, other vehicles and rolling stock vehicles, artwork, Hardware, copiers, telecopy machines and other telecommunication equipment, cubicles and miscellaneous office materials, located on, or off the premises of the Seller Properties.

"Equity Interests" means, with respect to any Person, (i) capital stock of, partnership interests, membership interests or other equity interests in, such Person, (ii) securities or other rights exercisable, convertible into or exchangeable for shares of capital stock, partnership interests, membership interests, voting securities or other equity interests in such Person and (iii) options, warrants, calls, commitments or other rights to acquire any of the foregoing described in clauses (i) and (ii), whether fixed or contingent, matured or unmatured, contractual, legal, equitable or otherwise.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Estimated Professional Fees Amount" has the meaning set forth in Section 3.1(b).

"Event of Default" has the meaning set forth in the DIP Order.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" means any Contract which is not a Purchased Contract.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Properties" means all stores, warehouses, distribution centers and other real property operated as part of the Business other than the Retained Properties.

"Excluded Matter" has the meaning set forth in the definition of "Material Adverse Effect."

"Excluded Taxes" means, to the fullest extent permitted by applicable Law, all Taxes of any Person (including, for the avoidance of doubt, any Taxes imposed in respect of the Business or the Purchased Assets), other than the Assumed Taxes, and for the avoidance of doubt shall include any past, present or future Taxes of the Karrie Beth Knopf 2002 Gift Trust and the Kristin Knopf 2002 Gift Trust.

"Final Allocation" has the meaning set forth in Section 12.2(a).

"Final Order" means an order of any Bankruptcy Court, any court of competent jurisdiction or other Governmental Body (i) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all material

respects without the possibility for further appeal or rehearing thereon; (ii) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) as to which no stay is in effect; provided, however, that, with respect to an order issued by the Bankruptcy Court, the filing or pendency of a motion under Federal Rule of Bankruptcy Procedure 9024 or Federal Rule of Civil Procedure 60 shall not cause an order not to be deemed a "Final Order" unless such motion shall be filed within fourteen (14) days after the entry of the order at issue.

"Financial Statements" has the meaning set forth in Section 5.16.

"GAAP" means generally accepted accounting principles in the United States, consistently applied throughout the applicable periods.

"Governmental Body" means any government or governmental, quasi-governmental or regulatory body thereof, or political subdivision thereof, whether foreign, multinational, international, federal, state, regional or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Hardware" means any and all computer and computer-related hardware, including, but not limited to, computers, file servers, servers, scanners, color printers, laser printers and networks.

"Hazardous Material" means any man-made or naturally occurring substance, product, material, waste or recyclable material which is regulated by any Governmental Body including, without limitation, petroleum and its by products, asbestos, and any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "special waste," "medical waste or biohazardous waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or other words of similar import under any provision of Environmental Law. Hazardous Material shall include mold, if such mold is present under such conditions as to render any structure, or portion thereof, unsafe or unfit for its intended uses.

"Income Tax" means any Tax based on or measured by reference to net income.

"Indebtedness" of any Person means, without duplication, (i) the principal, interest and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person with respect to any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to

12

in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Insurance Policies" has the meaning set forth in Section 5.17.

"Intellectual Property" means all intellectual property rights and other similar proprietary rights throughout the world, including, without limitation, all rights in, to and under all: (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon (collectively, "Patents"), (ii) trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos, corporate names, identifying symbols, emblems, signs or insignia and general intangibles of a like nature, together with the goodwill associated with or symbolized by any of the foregoing, and all applications and registrations therefor and renewals thereof (collectively, "Marks"), (iii) copyrights and registrations and applications therefor (collectively, "Copyrights"), (iv) trade secrets, know-how and confidential or proprietary information (including business information, formulas, compositions, manufacturing and production processes and techniques, data, databases, customer and supplier lists, pricing and cost information, business and marketing plans and proposals) (collectively, "Trade Secrets"), (v) Internet domain names and social media accounts (including, without limitation, Facebook, Instagram, and Twitter handles), (vi) software, programs, applications, source code, object code, firmware and documentation ("Software"), (vii) income and royalty payments arising from or relating to any of the foregoing, and (viii) causes of action and rights to sue or seek other remedies (including with respect to any past, present or future infringement, misuse or misappropriation) arising from or relating to any of the foregoing.

"Intellectual Property License" means any Contract pursuant to which (i) a Seller grants to any Person any right to use (including through releases, immunities from suit or covenants not to sue) any Owned Intellectual Property, and (ii) a Seller receives from any Person any right to use (including through releases, immunities from suit or covenants not to sue) such Person's Intellectual Property.

"Inventory" means all of the Sellers' inventory (including, without limitation, finished goods, merchandise, returned merchandise, display models, work in progress, residual by-products, samples, supplies, spare parts, shipping materials, packaging materials, raw materials and other consumables) owned and maintained, held or stored by or for any of the Sellers as of the Closing Date.

"IRS" means the Internal Revenue Service.

"Knopf Family" means any spouse, former spouse, child, sibling, cousin, parent or other relative of Kimberly Knopf.

"Knopf Family Persons" means (a) any member of the Knopf Family and (b) any Person that is an entity in which a Knopf Family Person has any interest (in each case other than any Seller), including Breakwater Point, LLC, Knopf Investment Properties, LLC, the Karrie Beth Knopf 2002 Gift Trust and the Kristin Knopf 2002 Gift Trust.

13

"Knowledge of the Sellers" means, as of the relevant date, the actual knowledge following due inquiry possessed by those officers of the Sellers identified on Schedule 1.1(a).

"Law" means any law, statute, code, ordinance, rule, regulation or binding interpretation of a Governmental Body.

"Legal Proceeding" means any claim, liability, action, complaint, suit, citizen suit, litigation, arbitration, appeal, petition, demand, inquiry, hearing, proceeding, investigation, enforcement, audit, warning or other dispute, whether judicial, quasi-judicial, regulatory, civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Body or any third person and any appeal from any of the foregoing; provided, however, that the Bankruptcy Cases shall not be considered a "Legal Proceeding".

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, license, sublicense, encumbrance, pledge, mortgage, deed of trust, security interest, charge, or similar encumbrance of any kind.

"Losses" means all losses, damages, costs, expenses, Taxes, Liabilities, interest, deficiencies, settlements, awards, judgments, fines, assessments, penalties, offsets, expenses, diminutions in value, Legal Proceedings or other charges of any kind, including reasonable attorneys' fees, costs of investigation and costs of enforcing any right to indemnification hereunder or pursuing any insurance providers.

"Marks" has the meaning set forth in the definition of "Intellectual Property."

"Material Adverse Effect" means any event, circumstance, development, change, condition, occurrence, result or effect that, individually or in that aggregate, (a) has had or would reasonably be expected to have or result in a material adverse effect on the business, assets, results of operation or condition (financial or otherwise) of any Seller (taken as a whole), the value of the Business or the Purchased Assets and the Assumed Liabilities (taken as a whole), in each case, other than to the extent an effect results from an Excluded Matter or (b) would prevent, materially delay or materially impair the ability of the Sellers to consummate the transactions contemplated by this Agreement. "Excluded Matter" means any one or more of the following, whether independently or in combination with any other of the following:  (i) the effect of any change in the global or domestic economy; (ii) the effect of any change in the domestic securities, financial or capital markets in general; (iii) the effect of any change that generally affects the domestic retail industry; (iv) the effect of any change arising in connection with earthquakes, hurricanes, floods, other natural disasters, national calamities, acts of war or the engagement of the United States in hostilities, acts of God, political conditions, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism or military actions existing or underway as of the date hereof; (v) the effect of any changes in applicable Laws or Tax or accounting rules or GAAP or any change in the interpretation of the foregoing by any Governmental Body; (vi) any effect resulting from the public announcement or pendency of this

14

Agreement, the identity of Purchaser, compliance with the terms of this Agreement (other than Section 8.2), or the consummation of the transactions contemplated by this Agreement; in each case, including on relationships, contractual or otherwise, with customers, suppliers, vendors or employees; (vii) failure by the Sellers to meet any projections (provided that the underlying causes of the failure shall not be excluded); (viii) any action by Purchaser or any of its Affiliates or the omission of an action that was required to be taken by Purchaser or any of its Affiliates under this Agreement; (ix) any action taken by the Sellers which is required by this Agreement (other than any action required to be taken by Section 8.2) or is taken at the request of Purchaser; or (x) any effect resulting from the filing or prosecution of the Bankruptcy Cases or any action taken by the Bankruptcy Court, provided, however, that the foregoing clauses (i) through (v) shall not include, and thus the determination of "Material Adverse Effect" shall not exclude, any event, circumstance, development, change, circumstance, occurrence, result or effect that has a material and disproportionate adverse effect on any Seller (taken as a whole), the Business or the Purchased Assets and the Assumed Liabilities (taken as a whole) as compared to the effect on other affected Persons that operate in the domestic retail industry.

"Material Contracts" has the meaning set forth in Section 5.9(a).

"Material Decision" shall mean any of the following to the extent the same may affect the Business following the Closing Date: (i) entering into any Material Contract; (ii) terminating any Material Contract to which any Seller is party; or (iii) making any material amendment to any Material Contract to which any Seller is party.

"Neutral Firm" has the meaning set forth in Section 12.2(a).

"Order" means any order, injunction, judgment, decree, ruling, settlement, verdict, decision, determination, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary course of business consistent with past practice subject, to the extent applicable to any action to be taken by any Seller on or following the date hereof, to any limitations applicable to such Seller arising as a result of the fact that it is a debtor-in-possession under the Bankruptcy Code and that it is operating under the supervision of the Bankruptcy Court.

"Owned Intellectual Property" means the Intellectual Property owned or purported to be owned by a Seller.

"Owned Real Properties" has the meaning set forth in Section 5.6.

"Party" means and refers to any signatory to this Agreement.  Such parties are collectively referred to as the "Parties."

"Patents" has the meaning set forth in the definition of "Intellectual Property."

"Permits" means any material approvals, authorizations, consents, registrations, licenses, permits or certificates issued by a Governmental Body.

15

"Permitted Exceptions" means (i) all Liens, defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in title records or policies of title insurance; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iii) zoning, building codes, entitlement and other land use and environmental regulations by any Governmental Body; (iv) pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation; (v) deposits by or on behalf of any Seller to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations incurred in the Ordinary Course of Business; (vi) any interest or title of a lessor under any lease of a Seller; (vii) Liens created under this Agreement or any Ancillary Agreement or arising from any action provided for under this Agreement or any Ancillary Agreement, or created by or through Purchaser; and (viii) Liens for Taxes not yet due and payable under applicable Law or that are being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with applicable accounting standards.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Leases" has the meaning set forth in Section 5.7.

"Personally Identifiable Information" means information that, alone or in combination with other information, relates to and can be used to identify a natural Person, bank account or device.  Personally Identifiable Information includes any information that constitutes personal data or personal information or has a similar status under any Privacy Laws or privacy policies applicable to a Seller or the Business.

"Petition Date" has the meaning set forth in the Recitals hereto.

"Post-Closing Straddle Period Taxes" means, for any Straddle Period, (i) in the case of Taxes imposed on the Business or the Purchased Assets that are based upon or related to income or receipts or otherwise not imposed on a periodic basis (including all related items of income, gain, deduction or credit), the amount of Taxes payable for the entire Straddle Period, less an amount equal to the amount that would be payable if the Tax year or period ended on the Closing Date, and (ii) in the case of any Taxes that are imposed on the Business or the Purchased Assets on a periodic basis (including real property, personal property, ad valorem and similar Taxes), an amount equal to the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of calendar days during the Straddle Period that is in the portion of such Straddle Period beginning on the calendar day after the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period.

"Prepetition Credit Bid Amount" means an amount equal to (i) all Pre-Petition Obligations (as defined in the DIP Order) outstanding under the Prepetition Loan Agreements (including, without limitation, any adequate protection obligations owed on account of the Pre-Petition Obligations) as of 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced, plus (ii) the increase in the amount of any Pre-Petition Obligations (as

defined in the DIP Order) outstanding under the Prepetition Loan Agreements (including, without limitation, any adequate protection obligations owed on account of the Pre-Petition Obligations) from 5:00 p.m. (Eastern time) on the day before the date on which the Auction is commenced through and including the Closing Date (including any amounts which become due and payable upon the Closing), such increase reduced by any amounts paid in respect thereof prior to the Closing Date.

"Prepetition Loan Agreements" shall have the meaning set forth in the DIP Motion.

"Privacy Laws" means all applicable Laws worldwide relating to the Processing, privacy and/or security of information, that, alone or in combination with other information, relates to and can be used to identify a natural Person, bank account or device, including the Fair Credit Reporting Act, Title V, Subtitle A of the Gramm-Leach-Bliley Act, 15 U.S.C. 6801 et seq. (and the rules and regulations promulgated thereunder), Section 5 of the Federal Trade Commission Act, the CAN-SPAM Act, Children's Online Privacy Protection Act, state data breach notification Laws, state data security Laws, state social security number protection Laws and any Law concerning requirements for website and mobile application privacy policies and practices, or any outbound communications (including e-mail marketing, telemarketing and text messaging), tracking and marketing.

"Processing", "Process" or "Processed", with respect to data, means any collection, access, acquisition, storage, retention, protection, use, re-use, disposal, disclosure, re-disclosure, destruction, transfer or other processing (as defined by any applicable Privacy Law) of such data.

"Products" means any and all products developed, manufactured, marketed, distributed, offered, sold or given away by the Sellers.

"Proposed Allocation" has the meaning set forth in Section 12.2(a).

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Contracts" has the meaning set forth in Section 2.5(a).

"Purchased Intellectual Property" has the meaning set forth in Section 8.11.

"Purchased Permits" has the meaning set forth in Section 2.1(j).

"Purchased Real Property Leases" has the meaning set forth in Section 2.1(g).

"Purchaser" has the meaning set forth in the Preamble hereto.

"Purchaser Core Representations" has the meaning set forth in Section 10.2(a)(i).

17

"Purchaser Deposit" has the meaning set forth in Section 7.4.

"Purchaser Documents" has the meaning set forth in Section 6.2.

"Purchaser Indemnitees" has the meaning set forth in Section 11.2.

"Purchaser's 401(k) Plan" has the meaning set forth in Section 9.2(c).

"Qualified Plans" has the meaning set forth in Section 5.10(d).

"Real Property Lease" and "Real Property Leases" has the meaning set forth in Section 5.6.

"Receivables" means any and all accounts receivable, credit card receivables, notes, and other amounts receivable by the Sellers from third parties, including customers and Affiliates of Sellers (other than another Seller), arising before the Closing Date, whether or not in the Ordinary Course of Business, but excluding, in each case, credits that have not been applied after ninety (90) days from the date on which they were awarded.

"Registered Owned Intellectual Property" has the meaning set forth in Section 5.8.

"Release" means any active or passively migrating release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching into the indoor or outdoor environment, or into or out of any property (including groundwater).

"Remedial Action" means all actions to (i) clean up, remove, treat or in any other way address any Hazardous Material or restore natural resources; (ii) prevent the Release of any Hazardous Material so it does not endanger or threaten to endanger worker or public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

"Retained Properties"  means the stores, warehouses, distribution centers and other real property operated as part of the Business set forth on Schedule 1.1(b), which schedule may be amended, modified or supplemented by Purchaser, in its sole discretion, at any time until the date that is five (5) Business Days prior to the Closing.

"Resolution Period" has the meaning set forth in Section 12.2(a).

"Review Period" has the meaning set forth in Section 12.2(a).

"Sale Motion" means a motion seeking (i) the entry of the Sale Order and (ii) approval of the Bid Procedures and this Agreement.

"Sale Motion Filing Date" means the date on which a Sale Motion is filed.

18

"Sale Order" means, if Purchaser is the Successful Bidder, a Final Order of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and the Sellers approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Sellers to consummate the transactions contemplated hereby and distribute the proceeds received pursuant hereto and providing, among other things (i) that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code; (ii) that this Agreement was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions; and (iii) that Purchaser and its Affiliates shall be released from all claims and liabilities, whether arising before or after the Petition Date, including, without limitation, relating to Purchaser as lender under the DIP Facility Agreement, pre-petition lender and Purchaser and relating to any commercial relationship of Purchaser or any of its Affiliates with any Seller; provided, however, that solely for purposes of Section 4.4(f)(ii), the term "Sale Order" shall not be a Final Order.

"Seller Documents" means any agreement, document, instrument or certificate contemplated by this Agreement or which has been or is to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement.

"Seller Marks" has the meaning set forth in Section 8.9.

"Seller Owners" shall mean Kimberly Knopf and Kenneth Knopf.

"Seller Property" and "Seller Properties" has the meaning set forth in Section 5.6.

"Sellers" has the meaning set forth in the Preamble hereto.

"Sellers Core Representations" has the meaning set forth in Section 10.1(a).

"Straddle Period" means a taxable period that begins before, and ends after, the Closing Date.

"Software" has the meaning set forth in the definition of "Intellectual Property".

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding voting securities or other voting Equity Interests of which is owned, directly or indirectly, by such first Person.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Tax Authority" means any federal, state, local or foreign government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements relating to Taxes, including any schedules or attachments thereto, and including any amendments thereof.

"Taxes" means (i) all federal, state, local or foreign taxes, charges, fees, duties, levies or other assessments, including, without limitation, all net income, gross receipts, net proceeds, capital, sales, use, ad valorem, value added, turnover, transfer, windfall profits, real estate transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, environmental, social security, unemployment, disability, excise, severance, stamp, occupation, real or personal property (tangible and intangible), leasing, lease, user, fuel and estimated taxes and customs duties, including in each case all interest, penalties, fines, additions to tax or additional amounts, whether disputed or not, imposed by any Tax Authority in connection with any such taxes, (ii) any Liabilities for the payment of any amounts of the type described in clause (i) of this definition as a result of being or ceasing to be a member of an affiliated, consolidated, combined or unitary group (including any arrangement for group or consortium relief or similar arrangement) for any period, and (iii) any Liabilities for the payment of any amounts of the type described in clauses (i) or (ii) of this definition as a result of any obligation to indemnify any other Person or as a result of any obligation under any agreement or arrangement with any other Person with respect to such amounts and including any liabilities for taxes of a predecessor or transferor or otherwise by operation of Law.

"Termination Date" has the meaning set forth in Section 4.4(a).

"Trade Secrets" has the meaning set forth in the definition of "Intellectual Property."

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Transferred Employees" has the meaning set forth in Section 9.1.

"Transition Services" has the meaning set forth in Section 8.15.

"Treasury Regulations" means the income tax regulations promulgated under the Code and effective as of the date hereof.

"WARN Act" means and refers to the Worker Adjustment and Retraining Notification Act of 1988, and all comparable state, local or other Laws, in each case, as amended from time to time.

"Wind Down Payments" has the meaning set forth in Section 3.1(c)

1.2    Other Definitional and Interpretive Matters.  Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to "$" shall mean U.S. dollars.

20

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## ARTICLE II

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and (if Purchaser is the Successful Bidder) the Sale Order, and subject to Section 2.5(a) and Section 2.5(d), at the Closing, Purchaser shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser all of the Sellers' right, title and interest, in, to and under the Purchased Assets free and clear of all Liens to the extent set forth in this Agreement and the Sale Order.  "Purchased Assets" shall mean, as of the Closing Date, all of the properties, assets, rights and interests of the Sellers (excluding the Excluded Assets), including the following:

(a)      the Receivables;

(b)      the Inventory;

(c)      all cash, cash equivalents, restricted cash and negotiable instruments of the Sellers (including those in the bank accounts of the Sellers set forth on Schedule 2.1(v));

(d)      all deposits, advance payments and prepaid and deferred payments, including any security deposits, prepaid rentals, and unbilled charges, fees and deposits of the

Sellers on the Closing Date, but excluding any security deposits, prepaid rentals, and unbilled charges, fees and deposits related exclusively to Excluded Assets;

(e)    the Equipment;

(f)    the Owned Intellectual Property (including, without limitation, all goodwill associated with or symbolized by the Business, and, as of the Closing, the Purchased Intellectual Property);

(g)    the Purchased Contracts, including, without limitation, the Real Property Leases ("Purchased Real Property Leases") set forth under the heading "Leases" on Schedule 2.5(a)(i) hereto, and any Avoidance Actions related to or arising from such Purchased Contract;

(h)    all Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business, including Documents relating to Products, services, marketing, advertising, promotional materials, Software, Owned Intellectual Property and Purchased Intellectual Property (including, without limitation, all prosecution and opposition files and dockets, registration certificates, litigation files and related opinions of counsel and correspondence relating thereto), supplier lists, customer lists, records, literature, correspondence and financial and tax records (and all Intellectual Property rights therein), including all Tax Returns relating to the Business or the Purchased Assets and any related work papers, but excluding such files as may not be transferred under applicable Law, including, without limitation, laws regarding confidentiality and privacy; provided, however, that, following the Closing, Purchaser shall provide the Sellers copies of or continued access to all Documents as are necessary to administer the Bankruptcy Cases and respond to and defend any Legal Proceeding;

(i)    all Permits, to the extent assignable or transferable, used by the Sellers in connection with the Purchased Assets ("Purchased Permits"), including those set forth on Schedule 2.1(i) hereto, provided that the cost of any such assignment shall be borne by Purchaser;

(j)    to the extent assignable, all rights of the Sellers under non-disclosure or confidentiality, non-compete, non-solicitation or similar agreements with any Employees and agents of the Sellers or with third parties, other than any such rights of the Sellers to the extent pertaining exclusively to any Excluded Assets;

(k)    to the extent assignable, all rights of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the Sellers, other than any warranties, representations and guarantees to the extent pertaining exclusively to any Excluded Assets;

(l)    all goodwill and other intangible assets of the Sellers;

(m)      to the extent not prohibited by applicable Law, all personnel files and employment records of the Transferred Employees (including, without limitation, I-9 forms and attachments);

(n)      subject to section 363(b)(1)(A) of the Bankruptcy Code, all rights to the telephone and facsimile numbers and email addresses used by the Sellers, as well as rights to receive mail and other communications addressed to the Sellers (including mail and communications from customers, suppliers, distributors and agents), other than any telephone and facsimile numbers for employees who will remain employees of the Sellers following the Closing;

(o)      to the extent transferable, all unexpired warranties, indemnities, or guaranties from any third party of the Sellers, including any such item of real property, personal property or equipment;

(p)      to the extent transferable and to the extent primarily related to the Purchased Assets, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by any of the Sellers on the purchase or other acquisition of the Purchased Assets;

(q)      any rights, demands, claims, credits, allowances, rebates, or rights of setoff (other than against the Sellers or any of their Affiliates) arising out of or relating to any of the Purchased Assets;

(r)      any amount received by any Seller pursuant to Section 5.3(b) of the DIP Facility Agreement;

(s)      any amounts withheld by any Seller in respect of employee-side payroll or employment Taxes on or prior to the Closing Date, to the extent Sellers have not properly deposited such amounts with an applicable Tax Authority on or prior to the Closing Date,

(t)      any claim, right or interest in or to any refund, rebate, abatement, credit or recovery of any Taxes, or similar benefits, with respect to the Business or the Purchased Assets, together with interest thereon and any refund of any penalties in respect thereof;

(u)      all Owned Real Property and all rights, privileges, servitudes and appurtenances thereunto belonging; and

(v)      all bank accounts of the Sellers set forth on Schedule 2.1(v); and

2.2      Excluded Assets.   Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets. "Excluded Assets" shall mean each of the following assets of the Sellers:

(a)      the Excluded Contracts (including this Agreement, the Ancillary Agreements and any and all employment, services and consulting agreements and offer letters

23

with the Employees, former employees, current and former independent contractors or current and former consultants of the Sellers), including any accounts receivable and other rights arising out of or in connection with any Excluded Contract (including, without limitation, the Purchase Price under this Agreement);

(b)     any (i) other books and records that the Sellers are required by Law or Contract to retain, including, without limitation, financial statements, and corporate or other entity filings; (ii) legal entity, minute books, stock ledgers, corporate seals, stock certificates and similar materials of the Sellers; and (iii) documents exclusively relating to the Excluded Assets or Excluded Liabilities or proposals to acquire the Business by Persons other than Purchaser or exclusively relating to any employees of the Sellers who are not Transferred Employees;

(c)     all Avoidance Actions except such Avoidance Actions acquired pursuant to Section 2.1(g);

(d)     the Equity Interests or other ownership interest in the Sellers;

(e)     all directors or officers liability insurance policies owned by any Seller (in each case of the foregoing, including any tail policies or coverage thereon), together with all rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(f)     professional retainers paid by any Seller to its advisors or representatives in connection with the Bankruptcy Cases and the transactions contemplated herein;

(g)     any security deposits, prepaid rentals, and unbilled charges, fees and deposits related exclusively to Excluded Assets (other than any security deposits or prepaid rentals with respect to the Real Property Leases);

(h)     all other assets listed on Schedule 2.2(h);

(i)     all claims or causes of action that relate exclusively to any Excluded Asset or Excluded Liability (including all claims or causes of action arising out of, in connection with, or contemplated by the DIP Order and/or under a Plan (e.g. claims or causes of actions against the equityholders of the Sellers, against the Sellers' directors, officers, managers and employees, against lenders or other third-parties, and/or against any of the Affiliates, agents or representatives of the foregoing);

(j)     any other assets of the Sellers that are not lawfully transferable; and

(k)     any assets identified by Purchaser in writing (including any Assignable Contract previously designated as a Purchased Contract, but excluding any Excluded Asset), in its sole discretion, at any time until the date that is seven (7) Business Days prior to the Closing Date.

2.3     Assumption of Liabilities.  Purchaser shall assume no liability or obligation of the Sellers, or of any predecessor or any Affiliate of any of the Sellers, except the liabilities and obligations expressly set forth in this Section 2.3 (collectively, the "Assumed Liabilities"), which Purchaser or its permitted assignee, as the case may be, shall on the terms and subject to the conditions of this Agreement, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto, and provided that notwithstanding anything to the contrary in this Agreement, such Assumed Liabilities shall in no event include any Excluded Taxes:

(a)     all Liabilities or obligations (including indemnification obligations) of the Sellers under the Purchased Contracts first arising or accruing after the Closing Date, in each case, excluding all Cure Amounts, but only to the extent that such Liabilities or obligations do not relate to any failure to perform, improper performance, warranty or other breach, default or violation by Seller or any of its Affiliates prior to the Closing;

(b)     all Liabilities  (except to the extent relating exclusively to any Excluded Asset) incurred in the Ordinary Course of Business from the sale or giving away of Products pursuant to product warranties, product returns and rebates to the extent set forth on Schedule 2.3(b);

(c)     the Assumed Taxes;

(d)     except as otherwise provided in this Agreement, all Liabilities with respect to the Purchased Assets to the extent first arising from and after the Closing, including, without limitation, under any Indebtedness incurred by Purchaser or any of its Affiliates concurrently with or following the Closing, but excluding any Liabilities to the extent arising prior to the Closing or relating to any services or products that were provided or sold by Sellers prior to the Closing;

(e)     all Liabilities relating to amounts expressly required to be paid by, or other obligations of, Purchaser hereunder or under any Ancillary Agreement;

(f)     all accrued and unpaid ordinary course trade payables as of the Closing Date, only to the extent related to any Purchased Assets that arose after the Petition Date and not due and owing as of the Closing Date and only up to a total aggregate amount of [$4,500,000];

(g)     all Liabilities arising from the employment of the Transferred Employees after the Closing;

(h)     all Liabilities set forth on Schedule 2.3(h) incurred in the Ordinary Course of Business to Transferred Employees for vacation time, sick leave and other paid time off, wages, salaries, commissions and bonuses, in each case with respect to the items described in this Section 2.3(h), that as of the Closing Date is fully earned and vested and unpaid up to a total aggregate amount of $1,600,000;

25

(i)       all Liabilities set forth on Schedule 2.3(i) with respect to gift cards, merchandise credits, coupons, rewards programs, sales promotions  and any other similar arrangement or program that has not, as of the Closing Date, expired and/or become subject to a limit or other provision that could cause the same to be subject to escheatment or any similar provision or condition under any applicable Law, but expressly excluding any Liabilities under any escheatment, abandoned property, unclaimed property or similar Laws of any jurisdiction;

(j)       all Indebtedness incurred in the Ordinary Course of Business under the credit card program with the Fifth Third Bank;

(k)       all Liabilities set forth on Schedule 2.3(k) with respect to customer deposits, layaway, special orders and delivery liabilities that remain outstanding for not more than ninety (90) days up to a total aggregate amount of $2,200,000; provided that, Schedule 2.3(k) may be updated from time to time and Sellers shall deliver a final Schedule 2.3(k) to Purchaser no later than five (5) Business Days prior to the Closing Date; and

(l)       all Liabilities for Environmental Claims which come due after the Closing, but only to the extent the facts or circumstances of such Liabilities first arose or existed after the Closing and only to the extent relating to the Purchased Assets.; and

(m)       all Assumed § 503(b)(9) Claims.

2.4       Excluded Liabilities.   Except as specifically set forth in Section 2.3, Purchaser will not assume or be liable for any Liabilities or other obligations of the Sellers, or any predecessor or Affiliate of the Sellers, of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (other than the Assumed Liabilities), including the following (collectively, the "Excluded Liabilities"):

(a)       except as otherwise set forth herein, all Liabilities related to or arising out of the Excluded Assets, including Excluded Contracts and all Liabilities related to the Excluded Properties;

(b)       all obligations and Liabilities of any Knopf Family Person or of the Sellers to any Knopf Family Person;

(c)       except as expressly set forth in Article IX or assumed by Purchaser pursuant to Section 2.3, any liability under or relating to any Employee Benefit Plan, whether or not such liability or obligation arises on, prior to or after the Closing Date, or any other liability relating to the employment or termination of employment of any (x) Person employed by the Sellers prior to Closing or the transactions contemplated by this Agreement (including but not limited to, any severance or stay or incentive bonuses) or (y) Person who is not a Transferred Employee;

(d)       all Indebtedness of any Seller;

(e)      all obligations and Liabilities of the Sellers related to the right to or issuance of any capital stock or other Equity Interest of any Seller, including any stock options or warrants;

(f)      all obligations and Liabilities of the Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of the Sellers or ownership, lease or license of any properties or assets or any properties or assets previously used by the Sellers or any predecessor of any Seller, or other actions or omissions, including any amounts due and owing or accrued under any Purchased Contract for the period prior to the Closing Date (including any Cure Amounts, but excluding the Assumed § 503(b)(9) Claims and any ordinary course trade payables as of the Closing Date to the extent related to any Purchased Assets that arose after the Petition Date, subject to the cap set forth in Section 2.3(f) above);

(g)      any obligation or Liability arising out of or resulting from (i) non-compliance or alleged non-compliance with any Law (ii) any tort or breach of contract by the Sellers;

(h)      any obligation or Liability of the Sellers under this Agreement or any other document executed in connection herewith;

(i)      any claim (as defined in the Bankruptcy Code) not expressly assumed pursuant to this Agreement;

(j)      all Excluded Taxes;

(k)      any obligations or Liability arising out of or relating to, directly or indirectly, Releases of Hazardous Materials or violations of Environmental Laws with respect to the Business, the conduct of the Sellers or the ownership, lease or license of any properties or assets or any properties or assets previously used by the Sellers or any predecessor of any Seller prior to Closing; and

(l)      any other Liabilities of the Sellers not expressly assumed by Purchaser pursuant to Section 2.3 above.

2.5      Assignment and Assumption of Contracts.

(a)      Assignment of Contracts and Unexpired Leases.  At Closing, the Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) (to the extent applicable), assign to Purchaser (the consideration for which is included in the Purchase Price) all Assignable Contracts, other than any Assignable Contract that is set forth on Schedule 2.5(a)(ii) (the "Excluded Contracts"), including the Assignable Contracts set forth on Schedule 2.5(a)(i) (all Assignable Contracts other than the Excluded Contracts, collectively, the "Purchased Contracts"); provided, however, that Purchaser shall be entitled to add, in its sole discretion, upon written notice to the Sellers no later than seven (7) Business Days prior to the Closing Date, (i) any Assignable Contract to Schedule 2.5(a)(ii) and any Assignable Contract so added shall be an Excluded Contract as of the Closing or (ii) any Excluded Contract to Schedule 2.5(a)(i) and any Excluded Contract so added shall be a Purchased Contract as of the Closing.

27

Purchaser will assume and agree to perform and discharge the Assumed Liabilities under the Purchased Contracts as of the Closing, pursuant to the Assignment and Assumption Agreement.

(b)    <u>Cure Payments</u>.  No later than three (3) Business Days after receipt of the Cash Payment, the Sellers shall pay all Cure Amounts in connection with the assumption and assignment of Assignable Contracts identified as Purchased Contracts at the Closing for which all necessary Consents and Bankruptcy Court approval to transfer have been obtained (as agreed to between Purchaser and the Sellers or as determined by the Bankruptcy Court).  The Sellers have provided to Purchaser a schedule set forth on <u>Schedule 2.5(b)</u> setting forth a good faith estimate of all Cure Amounts for all Purchased Contracts, which schedule the Sellers may update prior to the date that is five (5) days prior to the Closing Date.  The Sellers shall use commercially reasonable efforts to provide, within 30 days following the filing of the Sale Motion, a schedule containing the payment information and contact information for each party entitled to receive any Cure Amounts and, prior to the Closing, the Sellers and Purchaser shall cooperate in good faith to establish a protocol for the payment by the Sellers of the Cure Amounts as of the Closing.

(c)    <u>Preservation of Contracts and Unexpired Leases</u>.  The Sellers shall not reject any Assignable Contract unless such Assignable Contract is designated by Purchaser as an Excluded Contract or unless otherwise agreed in writing by Purchaser.  The Seller shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Purchased Contracts and take all other actions necessary to cause such Purchased Contracts to be assumed by the Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Purchaser the Purchased Contracts.

(d)    <u>Designation Right Contract</u>.

(i)    Purchaser shall have the right, by written notice to the Sellers no later than ~~five~~seven (~~5~~7) <u>Business</u> ~~d~~Days prior to the Closing Date, to specify that any Assignable Contract that is an Excluded Contract shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code (any such Contract, a "<u>Designation Right Contract</u>") for the duration of the Designation Rights Period; <u>provided</u>, <u>however</u>, that, with respect to any such Designation Right Contract, (A) Purchaser shall promptly reimburse the Sellers on demand, and thereby be solely responsible for, all costs associated with the continuation by, and ultimate assumption or rejection by, the Sellers of such Designation Right Contract (as set forth in a budget proposed by the Sellers and approved by Purchaser no later than three (3) days prior to the Closing Date for the period from the Closing through the end of the Designation Rights Period (such costs, "<u>Continuation Costs</u>"); (B) all cash collected by the Sellers in respect of, and other benefits deriving from, such Designation Right Contract shall be promptly delivered to Purchaser, provided that Sellers shall be entitled to deduct Continuation Costs from any cash collected by the Sellers in respect of the Designation Rights Contract giving rise to such costs; and (C) the foregoing shall not affect the validity of the transfer to Purchaser of any other Purchased Asset that may be related to such Designation Right Contract.  In the event that the costs associated with any Designation Right Contract exceed the budgeted Continuation Costs attributable to such Designation Right Contract (a "<u>Designation Cost Overage</u>"), Purchaser shall have the right to, by written notice to the Sellers, provide a Rejection

Notice (as defined below) with respect to such Designation Right Contract, in which case Sellers shall be liable for such Designation Cost Overage from and after the date of such Rejection Notice from Purchaser.

(ii)    As to each Designation Right Contract, as soon as practical after receiving further written notice(s) (each, an "Assumption Notice") from Purchaser during the Designation Rights Period requesting assumption and assignment of any Designation Right Contract, the Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code any Designation Right Contract(s) set forth in an Assumption Notice.

(iii)    As to each Designation Right Contract, as soon as practical after receiving further written notice(s) (each, a "Rejection Notice") from Purchaser during the Designation Rights Period requesting rejection of any Designation Right Contract, the Sellers shall take all actions required by the Sale Order or otherwise that are reasonably necessary to reject such contract pursuant to Section 365 of the Bankruptcy Code.

(iv)    The Sellers and Purchaser agree and acknowledge that the covenants set forth in this Section 2.5 shall survive the Closing.

(v)    Notwithstanding anything in this Agreement to the contrary, on the date any Designation Right Contract is assumed and assigned to Purchaser pursuant to this Section 2.5(d), such Designation Right Contract shall be deemed a Purchased Contract for all purposes under this Agreement and no further consideration shall be required to be paid for any Designation Right Contract that is assumed and assigned to Purchaser.

(vi)    If the Closing Date is less than 30 days prior to the date by which the Debtors must assume or reject any Real Property Lease pursuant to Section 365(d)(4) of the Bankruptcy Code, as soon as practicable after the Closing Date, the Sellers shall cause the Debtors to take all actions necessary to seek an extension of such Section 365(d)(4) period from the Bankruptcy Court to a date at least 30 days after the Closing Date.

2.6    Bulk Sales Laws.  Notwithstanding any other provision in this Agreement, Purchaser hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" and similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

2.7    Termination of Affiliate Arrangements.  All Contracts between a Seller, on the one hand, and any of their respective Affiliates, any Knopf Family Person or any Affiliate thereof, on the other hand, other than the Purchased Contracts, shall be terminated as of the Closing Date, without any further Liabilities of any kind to any Seller or the Business.

ARTICLE III

CONSIDERATION

3.1    <u>Purchase Price</u>.

(a)    In consideration of the sale of the Purchased Assets to Purchaser and the other undertakings set forth herein, upon the terms and subject to the conditions set forth in this Agreement, the purchase price (the "<u>Purchase Price</u>") for the Purchased Assets shall be equal to the sum of: (i) the Cash Payment as set forth in <u>Section 3.1(c)</u>, *plus* (ii) the assumption of the Assumed Liabilities by Purchaser, *plus* (iii) the Credit Bid Amount and, together with the Cash Payment and Assumed Liabilities, the "<u>Base Purchase Price</u>"), to be satisfied in the form of a credit against the Borrower's repayment obligations with respect to the DIP Loan pursuant to Section 363(k) of the Bankruptcy Code, *plus* (iv) the Cure Payments Adjustment Amount in accordance with <u>Section 3.2(b)</u>. Notwithstanding anything to the contrary herein, under no circumstances shall any portion of the Credit Bid Amount be converted into or otherwise require a cash payment. If, for any reason, Purchaser's ability to credit bid all or any portion of the Credit Bid Amount pursuant to Section 363(k) of the Bankruptcy Code is not allowed by the Bankruptcy Court (such portion, a "<u>Negated Credit Bid Amount</u>"), the obligation of Purchaser to deliver the portion of the Purchase Price attributable to the Credit Bid Amount shall be reduced dollar-for-dollar by the Negated Credit Bid Amount, no other component of the Purchase Price shall be increased, decreased or otherwise modified, and the failure by Purchaser to credit bid any Negated Credit Bid Amount shall not constitute a breach of this Agreement by Purchaser.

(b)    At least five (5) days prior to the Closing Date, the Sellers shall prepare and deliver to Purchaser a written report setting forth in reasonable detail (i) the Sellers' good faith estimate of the Cure Payments (the "<u>Estimated Cure Amounts</u>"), (ii) the Sellers' good faith estimate of the amount (in dollars) of the Assumed Liabilities, (iii) the Sellers' good faith estimate of legal, financial and accounting advisory fees and costs incurred by professionals retained by the Sellers that constitute allowed Administrative Expenses <u>(other than the Assumed § 503(b)(9) Claims)</u> and are due and owing but unpaid as of the Closing Date (the "<u>Estimated Professional Fees Amount</u>") and (iv) the wind down budget, setting forth a reasonably detailed breakdown of costs and expenses by category, in form and substance reasonably satisfactory to Purchaser.

(c)    On the Closing Date, Purchaser shall pay by wire transfer of immediately available funds (i) an amount equal to the Estimated Cure Amounts, (ii) the aggregate amount of all payment amounts set forth on <u>Schedule 3.1</u> paid to one or more segregated accounts of Sellers to be further paid by Sellers to the applicable parties in accordance with the wind down budget as provided in the Sale Order, which amount shall not exceed $300,000 (the "<u>Wind Down Payments</u>") and (iii) an amount equal to the Estimated Professional Fees Amount (together with the amounts in clauses (i) and (ii) above, the "<u>Cash Payment</u>"). Any amounts funded by Purchaser in accordance with this <u>Section 3.1(c)(i)</u> shall be subject to <u>Section 3.2</u>. Any amounts funded by Purchaser in accordance with this <u>Section 3.1(c)(ii)</u> and <u>(iii)</u> that are not spent by Sellers as set forth above shall be promptly remitted to Purchaser. For the avoidance of doubt, Wind Down Payments shall be limited to the specific applicable line item in <u>Schedule 3.1</u>, and any unused amounts in one line item may not be applied

30

or carried over to any other line item (but instead shall be remitted to Purchaser). Purchaser and its Affiliates shall retain any security interests in amounts funded for the Wind Down Payments and the Estimated Professional Fees Amount, to secure any claims for any cash remaining with the Sellers after payment of all allowed Administrative Expenses.

        3.2    Determination of Final Purchase Price

        (a)    As soon as reasonably practicable following the termination of the Designation Rights Period, Purchaser shall deliver to the Sellers a written statement setting forth in reasonable detail Purchaser's calculation of the Cure Amounts and the Cure Payments Adjustment Amount.

        (b)    Within two (2) Business Days after the delivery of the written statement by Purchaser in accordance with Section 3.2(a):

        (i)    if the Cure Payments Adjustment Amount is a positive number, then Purchaser shall pay an amount in cash equal to the Cure Payments Adjustment Amount to the Sellers by wire transfer of immediately available funds to an account of the Sellers designated in writing by the Sellers to Purchaser; or

        (ii)    if the Cure Payments Adjustment Amount is a negative number, then the Sellers shall pay an amount in cash equal to the absolute value of the Cure Payments Adjustment Amount to Purchaser by wire transfer of immediately available funds to an account of Purchaser designated in writing by Purchaser to the Sellers.

        3.3    Withholding and Tax Certifications. Purchaser and/or its agent shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to any Person such amounts as Purchaser and/or its agent reasonably determines it is required to deduct and withhold with respect to the making of such payment under the Code, the Treasury Regulations, any provision of U.S. state or local tax law or any provision of foreign tax law. To the extent that amounts are so withheld, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect of which such deduction and withholding was made by Purchaser and/or its agent.

ARTICLE IV

CLOSING AND TERMINATION

        4.1    Closing Date. The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place via electronic exchange of closing documents and signature pages on the date that is no less than one (1) Business Day and no greater than three (3) Business Days after the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver of any condition by the Party entitled to waive that condition), as such date may be determined by Purchaser in its sole discretion, but no later than fifteen (15) days after entry of the Sale Order. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the Parties in writing, the Closing shall be deemed

31

effective and all right, title and interest of the Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (Eastern time) on the Closing Date.

4.2    <u>Deliveries by the Sellers</u>.    At the Closing, the Sellers shall deliver to Purchaser:

(a)    a duly executed Bill of Sale substantially in the form of <u>Exhibit A</u> hereto;

(b)    duly executed Assignment and Assumption Agreement(s) substantially in the form of <u>Exhibit B</u> and <u>Exhibit E</u> hereto;

(c)    a duly executed Intellectual Property Assignment Agreement substantially in form of <u>Exhibit C</u>;

(d)    a duly executed Short Form Trademark Assignment Agreement substantially in form of <u>Exhibit D</u>, and any related or supporting documentation deemed reasonably necessary by Purchaser;

(e)    a copy of the duly executed (by the parties thereto) Purchased Intellectual Property Assignment Agreement;

(f)    the officer's certificate required to be delivered pursuant to <u>Sections 10.1(a)</u> and <u>10.1(b)</u>;

(g)    a certification of non-foreign status pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations sufficient to exempt Purchaser from the requirements of Code Section 1445(a), a valid, complete and executed IRS form W-9 from each Seller, and any other any other Tax forms, certifications or documentation reasonably requested by Purchaser or its agent;

(h)    a copy of the Sale Order; and

(i)    all other documents, instruments or writings of conveyance and transfer, in form and substance reasonably acceptable to Purchaser, as may be necessary or reasonably desirable to convey the Purchased Assets to Purchaser.

4.3    <u>Deliveries by Purchaser</u>.    At the Closing, Purchaser shall deliver to the Sellers:

(a)    the Purchase Price, including the Cash Payment and Wind Down Payment, in immediately available funds, as provided in <u>Section 3.1(c)</u> hereof;

(b)    duly executed Assignment and Assumption Agreement(s) substantially in the form of <u>Exhibit B</u> and <u>Exhibit E</u> hereto;

(c)    a duly executed Intellectual Property Assignment Agreement substantially in form of Exhibit C;

(d)    a duly executed Short Form Trademark Assignment Agreement substantially in form of Exhibit D; and

(e)    the officer's certificate required to be delivered pursuant to Sections 10.2(a) and 10.2(b).

4.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)    by Purchaser or the Sellers, if the Closing shall not have occurred by the close of business on the date that is the earlier of (i) fifteen (15) days after the date on which the Sale Order is entered and (ii) May 1, 2019 (such date, the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date due to an inaccuracy or breach of any of representations, warranties, covenants or agreements contained in this Agreement by Purchaser or the Sellers to an extent which would give the other party a right not to close pursuant to Article X, then the breaching Party may not terminate this Agreement pursuant to this Section 4.4(a);

(b)    by mutual written consent of the Sellers and Purchaser;

(c)    by Purchaser, if there shall be an inaccuracy in any representation or warranty of the Sellers, or a breach by any Seller of any covenant or agreement contained in this Agreement, which inaccuracy or breach would result in a failure of a condition set forth in Section 10.1 or 10.3 and which inaccuracy or breach cannot be cured or has not been cured by the earlier of (i) 15 Business Days after the giving of written notice by Purchaser to the Sellers of such breach and (ii) one Business Day prior to the Termination Date; provided, however, that if there shall be an inaccuracy or breach of any of representations, warranties, covenants or agreements of Purchaser contained in this Agreement to an extent which would give the Sellers the right not to close pursuant to Article X, then Purchaser may not terminate this Agreement pursuant to this Section 4.4(c);

(d)    by the Sellers, if there shall be a inaccuracy in any representation or warranty of Purchaser, or a breach by Purchaser of any covenant or agreement contained in this Agreement, which would result in a failure of a condition set forth in Section 10.2 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) 15 Business Days after the giving of written notice by the Sellers to Purchaser of such breach and (ii) one Business Day prior to the Termination Date; provided, however, that if there shall be an inaccuracy or breach of any of representations, warranties, covenants or agreements of any Seller contained in this Agreement to an extent which would give Purchaser the right not to close pursuant to Article X, then the Sellers may not terminate this Agreement pursuant to this Section 4.4(d);

(e)    by the Sellers or Purchaser if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, it being agreed that

33

Purchaser and Sellers shall consult in good faith to determine whether the Sellers shall appeal any adverse determination which is not non-appealable (and, in the event such appeal is pursued, the Sellers agree to pursue such appeal with reasonable diligence) unless and until Purchaser elects to terminate this Agreement in accordance with the terms hereof;

(f)    by Purchaser, if (i) the Bankruptcy Court does not enter an order approving the Debtors' entry into the DIP Facility Agreement in form and substance satisfactory to the DIP Lender by the date that is fifteen (15) calendar days following the Sale Motion Filing Date, (ii) the Bidding Procedures Order has not been entered by the date that is twenty-five (25) calendar days following the Sale Motion Filing Date, (iii) the Sale Order has not been entered by the earlier of (A) the date that is sixty (60) calendar days following the Sale Motion Filing Date and (B) the date that is ten (10) calendar days following the conclusion of any Auction, or (iv) the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated or modified pursuant to Section 8.2 of the DIP Facility Agreement;

(g)    by Sellers, if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and (i) Sellers have provided Purchaser with written notice that they are prepared to consummate the Closing, (ii) the conditions to Closing in Sections 10.1 and 10.3 have been satisfied (or waived, to the extent permissible, by the party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied by actions customarily taken at Closing) and (iii) the Closing Date does not occur within three (3) Business Days of Sellers providing Purchaser with such notice; and

(h)    by Purchaser or the Sellers, if (1) the Sellers consummate an Alternative Transaction or (2) Purchaser is neither the Successful Bidder nor a Backup Bidder at the conclusion of any Auction.

4.5    Procedure Upon Termination.    In the event of termination of this Agreement by Purchaser or the Sellers, or both, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or the Sellers.

4.6    Effect of Termination.    In the event that this Agreement is validly terminated pursuant to Section 4.4, (i) all further obligations of the Parties under this Agreement shall terminate, except that the obligations in this Section 4.6, Section 4.7 (Forfeiture of Purchaser Deposit); Section 4.8 (Break-Up Fee) and Article XIII shall survive and (ii) each Party shall pay the fees, costs and expenses incurred by it in connection with this Agreement, except as provided in clause (i) above or Article XIII.  Notwithstanding the foregoing, the termination of this Agreement shall not relieve any Party to this Agreement of liability for its willful and material breach of this Agreement. For purposes of this Agreement, "willful and material breach" means a material inaccuracy or breach of any material representation, warranty or covenant or other agreement set forth in this Agreement that is a consequence of an act or failure to act by or on behalf of the breaching Party with knowledge that the taking of such act or failure to take such act would, or would reasonably be expected to, result in a breach of this Agreement.

4.7    Forfeiture of Purchaser Deposit.   If the Sellers validly terminate this Agreement pursuant to Section 4.4(d) or Section 4.4(g), then the Sellers, as the Sellers' sole and exclusive remedy as a result of such termination, shall have the right  to permanently apply the credit against the Sellers' repayment obligations in respect of the DIP Loan represented by the Purchaser Deposit; provided, however, that nothing in Section 11.2 shall or shall be deemed to limit the right of the Sellers to apply the Purchaser Deposit to the extent provided in this Section 4.7.  In the event of any termination of this Agreement other than pursuant to Section 4.4(d) or Section 4.4(g), the credit against the Sellers' repayment obligations in respect of the DIP Loan represented by the Purchaser Deposit shall be automatically and immediately reversed such that the DIP Loan is restored to the amount that would have been payable without taking into account any application of the Purchaser Deposit.

4.8    Break-Up Fee.   Subject to the approval of the Bankruptcy Court, if this Agreement is terminated pursuant to Section 4.4(h), Purchaser shall be entitled to be paid an amount equal to six-hundred-fifty-thousand dollars ($650,000) (the "Break-Up Fee") if the Sellers consummate an Alternative Transaction.  The Break-Up Fee shall (to the extent payable pursuant to the preceding sentence) be paid by Sellers or the Successful Bidder to Purchaser within five (5) Business Days after the consummation of such Alternative Transaction.  Purchaser acknowledges that this Agreement is subject to overbid at an Auction in the Bankruptcy Cases, and that, in the event this Agreement is terminated pursuant to Section 4.4(h), the Sellers shall have no liability to Purchaser under this Agreement other than to pay the Break-Up Fee as set forth above; provided, however, that nothing in this sentence shall relieve the Sellers from any liability for breach of this Agreement prior to its termination; provided further, however, that nothing in Section 11.2 shall, or shall be deemed to, limit the right of Purchaser to retain the Break-Up Fee to the extent provided in this Section 4.8.  For the avoidance of doubt, payment of the Break-Up Fee shall not relieve the Sellers of any obligations (a) under the DIP Facility Agreement, (b) in respect of Purchaser's or its Affiliates' secured or unsecured debt in the Sellers or (c) with respect to any other Contracts or other arrangements to which Purchaser and/or one or more of its Affiliates may be party from time to time.

ARTICLE V

REPRESENTATIONS AND WARRANTIES OF SELLERS

Purchaser specifically acknowledges and agrees to the following with respect to the representations and warranties of the Sellers:

A.  Purchaser has conducted its own due diligence investigations of the Business or has waived its right to conduct such due diligence.

B.  Except as expressly provided, Sellers make no representations or warranties in this Article V with respect to Excluded Assets.

Except as otherwise disclosed to Purchaser in the Schedules hereto, the Sellers jointly and severally represent and warrant to Purchaser as follows:

5.1    <u>Organization and Good Standing</u>.  Each Seller is a corporation or limited liability company duly organized, incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has all requisite corporate or limited liability company power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Each Seller is duly qualified or authorized to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or leased by it requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not reasonably be expected to have a Material Adverse Effect.

5.2    <u>Authorization of Agreement</u>.  Except for such authorization as may be required by the Bankruptcy Court, each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and has all requisite power, authority and legal capacity to execute and deliver the Seller Documents, to perform their respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Seller Documents and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of each Seller and no other corporate or limited liability company action on the part of any of the Sellers is necessary authorize the execution and delivery of this Agreement and the Seller Documents by the Sellers and the consummation of the transactions contemplated hereby and thereby by each Seller.  This Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by the Sellers and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order and any other necessary Order to close the sale of the Purchased Assets) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of the Sellers enforceable against such Sellers in accordance with their respective terms, subject to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.3    <u>Conflicts; Consents of Third Parties</u>.

(a)    Except as set forth on <u>Schedule 5.3(a)</u>, none of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration cancellation under any provision of (i) the certificate of formation, limited liability company agreement, operating agreement or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller as of the date hereof; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults,

36

terminations, modifications, accelerations or cancellations that would not reasonably be expected to have a Material Adverse Effect.

(b)     Subject to entry of the Sale Order, and except as set forth on Schedule 5.3(b) (it being agreed that Schedule 5.3(b) may be updated after the date of this Agreement and Sellers shall deliver a final Schedule 5.3(b) to Purchaser no later than 14 days after the date of this Agreement), no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to any Person or Governmental Body is required on the part of any Seller in connection with the execution and delivery of this Agreement or the Seller Documents, the compliance by any Seller with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by such Seller of any other action contemplated hereby or thereby, except for compliance with such other consents, waivers, approvals, Orders, Permits, authorizations, declarations, filings and notifications, the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

5.4     Title to Purchased Assets; Sufficiency of Assets.

(a)     Except as set forth in Schedule 5.4(a), the Sellers have good, valid, marketable and undivided title to the Purchased Assets free and clear of all Liens, other than Permitted Exceptions. Purchaser will be vested with good title to (or, in the case of leased Purchased Assets, a valid and subsisting leasehold interest in) such Purchased Assets, free and clear of all Liens, to the extent set forth in the Sale Order and, subject to the entry of the Sale Order, Purchaser will be vested to the fullest extent permissible under Section 363(f) of the Bankruptcy Code with good valid, marketable and undivided title to the Purchased Assets free and clear of all Liens.

(b)     The Purchased Assets (which, for the avoidance of doubt, do not include Excluded Assets) constitute all of the assets, rights, interests and properties of every nature and kind whatsoever used (to the extent the Sellers hold rights, title and interest in such tangible personal property) or held for use by the Sellers, or otherwise necessary for Purchaser to conduct and operate the Purchased Assets and the Business (other than the Business conducted at the Excluded Properties) immediately after the Closing in all material respects as conducted and operated by the Sellers as presently conducted.  No Person other than the Sellers are engaged in the operation of, or hold rights, title and interest in, the Purchased Assets or assets that are used or useful in the operation of the Business.

5.5     Taxes.  Except as set forth on Schedule 5.5(a):

(a)     All Tax Returns required to be filed by the Sellers or in connection with the Business or the Purchased Assets have been timely filed with the appropriate Tax Authorities in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted or to be obtained on behalf of any Seller) and all such Tax Returns are true, correct and complete in all material respects, have been completed in accordance with applicable Law and accurately set forth all items to the extent required to be reflected or included on such Tax Returns; and (ii) all Taxes due and payable by the Sellers or in respect of the Business or the Purchased Assets have been timely paid (whether or not shown on

any Tax Return).  All Taxes required to have been withheld and paid by the Sellers or in respect of the Business or the Purchased Assets in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been timely withheld and deposited or paid (or, to the extent such amounts were withheld by the Sellers but were not required to be deposited with an applicable Tax Authority on or prior to the Closing Date, the Sellers have set aside all such amounts that will form a part of the Purchased Assets as of the Closing), and all Forms W-2 and 1099 or other information returns required with respect thereto have been properly completed and timely filed.  There are no Liens for Taxes upon the Purchased Assets (other than Permitted Exceptions).

(b)    To the Knowledge of the Sellers, no Tax Authority plans to assess any additional Taxes for any period for which Tax Returns have been filed in respect of the Sellers, the Business or the Purchased Assets, no action, suit, proceeding or audit is pending against or with respect to the Sellers, the Business or the Purchased Assets regarding Taxes, and no such action, suit, proceeding or audit is being contemplated. There are no matters relating to Taxes under discussion between the Sellers and any Tax Authority.

(c)    No claim has been made by a Tax Authority in a jurisdiction where a Tax Return is not filed in respect of the Sellers, the Business or the Purchased Assets that such jurisdiction imposes or may impose any Tax on the Sellers, the Business or the Purchased Assets. There is no obligation to file Tax Returns in respect of the Sellers, the Business or the Purchased assets in any such jurisdictions.

(d)    No statute of limitations in respect of Taxes imposed on Sellers, the Business or the Purchased Assets has been waived, and no extension of time with respect to a Tax assessment or deficiency in respect of such Taxes has been agreed to, other than any waiver or exclusion which has expired.

(e)    No Seller has (A) ever been a party to any Tax sharing, indemnification or allocation agreement or owes any amount under any such agreement (other than Tax indemnification clauses under customary commercial leases or contracts not primarily related to Taxes entered into in the ordinary course of business) or (B) ever had any Liability for the Taxes of any Person as a transferee or successor, by contract, by operation of law or otherwise.

(f)    No Seller has engaged in a "reportable transaction," as set forth in Treasury Regulation §1.6011-4(b) or any similar provision of state, local or non-U.S. law, or any transaction that is the same as or substantially similar to one of the types of transactions that the Internal Revenue Service has determined to be a tax avoidance transaction and identified by notice, regulation or other form of published guidance as a listed transaction as set forth in Treasury Regulation §1.6011-4(b)(2).

(g)    The Sellers have made available to Purchaser copies of all material Tax Returns filed by the Sellers or in respect of the Business or the Purchased Assets.

(h)    None of the Purchased Assets are tax-exempt use property within the meaning of Section 168(h) of the Code.

(i)    To the Knowledge of the Sellers, the transactions contemplated by this Agreement will not result in Taxes of any Seller being imposed on the Purchaser under a theory of successor or transferee liability, or otherwise by operation of law.

(j)    No Seller is a "foreign person" within the meaning of Section 1445 of the Code.

5.6    Real Property.    Schedule 5.6(a) sets forth a complete list of all real property and interests in real property owned by the Sellers (the "Owned Real Properties"). One or more of the Sellers has fee simple title to all Owned Real Properties, free and clear of all Liens (except for Permitted Exceptions). As of the date hereof, there are no pending or, to the Knowledge of the Sellers, threatened Legal Proceedings (i) relating to a condemnation action affecting any Owned Real Properties or (ii) materially and adversely affecting the current use or occupancy of any Owned Real Properties. The Sellers have not leased or otherwise granted to any Person the right to use, occupy or enjoy any Owned Real Properties or any portion thereof. Schedule 5.6(b) sets forth a complete list of all material real property and interests in real property leased, subleased, or otherwise occupied by the Sellers (individually, a "Real Property Lease" and collectively, the "Real Property Leases", and each such real property, a "Seller Leased Property" and collectively with the Owned Real Properties, the "Seller Properties") as lessee, sublessee, lessor or sublessor, together with the parties to, and date of, each Real Property Lease and the full street address of each parcel subject to a Real Property Lease. The Sellers have good and valid leasehold interests in the real property conveyed by the Real Property Leases. Each Real Property Lease is in full force and effect, and is valid and enforceable in accordance with its terms. To the Knowledge of the Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller under any of the Real Property Leases that are currently in effect and eligible to be assumed by Purchaser. Except as a result of the filing of the Bankruptcy Cases or as set forth on Schedule 5.6 (c), to the Knowledge of the Sellers, there has been no default or event that with notice or lapse of time, or both, would constitute a default by any Seller under any of the Real Property Leases.

5.7    Tangible Personal Property.    Schedule 5.7 sets forth all leases of personal property ("Personal Property Leases") involving annual payments in excess of $20,000 relating to personal property used or owned by any Seller or to which any Seller is a party or by which the properties or assets of any Seller is bound. Except as set forth on Schedule 5.7, to the Knowledge of the Sellers, no Seller has received any written notice of any default or event that with notice or lapse of time or both would constitute a default by any Seller under any of the Personal Property Leases contemplated to be assumed by any Seller and assigned to Purchaser other than in respect of any such default (or prospective default, as the case may be) that can be cured in connection with the assumption and assignment of the applicable underlying Personal Property Lease.

5.8    Intellectual Property.

39

(a)      Schedule 5.8(a) lists each item of Owned Intellectual Property that is registered, applied for, or issued, including, without limitation, any (i) issued Patent or Patent application, (ii) Copyright registration or application therefor, (iii) registrations or applications for a Mark, and (iv) domain names (the foregoing, the "Registered Owned Intellectual Property"); in each case, listing the (x) registration information of and the record owner (and legal owner, if different) of each such item and (y) any actions that must be taken within ninety (90) days after the date hereof with respect to any item of Registered Owned Intellectual Property for the purposes of continuing the prosecution of, maintaining or renewing any such Registered Owned Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of any documents.  To the Knowledge of Sellers, all of the Registered Owned Intellectual Property is subsisting, valid and enforceable.

(b)      A Seller solely and exclusively owns, free and clear of all Liens (except for Permitted Exceptions), all right, title and interest in and to the Owned Intellectual Property.  The Owned Intellectual Property (including, as of the Closing, the Purchased Intellectual Property) and the rights licensed to a Seller under a Purchased Contract includes all Intellectual Property used in, held for use in, necessary for or related to the Business, and upon the Closing, and such rights shall remain in force and effect immediately following the Closing without being altered, encumbered or otherwise adversely affected.  No Affiliate of the Company that is not a Seller, nor any Knopf Family Person, nor any current or former officer, founder, director, employee, consultant or contractor of a Seller or the Business (i) owns any Intellectual Property or is party to any Intellectual Property License, the rights to which are used in, held for use in or related to the Business (including, following the Closing, the Purchased Intellectual Property) or (ii) receives any license under or has any right in or to the Owned Intellectual Property.

(c)      No Legal Proceeding is pending or threatened in writing with respect to validity, enforceability or ownership of any material Owned Intellectual Property, and no Owned Intellectual Property is subject to any outstanding Order materially restricting the use thereof by the Business or restricting the licensing thereof by the Business to any Person.

(d)      (i) The conduct of the Business has not and does not infringe, misappropriate or otherwise violate any Person's Intellectual Property, (ii) to the Knowledge of Sellers, no Person is infringing, misappropriating or otherwise violating any Owned Intellectual Property or Purchased Intellectual Property, and (iii) no Legal Proceeding is pending, or threatened in writing (including as may be reasonably implied by means of an invitation to license or request for indemnification), alleging any of the foregoing.

(e)      The Sellers, and the Processing by or on behalf of a Seller or the Business of any Personally Identifiable Information, are and have been in compliance with the Sellers' privacy policies and all applicable Privacy Laws and contractual obligations and industry standards.  The execution, delivery and performance of this Agreement complies with all Privacy Laws, the Sellers' applicable contractual obligations and the Sellers' privacy policies.  The Sellers have all necessary rights and consents to Process Personally Identifiable Information as currently Processed and, subject to applicable bankruptcy law, following the Closing, Purchaser will have all such rights and consents for Processing such data in substantially the same manner.

40

(f)      To the Knowledge of Sellers, the Sellers and their Affiliates have taken all commercially reasonable measures to protect and maintain the secrecy and confidentiality of all Trade Secrets included in the Owned Intellectual Property or otherwise used in, held for use in or related to the Business.   There has been no (i) loss, modification, misappropriation, theft or misuse of any Personally Identifiable Information or other data held by or on behalf of a Seller or otherwise used in or related to the Business, (ii) material failures, disruptions, malfunctions, misuse, intrusions, unauthorized access to or breaches of the security of the Hardware, Software or information technology systems used by or on behalf of Sellers or in connection with the Business, or (iii) complaints, claims, request or warnings by any Person or any Legal Proceeding asserted against the Seller (nor any threatened in writing), in each case, concerning any of the foregoing.   Each Seller has implemented industry standard security measures to protect the security of its information technology systems and the privacy and security of any material data or Personally Identifiable Information stored thereon.

5.9      Material Contracts.

(a)      Schedule 5.9(a) sets forth all of the following Orders or Contracts to which any Seller is a party or by which it is bound and that are currently in effect (or by which the Purchased Assets may be bound or affected) (collectively, the "Material Contracts"):

(i)      [reserved];

(ii)      for the sale after the date hereof of any Purchased Asset owned or used by the Sellers for consideration in excess of $15,000, other than any sale of inventory in the Ordinary Course of Business in the Sellers' retail stores;

(iii)      relating to the acquisition by any Seller of any operating business or the capital stock of any other Person;

(iv)      Intellectual Property Licenses;

(v)      pursuant to which (A) a Seller shares, discloses or otherwise makes accessible any Personally Identifiable Information with or to any Person, or grants any Person any other rights to Process such Personally Identifiable Information, and (B) a Seller is granted the right to access, collect, receive or otherwise Process Personally Identifiable Information of any Person (other than Contracts pursuant to which a customer has "opted in" or otherwise permitted such activity in compliance with all Privacy Laws and in connection with a purchase or receipt of services or Products of the Business in the Ordinary Course of Business);

(vi)      relating to any joint venture, partnership, strategic alliance, or the research and development of Intellectual Property;

(vii)      which involve any Purchased Contract (other than purchase orders entered into in the ordinary course of business) the performance of which involves payment by or to any of the Sellers of consideration in excess of $50,000 over the term of such

41

Contract and which cannot be canceled by notice of ninety (90) days or fewer without penalty or payment;

> (viii)    which regard the employment, services, consulting, termination or severance from employment relating to or for the material benefit of any director, officer, employee, independent contractor or consultant of any Seller and require annual payments by any Seller in excess of $100,000; and

> (ix)    any other Contract that is material to the Business that is not required to be disclosed pursuant to any of the foregoing clauses in this Section 5.9(a).

> (b)    The Sellers have delivered to Purchaser true and complete copies of such Material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

> (c)    Each Material Contract is in full force and effect and is the valid and binding obligation of the Seller party thereto, and to the Knowledge of the Sellers, each other party thereto.

> (d)    Except as a result of the filing of the Bankruptcy Cases or as set forth on Schedule 5.9(d), no Seller is in default under any Material Contract, to the knowledge of the Sellers, no other party thereto is in default under any Material Contract and no Seller received any notice of any default or event that with notice or lapse of time or both would constitute a default by any party under any Material Contract.

5.10    Employee Benefits

> (a)    Schedule 5.10(a) lists all material Employee Benefit Plans.

> (b)    True, correct and complete copies of the following documents, with respect to each of the Employee Benefit Plans, have been made available to Purchaser (A) any plans and related trust documents, and all amendments thereto, (B) the most recent Forms 5500 for the past three years and schedules thereto, (C) the most recent financial statements for the past three years, (D) the most recent IRS determination letter, (E) the most recent summary plan descriptions (including letters or other documents updating such descriptions) and (F) written descriptions of all non-written agreements relating to the Employee Benefit Plans.

> (c)    Neither the Sellers nor any trade or business (whether or not incorporated) which are or have ever been under common control, or which are or have ever been treated as a single employer, with the Sellers under Section 414(b), (c), (m) or (o) of the Code sponsors, maintains, or has any liability with respect to any "employee pension plans," as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, including without limitation, any multiemployer plan as defined in Section 3(37) of ERISA, or any plan subject to Sections 4063 or 4064 of ERISA.

> (d)    Each of the Employee Benefit Plans intended to qualify under Section 401 of the Code ("Qualified Plans") has been determined by the IRS to be so qualified,

42

and, nothing has occurred with respect to the operation of any such plan which could reasonably be expected to result in the revocation of such favorable determination.

(e)     All contributions and premiums required by law or by the terms of any Employee Benefit Plan or any agreement relating thereto have been timely made (taking into account any waivers granted with respect thereto) to any funds or trusts established thereunder or in connection therewith in all material respects.

(f)     None of the Employee Benefit Plans which are "welfare benefit plans" within the meaning of Section 3(1) of ERISA provide for continuing benefits or coverage for any participant or any beneficiary of a participant post-termination of employment except as may be required under COBRA.

(g)     Each of the Employee Benefit Plans has been maintained, in all material respects, in accordance with its terms and all provisions of applicable Law.

(h)     Except as set forth on Schedule 5.10(h), neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (i) result in any payment becoming due to any employee of any Seller; (ii) increase any benefits otherwise payable under any Employee Benefit Plan; or (iii) result in the acceleration of the time of payment or vesting of any such benefits.

5.11    Labor.

(a)     No Seller is a party to any labor or collective bargaining agreement and no Employees are represented by any labor organization; no labor organization or group of Employees has made a pending demand for recognition or certification to the Seller and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Sellers, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority relating to the Sellers.   There are no organizing activities involving any Seller pending with any labor organization or group of Employees.

(b)     There are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any employee or group of employees of any Seller, except in each case as would not have a Material Adverse Effect.

(c)     The Seller is in compliance with all laws governing the employment of labor, including, but not limited to, all such laws relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding and/or social security Taxes and similar Taxes.

5.12    Litigation.   Except as set forth on Schedule 5.12, there are no Legal Proceedings pending or, to the Knowledge of the Sellers, threatened by or against any Seller before any Governmental Body (a) that could reasonably be expected to result in damages in

excess of $100,000 and that are not subject to the automatic stay in the Bankruptcy Cases, (b) that involve allegations that are being brought or could reasonably be expected to be brought by a "class" or (c) could result in a Material Adverse Effect.

      5.13   Compliance with Laws; Permits.

      (a)   The Sellers are, and have been since December 31, 2015, in material compliance with all Laws applicable to their respective operations or assets or the Business, except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect and except with respect to Environmental Laws which are addressed in Section 5.14.  No Seller has received any written notice of or been charged with the violation of any Laws since December 31, 2015, except where such violation would not reasonably be have a Material Adverse Effect.

      (b)   The Sellers currently have all material Permits which are reasonably required for the operation of the Business as presently conducted.  Such Permits are in full force and effect, subject to renewal in the ordinary course of business.  No such Permit will be terminated, materially and adversely affected or require the consent of any third party (including any Governmental Body) for its continued validity as a result of the transactions contemplated by this Agreement.  No Legal Proceeding is pending by any Governmental Body, or to the Knowledge of the Sellers, threatened by any Governmental Body, seeking the revocation, limitation or non-renewal of any such Permits.  Schedule 5.13(b) sets forth a complete and correct list as of the date of this Agreement of all Permits required for the conduct of the business (it being agreed that Schedule 5.13(b) may be updated after the date of this Agreement and Sellers shall deliver a final Schedule 5.13(b) to Purchaser no later than 30 days after the date of this Agreement).  No Seller is in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, except where such default or violation would not be material to the operation of the Business.

      5.14   Environmental Matters.  Except as set forth on Schedule 5.14 hereto or in each case as would not have a Material Adverse Effect:

      (a)   the Business and operations of the Sellers are in compliance with all applicable Environmental Laws and all Permits issued pursuant to Environmental Laws;

      (b)   the Sellers have obtained all Permits required under all applicable Environmental Laws necessary to operate the Business, subject to renewal of such Permits in the ordinary course of business;

      (c)   no Seller is the subject of any outstanding Liability respecting (i) violations of Environmental Laws, (ii) Remedial Action or (iii) any Release of a Hazardous Material by Seller;

      (d)   excluding each of such matters which Seller has resolved for total payments of less than $25,000, no Seller has received in the last two (2) years prior to the date of this Agreement any written communication alleging that any Seller or the Business may be in

44

violation of any applicable Environmental Law or any Permit issued pursuant to Environmental Law; and

(e)    the Sellers have delivered or made available to Purchaser copies of all environmental site assessments relating to the Sellers, the Business, or properties currently or formerly owned or operated by the Sellers that are in the Sellers' possession.

5.15    Financial Advisors.  Except as set forth on Schedule 5.15, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from the Sellers in respect thereof.

5.16    Financial Statements.  The Sellers have delivered to Purchaser true and correct copies of (i) the audited consolidated balance sheets of the Sellers and their respective Subsidiaries as at December 31, 2017 and the related unaudited consolidated statements of income and of cash flows of the Sellers and their respective Subsidiaries for the years then ended, and (ii) the unaudited consolidated balance sheets of the Sellers and their respective Subsidiaries as at December 31, 2018 and the related unaudited consolidated statement of income of the Sellers and their respective Subsidiaries for the years then ended (such audited, including the related notes and schedules thereto, and unaudited statements, together with the Monthly Financial Statements, are referred to herein as the "Financial Statements").  Except as set forth on Schedule 5.16 and to the Knowledge of the Sellers, (a) each of the audited Financial Statements has been prepared in accordance with GAAP consistently applied without modification of the accounting principles used in the preparation thereof throughout the period presented and (b) each of the unaudited Financial Statements has been prepared based on the Sellers' books and records and in accordance with the Sellers' accounting methodologies, principles and practices used in the preparation of financial statements for prior financial periods throughout the periods presented and in each case of (a) and (b), presents fairly in all material respects the consolidated financial position, results of operations and cash flows of the Sellers and its Subsidiaries as at the dates and for the periods indicated therein, subject to normal year-end adjustments and the absence of complete notes in the case of the unaudited statements.

5.17    Insurance.  Schedule 5.17(a)(i) contains a true and complete list of all insurance policies (by policy number, insurer, expiration date and type and amount of coverage) covering the Sellers and the Business, including self-insurance (the "Insurance Policies"). The Sellers are in material compliance with the terms and provisions of the Insurance Policies and all premiums due and payable with respect thereto have been paid.  Except as set forth in Schedule 5.17(b), the Sellers have not received a notice of cancellation or termination of any Insurance Policy. Except as set forth on Schedule 5.17(a)(ii), there is no material claim pending under any of the Insurance Policies as to which coverage has been questioned, denied or disputed by the underwriters of such policy.

5.18    Absence of Certain Changes.  Except (a) as set forth in Schedule 5.18 and (b) for the commencement or pendency of the Bankruptcy Cases, since December 31, 2017, there has been no event or condition that has had (or is reasonably likely to result in) a Material Adverse Effect.

ARTICLE VI

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Sellers that:

6.1     <u>Organization and Good Standing</u>.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted, except where the failure to have such power and authority would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

6.2     <u>Authorization of Agreement</u>.  Purchaser has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Purchaser Documents</u>"), and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary action on behalf of Purchaser and no other action on the part of Purchaser is necessary to authorize the execution and delivery of this Agreement and the Purchaser Documents by Purchaser and the consummation of the transaction contemplated hereby and thereby by Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity.

6.3     <u>Conflicts; Consents of Third Parties</u>.

(a)     Except as set forth on <u>Schedule 6.3(a)</u>, none of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound or (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

46

(b)      No consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to conduct the Business, except where the failure of which to obtain or make would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

6.4     Litigation.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions hereby. Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

6.5     Financial Advisors.  Purchaser does not have any obligation to pay any broker, finder or financial advisor for Purchaser any fee or commission or like payment in connection with the transactions contemplated by this Agreement for which the Sellers would be held responsible.

6.6     Financial Capability.  Purchaser at the Closing will have sufficient funds available to pay the Cash Payment and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement.

## ARTICLE VII

## BANKRUPTCY COURT MATTERS

7.1     Competing Bids.  This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to consider higher and/or otherwise better competing bids with respect to the Business and the Purchased Assets, pursuant to the Bid Procedures.  In accordance with the Bid Procedures, the Sellers have the right to, and may cause their representatives and Affiliates to, (a) initiate contact with any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any sale or other disposition of the Purchased Assets; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing.

7.2     Bankruptcy Court Filings.  The Sellers shall use reasonable best efforts to make any filings, take all actions and obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable following the date hereof.  Each Party

agrees that it will promptly take such actions as are reasonably requested by any other Parties to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of Section 363(n) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, the Sellers shall use their respective reasonable best efforts to defend such appeal unless and until Purchaser elects to terminate this Agreement in accordance with the terms hereof.

7.3     Adequate Assurances.     With respect to each Purchased Contract, Purchaser shall use reasonable best efforts to provide adequate assurance of the future performance by it of such Purchased Contract, Personal Property Lease or Real Property Lease to the extent requested by the counterparty to such Purchased Contract.

7.4     Purchaser Deposit.  A deposit (the "Purchaser Deposit") shall be paid by Purchaser via a credit against the Borrower's repayment obligations in respect of the DIP Loan in an amount equal to 10% of the outstanding principal amount of the DIP Loan as of 5:00 p.m. (prevailing Eastern Time) on the day before the date on which the Auction is commenced, which shall be deemed to have been paid as of such date; provided, however, (i) if Purchaser is neither the Successful Bidder nor a Backup Bidder at the conclusion of the Auction, the Purchaser Deposit shall be cancelled within one (1) Business Day following the Auction and (ii) the Purchaser Deposit shall be cancelled immediately upon any Debtor receiving notice of the occurrence of an Event of Default under the DIP Facility at any time prior to the Closing Date (or approval by the Court of an Alternative Transaction, as applicable).  For the avoidance of doubt, (i) the Purchaser Deposit shall not (w) increase, decrease or otherwise affect the availability of the DIP Loan under the DIP Facility Agreement, (x) will not be subject to any prepayment requirements under the DIP Facility Agreement, (y) will not constitute an Event of Default under the DIP Facility Agreement, and (ii) unless the Purchaser Deposit has been forfeited by Purchaser in accordance with Section 4.7 of this Agreement, the full amount of all outstanding Obligations of Sellers under the DIP Term Sheet and DIP Facility Agreement (including the amount of the Purchaser Deposit) shall be due and owing and satisfied upon consummation of any Alternative Transaction in accordance with the terms of this Agreement, the Bidding Procedures and the Bidding Procedures Order.

ARTICLE VIII

COVENANTS

8.1     Access to Information.  The Sellers agree that, prior to the Closing Date, Purchaser shall be entitled, through its officers, employees and representatives (including, without limitation, legal advisors and accountants), to make such investigation of the properties (including environmental site assessments), businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as is reasonable (and reasonably requested) and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted in a reasonable

48

manner (and shall not unreasonably interfere with the operations of the Sellers or the Business), during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to any applicable restrictions under applicable Law. The Sellers shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of the Sellers to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and Purchaser's representatives shall cooperate with the Sellers and the Sellers' representatives and Purchaser and Purchaser's representatives shall, at the discretion of the Sellers, take reasonable measures to minimize any disruption to the Business. Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege.

8.2    Conduct of the Business Pending the Closing.

(a)    Prior to the Closing, except (1) as required by applicable Law, (2) as otherwise expressly contemplated by this Agreement or (3) with the prior consent of Purchaser (which shall not be unreasonably conditioned, withheld or delayed), the Sellers shall, provided that such conduct would not result in a Default or Event of Default under the DIP Budget or the DIP Order:

(i)    conduct the Business only in the Ordinary Course of Business as in effect on the date hereof (taking into account such Seller's status as a debtor-in-possession); and

(ii)    use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business; (B) preserve the present relationships with customers and suppliers of the Business; and (C) preserve the Purchased Assets in their condition as of the date of this Agreement.

(b)    Prior to the Closing, except (1) as required by applicable Law, (2) as otherwise expressly contemplated, required or permitted by this Agreement, or (3) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), the Sellers shall not:

(i)    (A) increase the annual level of compensation payable or to become payable by any Seller to any director, officer or salaried employee of any Seller, (B) increase the annual level of compensation payable or to become payable by any Seller to any other employee of any Seller, except in the Ordinary Course of Business, (C) grant any unusual or extraordinary bonus, benefit or other direct or indirect compensation to any director, officer or employee, (D) increase the coverage or benefits available under any (or create any new) Employee Benefit Plan or (E) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement to which any Seller is a party or involving a director, officer or employee of any Seller, except, in each case, as required by applicable Law from time to time in effect or by any of the Employee Benefit Plans;

(ii)     subject any of the Purchased Assets to any Lien, except for Permitted Exceptions;

(iii)     acquire any material properties or assets that would be Purchased Assets or sell, assign, transfer, convey, lease, encumber, or otherwise dispose of any Purchased Assets (other than Intellectual Property) (except acquisitions of Inventory, Equipment and similar assets in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets);

(iv)     (x) sell, assign, transfer, convey, license or encumber any Owned Intellectual Property; (y) grant a license, release, immunity or covenant not to sue under any Owned Intellectual Property, other than non-exclusive licenses of Owned Intellectual Property granted by a Seller in the Ordinary Course of Business to a service provider or customer (where such license is granted solely for the benefit of such Seller and in connection with the products or services of the Business); or (z) abandon, cancel, let lapse, forfeit to the public or otherwise dispose of any Owned Intellectual Property;

(v)     cancel or compromise any material debt or claim or waive or release any material right of any Seller that constitutes a Purchased Asset;

(vi)     enter into any commitment for any capital expenditures in excess of $10,000 for any individual commitment and $50,000 for all commitments in the aggregate with respect to the Purchased Assets;

(vii)     enter into any labor or collective bargaining agreement or, through negotiation or otherwise, make any commitment or incur any liability to any labor organization with respect to any Purchased Asset;

(viii)     make any Material Decision;

(ix)     except in the Ordinary Course of Business, resolve any Liability that would be an Assumed Liability;

(x)     transfer, to the extent that following such transfer such amounts would be treated as Excluded Assets, any security deposits, prepaid rentals, unbilled charges, fees, deposits or, other than in the Ordinary Course of Business, cash, cash equivalents or negotiable instruments, in each case, constituting Purchased Assets;

(xi)     conduct, outside the Ordinary Course of Business, any promotion between execution of this Agreement and the Closing Date on warranty policy, return policy, gift card sales, coupons or rebates or conduct any other promotion that would have the effect of increasing the amount of Assumed Liabilities related to warranty policy, return policy, gift cards, coupons or rebates;

(xii)     change the policies or practices regarding working capital as compared with past practice;

50

(xiii)    other than in the Ordinary Course of Business, satisfy any Excluded Liability with a Purchased Asset; or

(xiv)    agree to do anything prohibited by this Section 8.2.

8.3    Consents.  Purchaser and Sellers shall use their reasonable best efforts to obtain at the earliest practicable date all consents and approvals required of them to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in Section 5.3(b) hereof; provided, however, that Sellers shall not be obligated to pay any material consideration therefor (other than the Cure Amounts) to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings (other than pursuant to the Bankruptcy Cases) to obtain any such consent or approval.  The Sellers shall reasonably cooperate with Purchaser in connection with Purchaser's efforts to make any required filings with or obtain any approvals required by any Governmental Body or third party.

8.4    Regulatory Approvals.

(a)    Purchaser and the Sellers shall (i) comply at the earliest practicable date with any request under the Antitrust Laws for information, documents, or other materials received by each of them or any of their respective Subsidiaries from any other Governmental Body in respect of the transactions contemplated hereby, and (ii) cooperate with each other in connection with resolving any investigation or other inquiry of any Governmental Body under any Antitrust Laws with respect to any such transaction.  Each such Party shall promptly inform the other Parties of any material oral communication with, and provide copies of material written communications with, any Governmental Body regarding any such transaction.  Absent an emergency circumstance, no Party shall independently participate in any formal meeting with any Governmental Body in respect of any such investigation or other inquiry without giving the other Parties prior notice of the meeting and, to the extent permitted by such Governmental Body, the opportunity to attend and/or participate.  Subject to applicable law, the Parties will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and proposals made or submitted by or on behalf of any Party relating to proceedings under the Antitrust Laws.  The Sellers and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.4 as "outside counsel only."  Such materials and the information contained therein shall be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers, or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (the Sellers or Purchaser, as the case may be).

(b)    Each of Purchaser and each Seller shall use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state statutes, rules, regulations, orders, decrees, administrative or

51

judicial doctrines or other laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "Antitrust Laws").

(c)    Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall require, or be construed to require, Purchaser or any of its Affiliates to (and each Seller shall not and shall cause each of its relevant Affiliates not to, without the prior written consent of Purchaser, which consent may be withheld for any reason), in connection with obtaining any Consent under any Antitrust Laws, (i) agree to (A) any sale, license, divestiture or other disposition or holding separate (through establishment of a trust or otherwise) of any capital stock, businesses, assets (tangible or intangible), properties or other interests of Purchaser, Sellers or any of their respective Affiliates, (B) the imposition of any limitation, restriction or condition on the ability of Purchaser, Sellers or any of their respective Affiliates to conduct their respective businesses or own, acquire, hold or exercise full rights of ownership of any capital stock, businesses, assets (tangible or intangible), properties or other interests, (C) the imposition of any limitation, restriction or condition on Purchaser, Sellers or any of their respective Affiliates under any Antitrust Law, or (D) any material modification or waiver of the terms and conditions of this Agreement (any such occurrence described in clause (A), (B), (C) or (D) above, a "Burdensome Condition"), or (ii) litigate with or otherwise participate in any Legal Proceeding with any Governmental Body in connection with obtaining any Consent pursuant to this Agreement.

8.5    Further Assurances.  Each of Purchaser and each Seller shall, at its own expense, use its reasonable best efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement and (iii) cooperate in connection with the transfer, collection or similar realization of the Purchased Assets for the benefit of Purchaser, including by making regulatory or other filings.  Each party agrees to, and to cause any applicable Affiliates to, execute and deliver such other documents, certificates, agreements and other writings and take such other actions as may be reasonably necessary or reasonably desirable in or order to vest in Purchaser good and valid title to the Purchased Assets or evidence the assumption by Purchaser of the Assumed Liabilities. The covenants in this Section 8.5 shall survive the Closing.

8.6    Delivery of Monthly Financial Statements.  The Sellers shall deliver to Purchaser true and correct copies of (a) the unaudited consolidated balance sheets of the Sellers and their respective Subsidiaries as at January 31, 2019, and the related consolidated statements of income of the Sellers and their respective Subsidiaries for the month then ended, on or prior to February 15, 2019 and (b) the unaudited consolidated balance sheets of the Sellers and their respective Subsidiaries as at February 28, 2019, and the related consolidated statements of income of the Sellers and their respective Subsidiaries for the month then ended, on or prior to March 1520th, 2019, unless such date is extended in writing by the Purchaser.  Prior to the Closing, the Sellers shall deliver (i) the unaudited consolidated balance sheets of the Sellers and their respective Subsidiaries, and the related consolidated statements of income of the Sellers and their respective Subsidiaries for other fiscal months of 2019, in each case, by the fifteenth (15th) day following the end of the relevant fiscal month and (ii) other financial information and data, in each case as reasonably requested by Purchaser.  All such monthly unaudited financial statements

delivered pursuant to this Section 8.6 are referred to herein as the "Monthly Financial Statements".  Prior to the Closing, Seller shall use its reasonable best efforts to respond promptly, and in any event no later than two (2) Business Days, to reasonable inquiries made by Purchaser regarding the Monthly Financial Statements or such other financial information or data provided by Sellers.

      8.7   Preservation of Records.  (a)  Subject to Section 12.4, the Sellers and their successors and Purchaser agree that each of them shall preserve and keep the books and records held by them or their Affiliates relating to the Purchased Assets for a period of three (3) months from the Closing Date and during such period shall make such books and records as well as any of their respective employees available to the other (and such Party's respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings against or governmental investigations of the Sellers or Purchaser any of their Affiliates (except for any Legal Proceedings relating to Taxes or other Tax audits or proceedings, which are subject to Section 12.4) or in order to enable any Party to comply with its obligations under this Agreement, any Ancillary Agreement or the Bankruptcy Cases; provided, however, that this Section 8.7 shall not apply to any Seller upon liquidation of such Seller.  Each Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall be entitled to inspect and make copies of any such books and records held by the other Party.  In the event any Seller or Purchaser wishes to destroy such books and records or the Sellers move to convert the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, in each case, before or within three (3) months from the Closing Date, it shall first give 10 days' prior written notice to the other Party (and its respective successors and representatives appointed by the Bankruptcy Court, if any) and the other Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall have the right, at their option and expense, upon prior written notice within such 10-day period, to take possession of the records within 10 days after the date of such notice.

      (a)   Access pursuant to this Section 8.7(b) shall be afforded by the party in possession of such records, upon receipt of reasonable advance notice, during normal business hours and at the expense of the party seeking such access; provided, however, that (i) any review of such records shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any party, (ii) no party shall be required to take any action that would constitute a waiver of the attorney-client privilege, and (iii) no party shall be required to supply the other party with any information which such party is under a legal obligation not to supply.

      8.8   Publicity.  Prior to the Closing, neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the reasonable judgment of Purchaser or the Sellers, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement, provided, however, that the Party intending to make such release shall use

its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

8.9     Intellectual Property Matters.

(a)     Purchased Intellectual Property.  Prior to the Closing, the Sellers shall obtain from each Seller Owner, Breakwater Point, LLC and Knopf Investment Properties, LLC, a valid and irrevocable assignment of all of their right, title and interest in and to any Intellectual Property owned by such Person that is used in, held for use in or related to the Business (the "Purchased Intellectual Property"), to Knopf Systems, LLC in an assignment agreement substantially in the form attached hereto as Exhibit G.

(b)     Use of Owned Intellectual Property and Seller Marks.  Following the Closing, the Sellers shall have no right, title or interest in or to the Owned Intellectual Property or the Purchased Intellectual Property.  Immediately after the Closing, the Sellers shall, and shall cause each Seller Owner and all other Knopf Family Persons (except to the extent and for so long as any such Knopf Family Person is employed by Purchaser),  to cease to hold themselves out as having any affiliation with the Business and cease all use or deployment of any Marks included in the Owned Intellectual Property (including the Purchased Intellectual Property) or other names (including any trade name or d/b/a) associated with the Business, including those set forth on Schedule 8.9 hereto, or containing or comprising any of the foregoing or that are confusingly similar thereto (collectively, the "Seller Marks"), including by attempting to register as a Trademark or domain name any of the Seller Marks, except (solely with respect to the Seller Owners) to the extent permitted under the terms of any employment or consulting agreement entered into between the Purchaser and a Seller Owner.

8.10     Schedules.  The Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information disclosed in the Schedules as an exception to a particular representation or warranty shall constitute a disclosure with respect to other representations and warranties, in each case, to the extent that the relevance of any such information to any other representation or warranty is readily apparent from the text of such disclosure notwithstanding any reference to a specific section.

8.11     WARN Act.  Purchaser shall be responsible for (and shall indemnify and hold the Sellers harmless from and against) all Liabilities for any and all WARN Act notices, payments, fines or assessments, including reasonable attorneys' fees incurred by the Sellers in connection therewith, with respect to the employment, discharge or layoff, on or after the Closing Date, of any Transferred Employees.  Sellers shall be responsible for (and shall indemnify and hold Purchaser harmless from and against) all Liabilities for any and all WARN Act notices, payments, fines or assessments, including reasonable attorneys' fees incurred by Purchaser in connection therewith, with respect to the employment, discharge or layoff of any employees of Purchaser other than the Transferred Employees.

8.12   Section 363(b)(1)(A).   Purchaser shall honor and observe any and all policies of the Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

8.13   Transfer of Personally Identifiable Information.   In connection with the transfer of the Purchased Assets, Sellers shall transfer and disclose all Personally Identifiable Information contained therein in compliance with all Privacy Laws.

8.14   Trade Payables.   The Sellers shall in all material respects make all payments in respect of trade payables of the Business (including rent payments and sales taxes) arising from and after the Petition Date in all material respects on a timely basis and shall otherwise manage the accounts payable of the business in accordance with the Sellers' ordinary course cash management policies and practices, in each case, subject to the DIP Budget.  Within twenty-one (21) days following the date hereof, the Sellers shall deliver to Purchaser an initial report containing an aging report for all payables of the Business allocated by vendor.  The Sellers shall make their employees and advisors reasonably available upon reasonable advance notice from Purchaser to answer any questions Purchaser may have, and provide such additional information Purchaser may reasonably request, with respect to any accrued expenses of the Business.

8.15   Transition Services.  Within [30] days from the Closing Date, the Company may identify and request Purchaser and its Affiliates to provide certain services reasonably necessary for the Sellers to effectuate an orderly winding down of their affairs.  If Purchaser, in its sole discretion, agrees to provide any of such requested services (the services agreed to be provided by Purchaser in its sole discretion, the "Transition Services"), then Purchaser shall, and shall cause its relevant Affiliates to, provide the Transition Services to the applicable Seller in a manner, for a duration and with a scope, in each case, that Purchaser, in its sole discretion, determines to be appropriate [for no consideration].  Purchaser may terminate any Transition Service at any time by giving the Company [5]-day advance written notice.  Neither Purchaser nor any of its Affiliates shall have any liability whatsoever to any Seller, any of the Sellers' Affiliates, or any third party in connection with the provision of the Transition Services.  Each Seller shall, and shall cause its Affiliates, directors, officers and employees to, comply with the policies and procedures of Purchaser and its Affiliates applicable to the provision of the Transition Services.

ARTICLE IX

EMPLOYEES AND EMPLOYEE BENEFITS

9.1     Transferred Employees.  Purchaser shall, or shall cause one or more of its Affiliates to, use reasonable efforts to provide offers of employment commencing on the Closing Date to a majority of the employees of the Sellers, in positions that are comparable to those held by such employees at the time.  Those employees to whom offers of employment are made and who commence employment with Purchaser as of the Closing Date shall be collectively referred to as the "Transferred Employees."  No such offer shall be made to either Kimberly or Kenneth Knopf.

9.2     Employee Benefits.

(a)     Enhanced Severance Benefits.  In lieu of any other severance benefit to which the Transferred Employees listed on Schedule 9.2(a) may be entitled, any such Transferred Employee shall be entitled to (i) six months of salary at the level in effect on the date of termination and (ii) a lump sum amount reflecting a reasonable estimate of the employer subsidy for a six-month period for health care benefits as determined by the Purchaser, in the event of any involuntary termination of their employment by the Purchaser or its Affiliates between the Closing Date and June 30, 2019 without cause, subject to execution of a general release in favor of the Purchaser and its Affiliates.

(b)     Health Benefits.  Purchaser and Sellers shall cooperate in good faith to facilitate continued coverage through December 31, 2019, for Transferred Employees under the medical insurance plan current applicable to them, subject to the generally applicable terms and conditions of such plan.

(c)     Purchaser shall endeavor in good faith to continue the offering of the iMS 401(k) Plan, effective as of the Closing.

(d)     Nothing herein expressed or implied is intended to confer on any person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Article IX.

(e)     Nothing contained in this Section 9.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any amendment to any employee benefit plan.

ARTICLE X

CONDITIONS TO CLOSING

10.1     Conditions Precedent to Obligations of Purchaser.   The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the

56

fulfillment, as of the Closing, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

         (a)     (i) the representations and warranties of the Sellers set forth in Sections 5.1 (Organization and Good Standing), 5.2 (Authorization of Agreement), and 5.4 (Title to Purchased Assets; Sufficiency of Assets) (collectively, the "Sellers Core Representations") shall be true and correct in all material respects at and as of the date hereof and the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); (ii) the representations and warranties of the Sellers set forth in this Agreement other than the Sellers Core Representations (without giving effect to any "materiality," "Material Adverse Effect" or similar qualifiers, other than the reference to "Material Adverse Effect" in the representation and warranty set forth in Section 5.18) shall be true and correct at and as of the date hereof and the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of an inaccuracy of a representation or warranty set forth in this Section 10.1(a)(ii), the condition set forth in this Section 10.1(a)(ii) shall be deemed satisfied unless the effect of all such inaccuracies of representations and warranties taken together result in or would reasonably be expected to result in a Material Adverse Effect to any of the Sellers or the Business, and (iii) Purchaser shall have received an officer's certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the foregoing effect;

         (b)     the Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Purchaser shall have received an officer's certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the forgoing effect;

         (c)     the Sellers shall have made arrangements, satisfactory to Purchaser in its reasonable discretion, to pay, as of the Closing, any and all Cure Amounts due under Assignable Contracts designated as Purchased Contracts as of the Closing;

         (d)     the aggregate book value of (i) the Inventory (excluding any return, excess, discontinued, outlet, not available for sale or obsolete Inventory identified in writing by Purchaser prior to Closing) and (ii) Sellers' credit card and customer receivables shall be no less than $5,200,000; and

         (e)     Since the date of this Agreement, no Material Adverse Effect shall have occurred.

     10.2   Conditions Precedent to Obligations of the Sellers. The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, as of the Closing, of each of the following conditions (any or all of which may be waived by the Sellers in whole or in part to the extent permitted by applicable Law, provided that any such waiver does not materially and adversely affect the Sellers' estates):

(a)    (i) the representations and warranties of Purchaser set forth in Sections 6.1 (Organization and Good Standing), 6.2 (Authorization of Agreement), and 6.6 (Financial Capability) (collectively, the "Purchaser Core Representations") shall be true and correct in all material respects at and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); (ii) the representations and warranties of Purchaser set forth in this Agreement other than the Purchaser Core Representations (without giving effect to any "materiality," "Material Adverse Effect" or similar qualifiers) shall be true and correct at and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of an inaccuracy of a representation or warranty set forth in this Section 10.2(a)(ii), the condition set forth in this Section 10.2(a)(ii) shall be deemed satisfied unless the effect of all such inaccuracies of representations and warranties taken together would reasonably be expected to prevent, materially delay or materially impair the ability of Purchaser to consummate the transactions, and (iii) the Sellers shall have received an officer's certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Sellers shall have received an officer's certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect.

10.3    Conditions Precedent to Obligations of Purchaser and the Sellers.  The respective obligations of Purchaser and the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, as of the Closing, of each of the following conditions (any or all of which may be waived by Purchaser and the Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, nor shall there be any statute, rule, regulation, Order or other law promulgated, enacted, entered, enforced or deemed applicable to the parties hereto which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded or constitutes or imposes any Burdensome Condition; and

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and those orders shall have become Final Orders.

10.4    Frustration of Closing Conditions.  Neither the Sellers nor Purchaser may rely on the failure of any condition set forth in Section 10.1, 10.2 or 10.3, as the case may be, if such failure was primarily caused by such Party's failure to comply with any provision of this Agreement.

ARTICLE XI

SURVIVAL; INDEMNIFICATION

11.1    Survival of Representations and Warranties.  Each of the representations and warranties set forth in this Agreement or any Ancillary Agreement shall survive (together with any right to assert a claim under Section 11.2) the Closing and the consummation of the transactions contemplated hereby and shall expire on the date that is eighteen (18) months after the Closing Date; provided, however, that the Sellers Core Representations and the representations set forth in section 5.5 shall survive (together with any right to assert a claim under Section 11.2) until 60 days after the expiration of the applicable statute of limitations. Each of the covenants and other agreements contained in this Agreement or any Ancillary Agreement shall survive (together with any right to assert a claim under Section 11.2) the Closing and the consummation of the transactions contemplated hereby until the later of the expiration of (i) its term and (ii) the applicable statute of limitations.

11.2    Indemnification.  From and after the Closing, the Sellers shall, jointly and severally, indemnify, defend and hold harmless Purchaser and its Affiliates and their respective partners, officers, directors, employees, agents, successors and assigns (collectively, the "Purchaser Indemnitees") from and against, and shall pay and reimburse each of the Purchaser Indemnitees for, any and all Losses incurred or sustained by, or imposed upon, the Purchaser Indemnitees based upon, resulting from, arising out of or relating to: (i) any inaccuracy in or breach of any representation or warranty of Sellers contained in this Agreement or any Ancillary Agreement; (ii) any breach of any covenant, agreement or obligation to be performed by Seller pursuant to this Agreement or any Ancillary Agreement; or (iii) any Excluded Asset or Excluded Liability; or (iv) the Transition Services provided by Purchaser or any of its Affiliates pursuant to Section 8.15, regardless of legal theory asserted, including any claims by third parties relating to the Transition Services.

11.3    Limitation on Indemnification.  Sellers, in the aggregate, shall not be required to indemnify, defend, hold harmless, pay or reimburse the Purchaser Indemnitees under this Section 11.3 from and after the aggregate amount of all Losses in respect of indemnification under this Section 11.3 exceeds the Base Purchase Price.  Notwithstanding anything to the contrary in this Agreement, nothing in this Article XI (including this Section 11.3) shall limit the rights or remedies of any Person under this Agreement following the Closing Date based upon or in connection with fraud, intentional misrepresentation or willful breach.

ARTICLE XII

TAXES

12.1    Transfer Taxes.    All sales, use, transfer, real estate transfer (including, without limitation, documentary transfer, deed, fixed asset, stamp and like taxes) and similar taxes and recording charges payable in connection with the consummation of the transactions contemplated by this Agreement (the "Transfer Taxes") shall be borne by Purchaser and any Tax Returns that must be filed in connection with such Transfer Taxes shall be prepared and filed when due by the Party primarily or customarily responsible under the applicable Law for filing

such Tax Returns.  A Party filing a Tax Return pursuant to the preceding sentence will use its commercially reasonable efforts to provide such Tax Return to the other Party at least ten (10) Business Days prior to the due date for such Tax Return, and such other Party shall promptly pay to the filing Party an amount equal to its share of any Liability for Transfer Taxes (as described in the preceding sentence) shown as due on such Tax Return at least one (1) Business Day prior to such due date.  The Parties shall reasonably cooperate with each other in any mutually agreeable, reasonable and lawful arrangement designed to minimize any applicable Transfer Taxes.

12.2    Other Taxes.  Subject to Section 12.1 and this Section 12.2, Sellers shall be responsible for the timely payment of all Excluded Taxes.  Purchaser shall prepare and file (or cause to be prepared and filed) all Tax Returns in respect of the Business or the Purchased Assets required to be filed by Purchaser after the Closing Date. To the extent any Taxes reflected on any such Tax Returns are Excluded Taxes, Sellers shall pay to Purchaser the amount of such Excluded Taxes within five (5) Business Days of receiving notice from Purchaser that such Tax Return has been filed or that Purchaser has paid such Excluded Taxes.

12.3    Purchase Price Allocation.

(a)    Within 90 days following the Closing, Purchaser shall prepare and deliver to the Sellers a proposed allocation of the Purchase Price (including any liabilities properly included therein for tax purposes) among the Purchased Assets in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable) (the "Proposed Allocation").  The Sellers shall have 30 days (the "Review Period") to review and object to the Proposed Allocation.  On or prior to the last day of the Review Period, the Sellers may object to the Proposed Allocation by delivering to Purchaser a written statement setting forth the Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement therewith (the "Allocation Dispute Notice").  If the Sellers fail to deliver the Allocation Dispute Notice before the expiration of the Review Period, the Proposed Allocation shall be deemed to have been accepted by the Sellers and become final and binding.  If the Sellers deliver the Allocation Dispute Notice before the expiration of the Review Period, Purchaser and the Sellers shall negotiate in good faith to resolve any such objections within 30 days (the "Resolution Period") following the delivery of the Allocation Dispute Notice, and if resolution of such dispute is reached, the agreed upon allocation shall become final and binding.  If Purchaser and the Sellers are unable to completely resolve any such objections within 30 days, the unresolved issues (and only the unresolved issues) (the "Allocation Dispute") shall promptly be submitted for resolution to a nationally recognized certified public accounting firm that is mutually acceptable to Purchaser and the Sellers or, if Sellers and Purchaser are unable to agree on an accounting firm, then a nationally recognized certified public accounting firm jointly selected by Sellers' accounting firm and Purchaser's accounting firm  (the "Neutral Firm").  The Neutral Firm shall be instructed to resolve any outstanding Allocation Dispute; provided, however, that the Neutral Firm's determination of any amount subject to the Allocation Dispute shall be (x) no less than the lesser of the amounts claimed by Purchaser and the Sellers, respectively, or (y) no greater than the greater of the amounts claimed by Purchaser and the Sellers, respectively. The Parties shall instruct the Neutral Firm to render its determination with respect to the entire Allocation Dispute within 30 days of the referral of the Allocation Dispute thereto, and the determination of the Neutral Firm shall be

60

final and binding upon the parties hereto for all purposes of this Agreement. The fees and expenses of the Neutral Firm shall be borne 50% by Purchaser and 50% by the Sellers. The final and binding allocation determined hereunder is hereinafter referred to as the "Final Allocation".

(b)     The Sellers and Purchaser agree to cooperate with each other in preparing IRS Form 8594 (including any subsequent adjustments required thereto) in a manner consistent with such Final Allocation, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.  If such Final Allocation is disputed by any Tax Authority or other Governmental Body, Purchaser or any Seller receiving notice of such dispute will promptly notify the other Parties and the Parties will use their reasonable best efforts to sustain the Final Allocation.  Neither Purchaser nor the Sellers shall take any position (including in any Tax Returns, reports, audits or otherwise) that is inconsistent with such allocation, unless otherwise required pursuant to a final determination by a court of competent jurisdiction or pursuant to a closing agreement with the IRS entered into pursuant to Section 7121 of the Code.

12.4    Cooperation.  The Sellers, on the one hand, and Purchaser, on the other hand, will provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes; provided, however, that nothing herein shall require Purchaser to provide information that is privileged if the disclosure is reasonably expected to result in the loss of such privilege.  Any information obtained under this paragraph shall be kept confidential, except (i) as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting an audit or other proceeding or defending any Tax claim, or (ii) with the consent of Sellers or Purchaser, as the case may be. The Sellers agree (i) to retain all books and records with respect to Tax matters pertinent to the Business and the Purchased Assets relating to any Pre-Closing Tax Period until expiration of the statute of limitations (and, to the extent notified by Purchaser, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any taxing authority and (ii) to give the Purchaser reasonable written notice prior to transferring, destroying or discarding any such books and records and, if the Purchaser so requests, shall allow the Purchaser to take possession of such books and records (other than any information that the Sellers reasonably believe to be privileged).

ARTICLE XIII

MISCELLANEOUS

13.1    Expenses.  Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each of Sellers and Purchaser shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Injunctive Relief.

(a)    The Parties acknowledge and agree that (i) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached or threatened to be breached, and (ii) damages and/or remedies at law would be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, each of the Parties shall be entitled to seek injunctive relief (without the posting of any bond or other security) with respect to any such breach, including without limitation specific performance of such covenants, promises or agreements or an order enjoining Purchaser from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The Parties' right to equitable relief, including specific performance and injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. The rights set forth in this Section 13.2 shall be in addition to any other rights which the Parties may have at law or in equity in connection with this Agreement.  If any action, suit or proceeding is brought by a Party to enforce this Agreement against another Party, the Party such action, suit or proceeding is brought against shall waive the defense that there is an adequate remedy at law and agrees not to assert that specific performance, injunctive and other equitable remedies are unenforceable, violate public policy, invalid, contrary to Law and inequitable for any reason. The right to specific performance, injunctive and other equitable remedies is an integral part of the transactions contemplated by this Agreement and without that right, none of the Parties would have entered into this Agreement.

13.3    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court, including to the entry by the Bankruptcy Court of final orders in any such proceedings, and shall receive notices at such locations as indicated in Section 13.7 hereof; provided, however, that if the Bankruptcy Cases have been closed and not reopened, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Eastern District of Kentucky and any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)    Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 13.7.

13.4    WAIVER OF RIGHT TO TRIAL BY JURY.  EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

13.5    Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto) and the Ancillary Agreements represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

13.6    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State.

13.7    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by electronic mail (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

If to the Sellers, to:

Innovative Mattress Solutions LLC
1056 Wellington Way, Suite 200
Lexington, KY 40513
Attention: Kim Knopf
E-mail:  kknopf@sleeponthebest.com

With a copy (which shall not constitute notice) to:

DelCotto Law Group PLLC
200 N. Upper Street
Lexington, KY 40507
Attention:  Dean A. Langdon

E-mail:  dlangdon@dlgfirm.com

If to Purchaser, to:

c/o Tempur Sealy International, Inc.
1000 Tempur Way
Lexington, KY 40511
Attention:  Joe Kamer
E-mail: joe.kamer@tempursealy.com

With a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Attention:  Lisa M. Schweitzer
E-mail: lschweitzer@cgsh.com

13.8    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.9    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a Party.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void and without effect; provided, however, that Purchaser may assign its rights or obligations under this Agreement to one or more of its Affiliates without the consent of any other Party.  No assignment of any obligations hereunder shall relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to any such permitted assignor shall apply to any such permitted assignee unless the context otherwise requires.

13.10    Counterparts.   This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

13.11    No Interpretation Against Drafter.  This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and any rules of

construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**<u>SELLERS</u>**

**INNOVATIVE MATTRESS SOLUTIONS LLC**

By: _____
      Name:
      Title:

[Signature Page to Asset Purchase Agreement]

**<u>PURCHASER</u>**

**TEMPUR WORLD, LLC**

By: _____
     Name:
     Title:

## **ANNEX 1**

Knopf Systems, LLC, a Delaware limited liability company
K.B. & Associates, Incorporated, a West Virginia corporation
Brown Immobilien LLC, a Delaware limited liability company
Sleep Outfitters of Kentucky, LLC, a Delaware limited liability company
Sleep Outfitters of Ohio LLC, a Delaware limited liability company
Sleep Outfitters of Tennessee LLC, a Delaware limited liability company
Sleep Outfitters of Alabama LLC, a Delaware limited liability company
Sleep Outfitters of Indiana LLC, a Delaware limited liability company
Sleep Liquidators LLC, a Delaware limited liability company
Sleep Outfitters of West Virginia, a Delaware limited liability company

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF KENTUCKY DIVISION**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Innovative Mattress Solutions LLC, *et al.*[1] | : | Case No. 19-50042 (GRS)  (Jointly |
| | : | Administered) |
| Debtors. | : | |
| | : | |

**ORDER (I) APPROVING THE ASSET PURCHASE AGREEMENT AMONG SELLERS
AND PURCHASER; (II) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF
THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND
ENCUMBRANCES, (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND LEASES IN CONNECTION
THEREWITH AND (IV) GRANTING RELATED RELIEF**

Upon the motion, dated February 12, 2019 [ECF No. 279] (the "Sale Motion"),[2] filed by

the above-captioned debtors and debtors in possession (the "Debtors") seeking, among other

things, entry of an order (the "Sale Order"), pursuant to sections 105, 363 and 365 of the United

States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004,

6006, 9007, and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Eastern

District of Kentucky (the "Local Rules"), authorizing and approving the sale of the Purchased

Assets and the assumption and assignment of certain executory contracts and unexpired leases of

the Debtors in connection therewith; and the Court having entered this Court's prior order, dated

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are as follows: Innovative Mattress Solutions, LLC – 1096; Sleep Outfitters of Alabama LLC – 2914; Sleep Outfitters of Indiana LLC – 6006; Sleep Outfitters of Kentucky, LLC – 2729; Sleep Outfitters of Ohio LLC – 9814; Sleep Outfitters of Tennessee LLC – 1127; Sleep Outfitters of West Virginia, LLC – 6079; Sleep Liquidators LLC – 5703; Brown Immobilien LLC – 6617; Knopf Systems, LLC – 1096; and K. B. & Associates, Incorporated – 3479.

[2]    Capitalized terms used herein but not otherwise defined have the meanings given to them in the Asset Purchase Agreement (as defined below) or, if not defined in the Asset Purchase Agreement, the meanings given to them in the Sale Motion.

February 25, 2019 [ECF No. 334] (the "Bidding Procedures Order"), approving competitive bidding procedures for the Purchased Assets (the "Bidding Procedures") and granting certain related relief; and Tempur World, LLC (the "Purchaser") having submitted the highest or otherwise best bid for the Purchased Assets, as reflected in the Asset Purchase Agreement (as defined below); and the Court having conducted a hearing on the Sale Motion (the "Sale Hearing") on [March 22], 2019, at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (i) the Sale Motion and the exhibits thereto, (ii) the Asset Purchase Agreement, dated as of February 12, 2019 by and among the Purchaser and the Sellers party thereto (the "Sellers") (as may be amended, restated, amended and restated from time to time, the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit A, whereby the Sellers have agreed, subject to Court approval, among other things, to sell the Purchased Assets to the Purchaser, including, without limitation, (x) the Purchased Contracts that will be assumed and assigned to Purchaser or designated, as applicable, each on the terms and conditions set forth in the Asset Purchase Agreement and (y) designation rights ("Designation Rights") for certain Assignable Contracts (the sale of such Purchased Assets, collectively, the "Sale Transaction"), (iii) the Bidding Procedures Order and the record of the hearing before the Court on February 21, 2019 at which the Bidding Procedures Order was approved, (iv) the ability of the Purchaser to submit its Credit Bid pursuant to Asset Purchase Agreement section 3.1(a) (the "Credit Bid"), and the record of the hearing before the Court commenced on [March 22, 2019], at which the Court authorized the Purchaser's Credit Bid (as approved pursuant to this Sale Order), and (v) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and it appearing that due notice of the Sale Motion, the Asset Purchase Agreement, the Bidding

Procedures Order, and the form of this order (the "<u>Sale Order</u>") having been provided in accordance with the Bidding Procedures Order; and, except as otherwise provided for herein, all objections to the Sale Motion having been withdrawn, resolved, or overruled as provided in this Sale Order; and it appearing that the relief granted herein is in the best interests of the Debtors, their estates and creditors and all parties in interest in these chapter 11 cases; and upon the record of the Sale Hearing and these chapter 11 cases; and after due deliberation; and good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.    **<u>Fed. R. Bankr. P. 7052</u>**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings shall also include any oral findings of fact and conclusions of law made by the Court during or at the conclusion of the Sale Hearing.  This Sale Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon entry hereof.

B.    **<u>Jurisdiction and Venue</u>**.  This Court has jurisdiction over the Sale Motion, the Sale Transaction and the property of the Debtors' estates, including the Purchased Assets, pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157.  Venue of these chapter 11 cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief sought in the Sale Motion are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014, Local Rules 6004-1 and 6006-1.

D.      **Final Order**.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement.  In the absence of a stay pending appeal, Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the sale contemplated by the Asset Purchase Agreement at any time after entry of this Sale Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

E.      **Notice and Opportunity to Object**.  Actual written notice of, and a fair and reasonable opportunity to object to and to be heard with respect to the Sale Motion, the Sale Transaction, the sale of the Purchased Assets that are owned by the Debtors free and clear of any Claims (as defined below), the assumption and assignment of the Purchased Contracts, the Auction, the Bidding Procedures, and the relief requested in the Sale Motion has been given, as required by the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Bidding Procedures Order.

F.      **Title to the Purchased Assets**.  The Purchased Assets that are owned by the Debtors constitute property of the Debtors' estates and good title is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.  Except as provided in the Asset Purchase Agreement, the Debtors are the sole and rightful owners of such Purchased Assets that are owned by the Debtors with all right, title and interest to transfer and convey the

Purchased Assets to the Purchaser or its assignee (each, an "Assignee"), and no other person has any ownership right, title, or interests therein.

       G.    **Sound Business Purpose**.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Sale Motion, the Sale Transaction, the Asset Purchase Agreement, and all related agreements (the "Related Agreements").  The Debtors' entry into and performance under the Asset Purchase Agreement and Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and appropriate under the circumstances.  The Debtors have demonstrated compelling circumstances for the Sale Transaction outside: (i) the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code; and (ii) a plan of reorganization, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to preserve and maximize the value of the Debtors' estates.  Business justifications for the Sale Transaction include, but are not limited to, the following: (i) the Purchase Price set forth in the Asset Purchase Agreement constitutes the highest or otherwise best offer received for the Purchased Assets; (ii) the Asset Purchase Agreement and the transactions contemplated thereby present the best opportunity to maximize the value of the Purchased Assets, whether on a going concern basis or otherwise, and avoid decline and devaluation of the Purchased Assets that would occur in an immediate liquidation of the Purchased Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for pursuant to the Asset Purchase Agreement, recoveries to creditors,

if any, will be diminished; and (iv) the value of the Debtors' estates will be maximized through the sale of the Purchased Assets pursuant to the Asset Purchase Agreement.

H.    **Compliance with Bidding Procedures**.    The Bidding Procedures were substantively and procedurally fair to all parties, including all potential bidders, and were the result of arms'-length negotiations.  Further, the Bidding Procedures afforded notice and a full, fair, and reasonable opportunity for any Person to make a higher or otherwise better offer to purchase the Purchased Assets.  The Debtors, the Purchaser and their respective counsel and other advisors have complied with the Bidding Procedures and Bidding Procedures Order in all respects.  The Purchaser subjected its bid to the competitive Bidding Procedures approved by this Court and the Purchaser was found eligible to participate in the Auction and was the Successful Bidder (as defined in the Bidding Procedures) for the Purchased Assets in accordance with the Bidding Procedures Order and Bidding Procedures.

I.    **Sale Process**.  (i) The Debtors and their advisors, including Conway MacKenzie, engaged in a robust and extensive marketing and sale process through the postpetition sale process pursuant to the Bidding Procedures Order and the Bidding Procedures; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the sale process, the Bidding Procedures and all actions taken pursuant thereto, were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Purchased Assets; and (iv) the process conducted by the Debtors pursuant to the Bidding Procedures obtained the highest or otherwise best value for the Purchased Assets for the Debtors and their estates, and any other transaction would not have yielded as favorable an economic result.

J.    **Fair Consideration; Highest or Best Value**.  The consideration to be paid by the Purchaser under the Asset Purchase Agreement, including, without limitation, the Credit Bid

Amount (as hereinafter defined): (i) constitutes fair and reasonable consideration for the Purchased Assets; (ii) is the highest or best offer for the Purchased Assets; (iii) will provide a greater recovery for the Debtors' estates and creditors than would be provided by any other practically available alternative; (iv) constitutes fair and reasonably equivalent value and full and adequate consideration, under the Bankruptcy Code and the Uniform Fraudulent Transfer Act; (v) constitutes fair consideration under the Uniform Fraudulent Conveyance Act; and (vi) constitutes reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.  Such consideration constitutes the highest or best bid for the Purchased Assets.  Under the facts and circumstances of these chapter 11 cases, the Purchase Price for the Purchased Assets is fair and reasonable.

K.    **Purchaser Secured Claims**.  In accordance with the Asset Purchase Agreement, effective upon the Closing Date, the Purchaser Secured Claims (as defined below) against the Debtors arising under the: (i) Prepetition Loan Agreements and (ii) the DIP Facility Agreement (together with the security interests securing any of the Claims of the Purchaser described in the preceding sub-clauses (i)-(ii), collectively, the "Purchaser Secured Claims"), shall each be deemed allowed as of the Closing Date for all purposes in these chapter 11 cases and under the Bankruptcy Code in the amount of the (i) Prepetition Credit Bid Amount, if any, with respect to the Prepetition Loan Agreements and (ii) the DIP Credit Bid Amount with respect to the DIP Facility Agreement.  Pursuant to Section 363(k) of the Bankruptcy Code and this Sale Order, Purchaser is hereby authorized to credit bid (or cause to be credit bid) the claims against the Debtors arising under the DIP Facility Agreement (the "Purchaser Secured Claims") and to use

such Purchaser Secured Claims as a portion of the Purchase Price (the "Credit Bid Amount") as

set forth in Section 3.1(a) of the Asset Purchase Agreement.

       L.     **No Successor or Other Derivative Liability**.  The sale and transfer of the

Purchased Assets of the Debtors to the Purchaser, including the assumption by the Debtors and

assignment, transfer and/or sale to the Purchaser or its designee of the Purchased Contracts, will

not subject the Purchaser, an Assignee (as applicable) or any of Purchaser's affiliates to any

liability (including any successor liability) under any laws, including any bulk-transfer laws, or

any theory of successor or transferee liability, antitrust, environmental, product line, *de facto*

merger or substantial continuity or similar theories, with respect to the operation of the Debtors'

business prior to the Closing, and for each Purchased Contract, the applicable date the

assumption becomes effective (the "Assumption Effective Date"), except that, upon the Closing

or such other date as specified in the Asset Purchase Agreement, the Purchaser shall become

liable for the applicable Assumed Liabilities.  The Purchaser (or an Assignee, as applicable): (i) is

not, and shall not be considered or deemed a mere continuation of, or successor to, the Debtors

in any respect; (ii) has not, *de facto* or otherwise, merged with or into the Debtors; and (iii) is not

a continuation or substantial continuation, and is not holding itself out as a mere continuation, of

any of the Debtors or their respective estates, businesses or operations, or any enterprise of the

Debtors and there is no continuity of enterprise between the Debtors and the Purchaser (or an

Assignee, as applicable).  Accordingly, the Purchaser (or an Assignee, as applicable) is not and

shall not be deemed a successor to the Debtors or their respective estates as a result of the

consummation of the transactions contemplated by the Asset Purchase Agreement, and except

with respect to any Assumed Liabilities or as otherwise set forth in the Asset Purchase

Agreement, Purchaser's acquisition of the Purchased Assets from the Debtors shall be free and

clear of any "successor liability" claims of any nature whatsoever.  Purchaser would not purchase the Purchased Assets but for the protections against any claims based upon "successor liability" theories as specified herein.

      M.    **Good Faith; No Collusion**.  The Asset Purchase Agreement and each of the Transactions were negotiated, proposed, and entered into by the Debtors, their management, their boards of directors or equivalent governing bodies, members, managers, affiliates and representatives and the Purchaser and its management, board of directors or equivalent governing body, officers, directors, employees, agents, members, managers, affiliates and representatives, in good faith, without collusion or fraud, and from arms'-length bargaining positions.  The Purchaser is a "good faith purchaser" and the Purchaser is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  In the absence of any Person obtaining a stay pending appeal, effective upon the Closing, it shall be deemed that neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  The Purchaser has proceeded in good faith in all respects in that, among other things: (i) the Purchaser has recognized that the Debtors were free to deal with any other party in interest in acquiring the Purchased Assets; (ii) the Purchaser has complied with the applicable provisions of the Bidding Procedures Order; (iii) the Purchaser's bid was subjected to competitive Bidding Procedures as set forth in the Bidding Procedures Order; and (iv) all payments to be made by the Purchaser and all other material agreements or arrangements entered into by the Purchaser and the Debtors in connection with the Sale Transaction have been disclosed and are appropriate. The sale price in respect of the Purchased Assets was not controlled by any agreement among

potential bidders and neither the Debtors nor the Purchaser have engaged in collusion, fraud, or any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code or that would prevent the application of section 363(m) of the Bankruptcy Code. Accordingly, neither the Asset Purchase Agreement nor the Sale Transaction may be avoided and no party shall be entitled to damages or other recovery pursuant to section 363(n) of the Bankruptcy Code.

N. **Notice**. As evidenced by the certificates of service filed with the Court: (i) due, proper, timely, adequate, and sufficient notice of the Sale Motion, the Bidding Procedures (including the bidding process and the deadline for submitting bids and all other deadlines and scheduled dates pursuant thereto), the Sale Hearing, the Sale Transaction, the proposed Sale Order attached to the Asset Purchase Agreement, and the other relief requested in the Sale Motion was provided by the Debtors [via actual and publication notice to all required notice parties pursuant to the Bidding Procedures Order]; (ii) such notice was good, sufficient, and appropriate under the particular circumstances and complied with the Bidding Procedures Order; and (iii) no other or further notice of the Sale Motion, the Sale Transaction, the Bidding Procedures, the Sale Hearing, the proposed Sale Order, or any of the relief requested in the Sale Motion, except as otherwise provided in paragraphs [26 and 30] of this sale order, is required.

O. **Assignment and Cure Notice**. As evidenced by the certificates of service filed with the Court, and in accordance with the provisions of the Bidding Procedures Order, the Debtors have served, prior to the Sale Hearing, the Assumption and Assignment Notice (as defined in the Bidding Procedures Order) on each counterparty to an Assignable Contract, dated February 27, 2019, which provided the Debtors' intent to potentially assume and assign such Assignable Contract (to the extent the Assignable Contract is an executory contract or lease) and

notice of the related proposed Cure Costs upon each non-debtor counterparty to such Assignable Contract.  The service of the Assumption and Assignment Notice was timely, good, sufficient and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Purchased Contracts, including without limitation the Designation Right Contracts, except as set forth in paragraphs 26 and 30 herein. *See Certificate of Service of Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases* [ECF No. 343].   All non-debtor parties to the Assignable Contracts (to the extent the Assignable Contract is an executory contract or lease and was listed on the *Notice of Cure Costs and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases*) have had a reasonable opportunity to object ~~both~~ to the Cure Costs listed on the applicable Assumption and Assignment Notice and, for Purchased Contracts other than Designation Right Contracts, to the assumption and assignment of the Purchased Contracts to the Purchaser (or an Assignee, as applicable) in accordance with the Bidding Procedures Order.   All non-debtor parties to the Designation Right Contracts have had a reasonable opportunity to object ~~both~~ to the Cure Costs listed on the applicable Assumption and Assignment Notice.   The procedures providing for a notice of designation (the "Notice of Designation") with regard to updated adequate assurance information from the Purchaser, as well as any updated Cure Amount as to the Designation Right Contract (if applicable) are sufficient and appropriate.

       P. ~~O.~~ **Satisfaction of Section 363(f) Standards**.  Except as expressly provided for in this Sale Order or the Asset Purchase Agreement, the Debtors may sell the Purchased Assets that are owned by the Debtors free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, mortgages, deeds

of trust, pledges, charges, security interests, of whatever kind or nature, rights of first refusal,

rights of offset or recoupment, royalties, conditional sales or title retention agreements,

hypothecations, preferences, debts, easements, suits, licenses, options, rights-of-recovery,

judgments, orders and decrees of any court or foreign domestic governmental entity, taxes

(including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases,

options, off-sets, recoupments, claims for reimbursement or subrogation, contribution, indemnity

or exoneration, encumbrances and other interests of any kind or nature whatsoever against any of

the Debtors or the Purchased Assets owned by them, including, without limitation, any debts

arising under or out of, in connection with, or in any way relating to, any acts or omissions,

obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability

claims, environmental liabilities, employment or labor law claims or liabilities, employee pension

or benefit plan claims, multiemployer benefit plan claims, retiree healthcare or life insurance

claims or claims for taxes of or against any of the Debtors and any derivative, vicarious,

transferee or successor liability claims, alter ego claims, *de facto* merger claims, rights or causes

of action (whether in law or in equity, under any law, statute, rule or regulation of the United

States, any state, territory, or possession thereof or the District of Columbia), whether arising

prior to or subsequent to the commencement of these chapter 11 cases, whether known or

unknown, contingent or matured, liquidated or unliquidated, choate or inchoate, filed or unfiled,

scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or

unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material,

statutory or    non-statutory, legal or equitable, and whether imposed by agreement,

understanding, law, equity or otherwise arising under or out of, in connection with, or in any way

related to any of the Debtors, any of the Debtors' interests in the Purchased Assets, the operation

of any of the Debtors' businesses before the Closing Date and for each Purchased Contract

(subject to the payment of Cure Costs as required under section 365(b) of the Bankruptcy Code),

the applicable Assumption Effective Date, pursuant to the Asset Purchase Agreement, or the

transfer of any of the Debtors' interests in the Purchased Assets to the Purchaser, and all

Excluded Liabilities; (collectively, excluding any Assumed Liabilities or Permitted Exceptions,

the "Claims"), because, in each case, one or more of the standards set forth in section 363(f)(1)-

(5) of the Bankruptcy Code have been satisfied; provided, however, that, nothing herein shall be

deemed, or construed as, a ruling or determination by this Court that the Assumed Liabilities

encumber the Purchased Assets.  Without limiting the generality of the foregoing, "Claims" shall

include any and all liabilities or obligations whatsoever arising under or out of, in connection

with, or in any way relating to: (1) any of the employee benefit plans, including any Claims

related to unpaid contributions or current or potential withdrawal or termination liability; (2) the

Worker Adjustment and Retraining Notification Act of 1988; and (3) any of the Debtors' current

and former employees.  Those holders of Claims who did not timely object (or who ultimately

withdrew their objections, if any) to the Sale Transaction or the Sale Motion are deemed to have

consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Claims who

did object that have an interest in the Purchased Assets could be compelled in a legal or equitable

proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall

within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are

therefore adequately protected by having their Claims that constitute interests in the Purchased

Assets, if any, attach solely to the proceeds of the Sale Transaction ultimately attributable to the

property in which they have an interest, in the same order of priority and with the same validity,

force and effect that such holders had prior to the Sale Transaction, subject to any defenses of

the Debtors.  By operation of this Sale Order and whether or not such Person received actual notice of such Sale Order, all Persons having Claims of any kind or nature whatsoever against the Debtors or the Purchased Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims against the Purchaser or any of its assets, property, affiliates, successors, assigns, or the Purchased Assets.

Q.    P. The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the Purchased Assets that are owned by the Debtors were not free and clear of all Claims, if the Purchaser would, or in the future could, be liable for any such Claims, including, as applicable, certain liabilities related to the Business that will not be assumed by the Purchaser, as described in the Asset Purchase Agreement, or if the Credit Bid were not a component of the Sale Transaction.  A sale of the Purchased Assets owned by the Debtors other than one free and clear of all Claims would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale Transaction.

R.    Q. The total consideration to be provided under the Asset Purchase Agreement reflects the Purchaser's reliance on this Sale Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets owned by the Debtors free and clear of all Claims (including, without limitation, any potential derivative, vicarious, transferee or successor liability claims).

S.    R. As of the Closing, the transfer of the Purchased Assets of the Debtors to the Purchaser will be a legal, valid, and effective transfer of the Purchased Assets, and will vest the

Purchaser with all rights, title and interest of the Debtors in, and to, the Purchased Assets, free and clear of all Claims.

T.    S.    **Assumption and Assignment of Purchased Contracts**.  The assumption and assignment of the Purchased Contracts are integral to the Asset Purchase Agreement, are in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Debtors' sound business judgment.  Specifically, the assumption and assignment of the Purchased Contracts (i) is necessary to sell the Purchased Assets to the Purchaser, (ii) allows the Debtors to sell their business to the Purchaser as a going concern, (iii) limits the losses suffered by counterparties to the Purchased Contracts, and (iv) maximizes the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Purchased Contracts.

U.    T.    **Validity of the Transfer**.  As of the Closing, the transfer of the Purchased Assets to the Purchaser will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Purchaser (or an Assignee, as applicable) with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all Claims against the Debtors to the fullest extent permitted by applicable law.  The consummation of the Sale Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale Transaction.

V.    U.    **Corporate Power and Authority.**  The Debtors (i) have full corporate or limited liability company (as applicable) power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale Transaction has been

duly and validly authorized by all necessary corporate or other action of the Debtors, (ii) have all of the corporate or limited liability company (as applicable) power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, and (iii) upon entry of this Sale Order, other than as set forth in the Asset Purchase Agreement (including, without limitation, with respect to antitrust matters), need no consent or approval from any other person to consummate the Sale Transaction.

W.   ~~V.~~ **Valid and Binding Contract.**  The Asset Purchase Agreement is a valid and binding contract between the Debtors and the Purchaser and shall be enforceable pursuant to its terms.  The Asset Purchase Agreement and Related Agreements were not entered into for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession or the District of Columbia.  None of the Debtors nor the Purchaser is, or will be, entering into the Asset Purchase Agreement and transactions contemplated therein fraudulently (including with respect to statutory or common law fraudulent conveyance or fraudulent transfer claims, whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof or the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing) or for an otherwise improper purpose.  The Asset Purchase Agreement and the Sale Transaction itself, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors, and any chapter 7 or chapter 11 trustee appointed in these chapter 11 cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

X.   ~~W.~~ **No DeFacto Plan**.  The Sale Transaction does not constitute a *de facto* plan of reorganization or liquidation as it does not propose to: (i) impair or restructure existing debt

of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtors; (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests or extend debt maturities.  Entry into the Asset Purchase Agreement and the Sale Transaction neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan for the Debtors.  Entry into the Asset Purchase Agreement does not constitute a *sub rosa* chapter 11 plan.

Y.    X.  **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**.  The sale of the Purchased Assets must be approved and consummated promptly in order to preserve the value of the Purchased Assets.  Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close the Sale Transaction as soon as reasonably practicable.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Asset Purchase Agreement.  Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to this Sale Order, except with respect to adjourned matters.

Z.    Y.  **Personally Identifiable Information**.  As contemplated in the Bidding Procedures Order, and subject to the terms of this Sale Order, the sale to the Purchaser under the Asset Purchase Agreement of any personally identifiable information (as such term is defined in section 101(41A) of the Bankruptcy Code) about individuals is either consistent with the privacy policy of the Debtors in effect on the date of commencement of these chapter 11 cases or satisfies the requirements of section 363(b)(1)(A).

AA.    ~~Z.~~ **Legal and Factual Bases**.  The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

BB.    ~~AA.~~ **Necessity of Order.**  The Purchaser would not consummate the transactions absent the relief provided for in this Sale Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    **Motion is Granted**.  The Sale Motion and the relief requested therein to the extent not previously granted by this Court pursuant to the Bidding Procedures Order is granted and approved solely to the extent set forth herein.

2.    **Findings of Fact and Conclusions**.  The Court's findings of fact and conclusions of law in the Bidding Procedures Order and the record of the hearing with respect to the Bidding Procedures Order are incorporated herein by reference.

3.    **Objections Overruled**.  All objections, to the Sale Motion or the relief requested therein, and any joinders thereto, that have not been withdrawn with prejudice, waived, settled, or otherwise resolved as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice; provided that: (i) ~~all~~any timely filed objections to the assumption and assignment of an Assignable Contract or Lease, including, without limitation, as to adequate assurance of future performance and to the payment of all amounts due and owing and performance of all other obligations under an Assignable Contract or Lease, but not as to any other objections to approval of the Sale Transaction itself pursuant to section 363 of the Bankruptcy Code, to the extent not heard and resolved at the Sale Hearing, are adjourned and all parties' rights as to such issues are fully preserved and will be determined if and to the extent the applicable Assignable Contract or Lease is designated for assumption and assignment pursuant to the procedures

described in this Sale Order; (ii) no finding of fact or conclusion of law set forth herein with respect to the assumption and assignment of the Purchased Contracts shall apply, be binding upon, be law of the case, or operate to collaterally estop any issue, with respect to the assumption and assignment of any other Contract or Lease, other than with respect to the Purchased Contracts; (iii) no Contract or Lease with a Debtor other than the Purchased Contracts as set forth in Schedule 2.5(a)(i) of Exhibit A shall be part of the Purchased Assets unless and until assumption and assignment of such Contract or Lease is approved in accordance with the procedures in this Sale Order.  All holders of Claims or other persons and entities (including any counterparties to the Purchased Contracts identified on Schedule 2.5(a)(i) of Exhibit A hereto) that failed to timely object, or withdrew their objections to the Sale Motion, the Sale Transaction, or this Sale Order are deemed to consent to the relief granted herein for all purposes, including pursuant to section 363(f)(2) of the Bankruptcy Code, except to the extent that the procedures described herein provide otherwise.  Each holder of any Claim against the Debtors, their estates, or any of the Purchased Assets owned by the Debtors: (i) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented to the Sale Transaction; (ii) could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such Claim; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code.

4.    **Notice**.        Notice of the Sale Motion, the Sale Hearing, and the Assumption and Assignment Notice with regard to any Purchased Contracts and Designation Rights Contracts was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and the Bidding Procedures Order.

5.      **Fair Purchase Price**.  The consideration provided by the Purchaser under the Asset Purchase Agreement, including the portion of the Purchase Price that is the Credit Bid Amount, is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.  The Credit Bid constitutes a valid, duly authorized credit bid and is proper under the Bidding Procedures Order, sections 363(b) and 363(k) of the Bankruptcy Code, the applicable Prepetition Loan Documents (as defined in the Final DIP Order) and applicable law.

6.      **Approval of the Asset Purchase Agreement**.  Except as expressly provided herein with respect to the assumption and assignment of contracts and leases, the Asset Purchase Agreement, all ancillary documents filed therewith or described therein, the Credit Bid and all other transactions contemplated therein (including, but not limited to, all ancillary agreements contemplated thereby) and all of the terms and conditions thereof, including, without limitation, the Credit Bid pursuant to section 363(k) of the Bankruptcy Code of the Credit Bid Amount and the Purchaser's right to assign any of its rights and obligations and any Purchased Assets or Assumed Liabilities to any Assignee that is an Affiliate of the Purchaser, are hereby approved. The failure specifically to include any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety, except as provided herein.

7.      **Discharge of Credit Bid Claims.** Upon the Closing Date, the ~~portion of the~~ Purchaser Secured Claims ~~that is used as part of the Credit Bid Amount~~credit bid in accordance with this Sale Order and the Asset Purchase Agreement shall be deemed discharged against the Debtors and satisfied in full.  ~~For the avoidance of doubt~~If, and only to the extent that the Purchaser is entitled to a refund of sums paid on the Closing Date (including but not limited to Cure Payment Adjustment Amounts, unused Wind Down Payments and Estimated Professional Fees), the Purchaser ~~Secured Claims~~ shall remtain ~~outstanding against the Debtors and their estates with respect to all amounts other than the Credit Bid Amount applied to the Purchase Price in accordance with Section 3.1(a) of the Asset Purchase Agreement, if any~~a lien against such sums pursuant terms of the Final DIP Order.   Further, should the Credit Bid Amount fully satisfy the Purchaser Secured Claims, any Excluded Assets shall remain property of the Debtors' Estates, free and clear of the Purchaser Secured Claims.  Notwithstanding the foregoing, nothing set forth herein shall affect the validity or allowance of any other secured, unsecured, administrative or priority claims held by the Purchaser or any of its affiliates against the Debtors and the rights of the estates to object to or contest the validity or allowance of such claims are preserved.

8.      **Consummation of Sale Transaction**.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the Debtors, as well as their officers, employees and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Asset Purchase Agreement and the Related Agreements and to close and consummate the Sale Transaction, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transaction and each of the transactions contemplated thereby

pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, the Related Agreements, and this Sale Order.

9.    The Debtors, their affiliates and their respective officers, employees and agents, are authorized to execute and deliver, and authorized to perform under, consummate and implement all additional instruments and documents that may be necessary or desirable to implement the Asset Purchase Agreement and Related Agreements, including the transfer and the assignment of all the Purchased Assets, and the assumption and assignment of all the Purchased Contracts, and to take all further actions as may be (i) reasonably requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to the Purchaser's possession, the Purchased Assets or (ii) necessary or appropriate to the performance of the obligations contemplated by the Asset Purchase Agreement or to implement the Sale Transaction, including pursuant to this Sale Order, all without further order of the Court.

10.    All Persons that are currently in possession of some or all of the Purchased Assets are hereby directed to surrender possession of such Purchased Assets to the Purchaser as of the Closing or at such later time as the Purchaser reasonably requests.  To the extent required by the Asset Purchase Agreement, the Debtors agree to exercise commercially reasonable efforts to assist the Purchaser in assuring that all Persons that are presently, or on the Closing Date may be, in possession of some or all of the Purchased Assets will surrender possession of the Purchased Assets to either (i) the Debtors before the Closing Date or (ii) the Purchaser on or after the Closing Date.

11.    All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Purchased Assets owned by the Debtors to the

Purchaser in accordance with the Asset Purchase Agreement and this Sale Order; provided that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

12.     Purchaser (, on behalf of itself or an Assignee, as applicable), has provided adequate assurance of future performance of and under the Purchased Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code.

13.     **Direction to Creditors and Parties in Interest**.  On the Closing, each of the Debtors' creditors and the holders of any Claims are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims in the Purchased Assets, if any, as such Claims may otherwise exist.

14.     **Direction to Government Agencies**.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated by the Asset Purchase Agreement and approved by this Sale Order.

15.     **Transfer of the Purchased Assets Free and Clear**.  Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Debtors are authorized to transfer the Purchased Assets owned by the Debtors, including, without limitation, Designation Right contracts in accordance with the terms of the Asset Purchase Agreement and this Sale Order. The Purchased Assets shall be transferred to the Purchaser (or an Assignee, as applicable) in

accordance with the terms of the Asset Purchase Agreement and this Sale Order, and upon the Closing Date, such transfer shall: (i) be valid, legal, binding and effective; (ii) vest the Purchaser (or an Assignee, as applicable) with all right, title and interest of the Debtors in the Purchased Assets; and (iii) be free and clear of all Claims against the Debtors and the Purchased Assets owned by the Debtors (including Claims of any Governmental Authority) in accordance with section 363(f) of the Bankruptcy Code, and all other Claims (including, without limitation, contingent indemnification obligations) that represent interests in property shall attach to the net proceeds, if any, of the Sale Transaction, in the same order of their priority and with the same validity, force and effect which they now have against the Purchased Assets, subject to any claims and defenses the Debtors may possess with respect thereto, in each case immediately before the Closing Date.

16.    This Sale Order: (i) shall be effective as a determination that, as of the Closing Date, all Claims against the Debtors have been unconditionally released, discharged and terminated as to the Purchased Assets, and that the conveyances and transfers described herein have been effected; and (ii) is and shall be binding upon and govern the acts of all persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Purchaser (or an Assignee, as applicable) is the assignee and owner of the Purchased Assets free and clear of all Claims, or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers").  All Recording Officers are authorized

and specifically directed to strike recorded Claims against the Purchased Assets owned by the Debtors recorded prior to the date of this Sale Order.  A certified copy of this Sale Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Claims against the Purchased Assets recorded prior to the date of this Sale Order.  All Recording Officers are hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

17.    Following the Closing, no holder of any Claim against the Debtors or their estates shall interfere with the Purchaser's (or an Assignee's, as applicable) title to or use and enjoyment of the Purchased Assets based on or related to any such Claim or based on any actions the Debtors may take in these chapter 11 cases.

18.    Except as expressly set forth herein or in the Asset Purchase Agreement, the Purchaser and its successors and assigns shall have no liability for any Claim against the Debtors or the Debtors' estates or Excluded Liabilities, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether derivatively, vicariously, as a transferee, successor, alter ego, or otherwise, of any kind, nature or character whatsoever, by reason of any theory of law or equity, including Claims or Excluded Liabilities arising under, without limitation: (i) any employment or labor agreements or the termination thereof relating to the Debtors; (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing; (iii) the Debtors' business operations or the cessation thereof; (iv) any litigation involving one or more of the Debtors; and (v) any employee, workers'

compensation, occupational disease or unemployment or temporary disability related law, including, without limitation, claims that might otherwise arise under or pursuant to: (A) the Employee Retirement Income Security Act of 1974, as amended; (B) the Fair Labor Standards Act; (C) Title VII of the Civil Rights Act of 1964; (D) the Federal Rehabilitation Act of 1973; (E) the National Labor Relations Act; (F) the Worker Adjustment and Retraining Notification Act of 1988; (G) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended; (H) the Americans with Disabilities Act of 1990; (I) the Consolidated Omnibus Budget Reconciliation Act of 1985; (J) the Multiemployer Pension Plan Amendments Act of 1980; (K) state and local discrimination laws; (L) state and local unemployment compensation laws or any other similar state and local laws; (M) state workers' compensation laws; (N) any other state, local or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment or termination of employment with any or all Debtors or any predecessors; (O) any antitrust laws; (P) any product liability or similar laws, whether state or federal or otherwise; (Q) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes; (R) PACA; (S) any bulk sales or similar laws; (T) any federal, state or local tax statutes, regulations or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (U) any common law doctrine of de facto merger or successor or transferee liability, successor-in-interest liability theory or any other theory of or related to successor liability.

19.     If any Person that has filed financing statements, mortgages, mechanic's liens, *lis pendens* or other documents or agreements evidencing Claims against or in the Debtors or the

Purchased Assets owned by the Debtors shall not have delivered to the Debtors prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or, as appropriate, releases of all Claims (collectively, the "Release Documents") the Person has with respect to the Debtors or the Purchased Assets or otherwise, then with regard to the Purchased Assets that are purchased by the Purchaser pursuant to the Asset Purchase Agreement and this Sale Order: (i) the Debtors are hereby authorized and directed to, and the Purchaser is hereby authorized to, execute and file such statements, instruments, releases and other documents on behalf of the person with respect to the Purchased Assets; (ii) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the Purchased Assets; and (iii) the Purchaser may seek in this Court or any other court to compel appropriate persons to execute termination statements, instruments of satisfaction, and releases of all Claims with respect to the Purchased Assets other than liabilities expressly assumed under the Asset Purchase Agreement; provided that, notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, the provisions of this Sale Order shall be self-executing, and neither the Sellers nor Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.  This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, county or local government agency, department or office.

      20.    On the Closing Date, and subject to the terms of this Sale Order, this Sale Order shall be considered and constitute for any and all purposes a full and complete general

assignment, conveyance and transfer by the Debtors of the Purchased Assets acquired under the Asset Purchase Agreement or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in all of the Debtors' right, title, and interest in and to the Purchased Assets to the Purchaser (or an Assignee, as applicable).

21.     **No Successor or Other Derivative Liability**.  By virtue of the Sale Transaction, the Purchaser and its affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be consolidated with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Purchaser has not assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except with respect to the Assumed Liabilities.  Except as expressly set forth in the Asset Purchase Agreement, the Purchaser and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account of any taxes or other Governmental Authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any

way relating to, the operation of the Purchased Assets prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

22.    **Releases**. Effective upon consummation of the Closing, the Sellers, each of the Seller's respective former or current principals and shareholders and each of the Debtors (collectively, the "Releasing Parties") forever and irrevocably (a) release, discharge, and acquit the Purchaser, DIP Lender and the Pre-Petition Lender (in any and all capacities) and each of their respective former, current or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates (including but not limited to affiliates which sold products to or received payments from the Debtors), and successors and predecessors in interest (in their respective capacities as such) (collectively, the "Releasees") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every type, including, without limitation, any claims arising from any actions relating to any aspect of the relationship among the Purchaser, the DIP Lender or the Pre-Petition Lender and the Sellers and their affiliates including any equitable subordination or recharacterization claims or defenses, with respect to or relating to (i) the DIP Obligations, the DIP Liens, the DIP Loan Documents, (ii) the Pre-Petition Obligations, the Pre-Petition Secured Liens, the Pre-Petition Loan Documents, (iii) the Sellers' attempts to restructure the Pre-Petition Obligations, (iv) any and all transactions between the Sellers or any affiliate of the Sellers and the Purchaser or any of its affiliates occurring or arising prior to the Closing Date, (v) any and all claims and causes of action arising under title 11 of the United States Code (including, without limitation, causes of action pursuant to Chapter 5 thereof and similar claims under the law of any state or other jurisdiction), and (vi) any and all claims regarding the validity, priority, perfection

or avoidability of the liens or secured claims of the Purchaser, the DIP Lender and the Pre-Petition Lender; and (b) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and non-avoidability of the DIP Obligations, the DIP Liens, the Pre-Petition Obligations and the Pre-Petition Secured Liens.  For the avoidance of doubt, the releases granted herein shall prohibit and preclude any derivative claims assertable on behalf of the Releasing Parties against the Releasees.

23. **Assumption and Assignment of Purchased Contracts**.  Subject to paragraph 21, and conditioned upon the occurrence of the Closing Date and paragraphs 28 to 38 with respect to Designation Right Contracts, the Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Purchased Contracts to the Purchaser (or an Assignee, as applicable) free and clear of all Claims to the extent set forth in this Sale Order, and to execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Purchased Contracts to the Purchaser (or an Assignee, as applicable) as provided in the Asset Purchase Agreement.  With respect to each of the Purchased Contracts, the Debtors or Purchaser, in accordance with the provisions of the Asset Purchase Agreement, have cured or will cure before the Closing Date any monetary default required to be cured with respect to the Purchased Contracts under section 365(b)(1) of the Bankruptcy Code, and the Purchaser has provided adequate assurance of future performance under the Purchased Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required and not waived by the non-debtor counterparties to such Purchased Contracts.  Subject to payment of the Cure Costs, Uupon the Closing Date with respect to a Purchased Contract, the Purchaser (or an Assignee, as applicable) shall be fully and irrevocably vested with all rights, title and interest of the Debtors under such

Purchased Contract and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to breach of such Purchased Contract occurring after such assumption and assignment to Purchaser as provided in section 365(k).  Purchaser acknowledges and agrees that from and after the Closing Date with respect to a Purchased Contract, subject to and in accordance with the Asset Purchase Agreement, it shall comply with the terms of each of such Purchased Contract in its entirety, including any indemnification obligations expressly contained in such Purchased Contract that could arise as a result of events or omissions that occur ~~from~~before and after the Closing, unless ~~any~~ such provisions are not enforceable pursuant to the terms of this Sale Order.  The assumption by the Debtors and assignment to the Purchaser (or an Assignee, as applicable) of any Purchased Contract shall not be a default under such Purchased Contract.

24.     Provided that assumption of a Contract has been approved by the Bankruptcy Court, all Cure Costs that have not been waived by, or as to which an objection has been filed by, or that have not been otherwise addressed in an alternate arrangement with, any non-debtor party to an Purchased Contract shall be: (i) paid in cash by the Debtors, on or before the Closing as to the undisputed amounts and (ii) reserved against the establishment of a cash reserve equal to the cure amount the objecting Counterparty reasonably believes is required to cure the asserted monetary default under the applicable Assignable Contract  (a "Cure Cost Reserve") and paid promptly upon resolution of any such disputed Cure Cost; provided that upon resolution of an Adjourned Contract Objection and the payment of the applicable cure amount, if any, the applicable Assignable Contract that was the subject of such Adjourned Contract Objection shall be deemed assumed and assigned to the Purchaser (or an Assignee, as applicable), as of the Closing Date.  To the extent that an Adjourned Contract Objection is not resolved or determined

prior to the Closing Date, the Debtors, at the direction of the Purchaser, may elect to (i) not assume such Contract, or (ii) postpone the assumption of such Contract until the resolution of such objection.  To the extent any Contract Objection is resolved or determined unfavorably to the Debtors, the Debtors may, subject to the terms of the Asset Purchase Agreement, reject the applicable Contract or Lease after such determination; provided, that the Purchaser shall be responsible for the payment of all obligations arising under such Assignable Contract for the period between the Closing Date and the effective date of rejection of the Assignable Contract, which date shall not be until the later of the date a rejection notice is filed or the date the Debtors surrender and vacate the premises, provided however, that the Purchaser shall not be responsible for the payment of any obligations arising under any such Assignable Contract attributable to any time (or partial period) after the date that is 5 Business Days after the Purchaser provides a notice of rejection to the Debtors in accordance with the Asset Purchase Agreement.   Payment of Cure Costs as required under section 365(b) of the Bankruptcy Code with respect to the Purchased Contracts identified on Schedule 2.5(a)(i) of Exhibit A hereto or negotiation of an alternate arrangement by the applicable parties to resolve any outstanding Contract Objection , shall: (i) be in full satisfaction and cure of any and all defaults under these Purchased Contracts, whether monetary or non-monetary; and (ii) compensate the non-Debtor counterparty for any actual pecuniary loss resulting from such defaults.

25.     The Debtors served all counterparties to the Purchased Contracts, identified on Schedule 2.5(a)(i) of Exhibit A hereto, with an Assumption and Assignment Notice and the deadline to object to the Cure Costs and adequate assurance of future performance with respect to the Purchaser has passed.  Accordingly, unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Purchaser was filed and served before the

applicable deadline, each non-Debtor party to an Purchased Contract is forever barred, estopped and permanently enjoined from asserting against the Debtors or the Purchaser, their affiliates, successors or assigns or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing.

26.     Nothing in this Sale Order shall affect the rights of the Purchaser to designate each Assignable Contract as a "Purchased Contract," "Excluded Contract," or "Designation Right Contract" under the Asset Purchase Agreement through the date that is seven (7) Business Days prior to the Closing Date in accordance with the terms of the Asset Purchase Agreement. All of the requirements of sections 365(b) and 365(f), including without limitation, the demonstration of adequate assurance of future performance and Cure Costs required under the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to the Purchaser (or an Assignee, as applicable), solely with respect to the Purchased Contracts identified on Schedule 2.5(a)(i) of Exhibit A hereto.  The Purchaser has satisfied its adequate assurance of future performance requirements with respect to the Purchased Contracts identified on Schedule 2.5(a)(i) of Exhibit A hereto and in connection therewith has demonstrated it is sufficiently capitalized to comply with the necessary obligations under the Purchased Contracts, identified on Schedule 2.5(a)(i) of Exhibit A hereto.  All objections to the Debtors' or Purchaser's adequate assurance of financial performance that were timely filed (other than adequate assurance objections that related to the Purchased Contracts identified on Schedule 2.5(a)(i) of Exhibit A hereto) are fully reserved pending further hearing of this Court and nothing in this Sale Order shall limit such objections in any respect.

27.     To the extent a counterparty to an Purchased Contract failed to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined as of the

Debtors' filing of the Assumption and Assignment Notice and any such counterparty shall be barred, and forever prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost as of such dates.

28.    **Designation Rights Procedures**.  The Debtors are authorized, at the direction of the Purchaser pursuant to the Asset Purchase Agreement, to seek to assume and to assign pursuant to sections 363 and 365 of the Bankruptcy Code, the Designation Right Contracts that the Purchaser designates for assumption and assignment in accordance with the Asset Purchase Agreement and this Sale Order including to a permitted Assignee, as applicable.  Each of the Designation Right Contracts constitutes an unexpired lease or executory contract within the meaning of section 365 of the Bankruptcy Code and, at the Purchaser's election, will be deemed assumed and assigned by the Debtors on the date the designation assignment is made subject to compliance with and the procedures set forth in the Asset Purchase Agreement and herein.[3]  The assumption of any liabilities under a Designation Right Contract that is assumed by an Assignee shall constitute a legal, valid and effective delegation of all liabilities thereunder to the applicable Assignee and, following payment of all amounts required to be paid by agreement of the parties or an order of the Court, and except as expressly set forth in the Asset Purchase Agreement or this Sale Order, shall divest the Debtors of all liability with respect to such Designation Right Contract for any breach of such Designation Right Contract occurring after the date the designation assignment is made or any breach of such additional contract after the applicable date on which such additional contract is assigned to the applicable Assignee in accordance with the

---

[3] In the case of any conflict between the provisions of the Asset Purchase Agreement and this Order, this Order shall govern.

Asset Purchase Agreement, in each case, to the extent provided in section 365(k) of the Bankruptcy Code.

29.     The Debtors shall serve all non-debtor counterparties to a Designation Right Contract ("Designation Right Contract Counterparties") after the Closing Date with a Notice of Designation containing updated adequate assurance information from the Purchaser, as well as any updated Cure Amount as to the Designation Right Contract.   Any Designation Right Contract Counterparty served with a Notice of Designation shall have three (3) ~~Business D~~days from the filing and service of a Notice of Designation in which to file an objection to assumption and assignment, which shall be limited to any change in circumstances regarding the proposed adequate assurance or Cure Amount since the date of the Sale Hearing.  Unless an objection to the proposed Cure Costs or Adequate Assurance Information with respect to the Purchaser was filed and served before the applicable deadline (a "Filed Objection"), the applicable Designation Right Contract Counterparty shall be forever barred from objecting to (i) the Cure Costs and from asserting any additional cure or other amounts with respect to the applicable Designation Right Contract in the event it is assumed and/or assigned by an Assignee, except to the extent such Cure Costs further accrue (being subject to further credits, debits, and adjustments in accordance with the terms of the applicable underlying Lease or Contract) following the Debtors' filing of the applicable Assumption and Assignment Notice or (ii) adequate assurance of future performance by the Purchaser.

30.     With respect to any Filed Objection, to the extent that the applicable Contract or Lease is designated for assumption and assignment, or assigned to the Purchaser's designee, an Assumption and Assignment Notice shall be served on the Designation Right Contract Counterparty, and the Purchaser and the applicable counterparty shall have authority to

compromise, settle or otherwise resolve any Filed Objections without further order of the Court. If a timely filed Contract Objection cannot otherwise be resolved by the parties, such objection may be heard by the Court at the Sale Hearing or subsequent to the Sale Hearing (an "Adjourned Contract Objection"); provided that the determination of whether a Contract Objection may be heard at the Sale Hearing is in the Debtors' and the Court's discretion.

31.    Except as set forth in paragraphs 28 to 38, all Designation Right Contract Counterparties' rights under section 365 with respect to the assumption and assignment of the Designation Right Contracts pursuant to the Bankruptcy Code (including, without limitation, as to the provision of adequate assurance of future performance if the Designation Right Contracts are designated to a third party or with respect to the provision of adequate assurance of future performance of the Purchaser if a Filed Objection was timely served) are reserved pending delivery of a Notice of Designation following Sellers' receipt of a Purchaser's Assumption Notice.

32.    Each ~~Designation Right~~ Notice of Designation will set forth the following information, to the best of the Debtors' knowledge:  (a) the street address of the real property that is the subject of such Designation Right Contract (if such contract is a lease); (b) the name and address of the counterparty of such Designation Right Contract (and their counsel, if known); (c) a description of the deadlines and procedures for filing objections to the Designation Right Contract Notice; (d) the identity of the proposed Assignee; (e) information intended to provide the counterparty to the Designation Right Contract with adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code, if and only if such Designation Right Contract is proposed to be assigned to a third party and (f) the proposed Cure Costs associated with such Designation Right Contract; provided,

however, that if adequate assurance information is provided pursuant to this paragraph, such adequate assurance information shall be kept strictly confidential and  not be used for any purpose other than to (a) evaluate whether adequate assurance requirements under Bankruptcy Code section 365(f)(2)(B) and, if applicable, Bankruptcy Code section 365(b)(3) have been satisfied, and (b) to support any objection to adequate assurance provided by any party including the Purchaser and its affiliates.

33.    During the Designation Rights Period, the Purchaser may designate any Designation Right Contract for assumption and assignment in accordance with the terms of the Asset Purchase Agreement and this Sale Order.  In such event, the Debtors shall file with the Court and serve on the applicable Designation Right Contract Counterparty a Notice of Designation, together with any applicable Assignment and Assumption of Lease or other applicable assignment agreement with respect to any Designation Right Contract.  If the proposed Assignee is not the Purchaser, the Debtors shall also deliver to the applicable Designation Right Contract Counterparty (and deliver by email or facsimile to counsel for the applicable Designation Right Contract Counterparty, if such counsel has filed a notice of appearance in the Bankruptcy Cases) evidence of adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code with respect to the applicable Designation Right Contract that is proposed to be assumed and assigned to such Assignee.

34.    Any party seeking to object to the assumption and assignment of any Designation Right Contract to a proposed Assignee that is not the Purchaser on any basis other than the Cure Costs (including, but not limited to, objections to adequate assurance of future performance if such Designation Right Contract is designated to a third party or with respect to the provision of adequate assurance of future performance of the Purchaser if a Filed Objection was timely

served), must (a) file a written objection in compliance with the Bankruptcy Rules and the Local Rules (a "Designation Right Contract Assumption and Assignment Objection") with the Court, so that such objection is filed no later than ~~three~~seven (~~3~~7) days after the date on which (i) the applicable Designation Right Contract Notice is filed with the Court and served on the applicable counterparty and (ii) evidence of adequate assurance of future performance required pursuant to the preceding sentence is served on the applicable Designation Right Contract Counterparty (the "Designation Contract Assumption and Assignment Objection Deadline"), and (b) serve the Designation Right Contract Assumption and Assignment Objection (by email, facsimile or hand delivery) so that it is actually received by counsel for the Debtors and the Purchaser on or before the Designation Right Contract Assumption and Assignment Objection Deadline.

35.    If no Filed Objection or Designation Right Contract Assumption and Assignment Objection has been filed by the Designation Right Contract Assumption and Assignment Objection Deadline, this Sale Order shall serve as approval of the assumption and assignment of the applicable Designation Right Contract.  If a Filed Objection or a Designation Right Contract Assumption and Assignment Objection is timely filed and not withdrawn or resolved, the Debtors, the Purchaser and the objecting Designation Right Contract Counterparty shall have authority to compromise, settle or otherwise resolve any objections without further order of the Court.  If the Debtors, the Purchaser and the objecting Designation Right Contract Counterparty determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Designation Right Contract will be determined by the Court on a date to be scheduled by any of the Debtors, the Purchaser or the objecting Designation Right Contract Counterparty (which hearing date shall be no sooner than ten (10) business days following the date of filing of the Designation Right Contract Notice),

unless the Debtors, the Purchaser and the applicable Designation Right Contract Counterparty agree otherwise.

36.      Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, the Debtors shall, on the applicable Assumption Effective Date for a Designation Right Contract, cure all nonmonetary defaults solely to the extent required under section 365 of the Bankruptcy Code and pay to the applicable Designation Right Contract Counterparty all undisputed Cure Costs and other such undisputed amounts required with respect to such Designation Right Contract, solely to the extent designated for assumption by the Sellers and assignment to Purchaser (or an Assignee, as applicable) by written notice from Purchaser to Sellers delivered prior to the end of the Designation Rights Period (the "Designated Agreements").  Upon assumption and assignment of any Designated Agreement, but subject to the cure of all nonmonetary defaults and payment of all Cure Costs, the Debtors and the estates shall be relieved of any liability for breach of such Designated Agreement pursuant to section 365(k) of the Bankruptcy Code.; provided that, except as expressly provided herein or in Purchaser acknowledges and agrees that from and after the assignment of a Designated Agreement, subject to and in accordance with the Asset Purchase Agreement or Related Agreements, neitherand unless such terms are not enforceable pursuant to the terms of this Sale Order, it shall comply with the terms of each of such Designated Agreements in their entirety, including any indemnification obligations expressly contained in such Designated Agreement, unless such indemnification obligations relate to the pre-Closing Date period and such obligations would qualify as Cure Amounts that were not asserted by the landlord prior to the date of the assignment of such Designated Agreement or were asserted and cured through payment of the Cure Amount for such Designated Agreement.  The assumption by the Debtors and assignment to the Purchaser (nor the applicablean Assignee shall have any

-39-

obligations under, as applicable) of any Designated Agreement that is a Purchased Real Property Lease (any such lease, including any amendment thereto, an "Acquired Lease") or related Purchased Contract in respect of any portion of any year-end (or other) adjustment (including, without limitation, for royalties, rents, utilities, taxes, insurance, fees, any common area or other maintenance charges, promotional funds and percentage rent) arising under any Acquired Lease or any other Purchased Contract for the calendar year in which the applicable Lease Assignment occurs attributable to (x) the portion of such calendar year occurring prior to such Lease Assignment or (y) for any previous calendar year other than to the extent and in the amount allowed as the Cure Cost for such Acquired Lease or Purchased Contract.shall not be a default under such Designated Agreement.

37.     Upon the applicable Assumption Effective Date, any provision in any Purchased Contract that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable and all Purchased Contracts shall remain in full force and effect notwithstanding assignment thereof.  No sections or provisions of any Purchased Contracts, that in any way purport to: (i) prohibit, restrict, or condition the Debtors' assignment of such Purchased Contract (including, but not limited to, the conditioning of such assignment on the consent of any non-debtor party to such Purchased Contract); (ii) provide for the cancellation, or modification of the terms of the Purchased Contract based on the filing of a bankruptcy case, the financial condition of the Debtors, or similar circumstances; (iii) provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges, or other financial accommodations in favor of the non-debtor third party to such Purchased Contract upon assignment thereof; or (iv) provide for any rights of first refusal on a contract counterparty's part, or any recapture or termination rights in favor of a contract

counterparty, or any right of a Landlord to take an assignment or sublease from a tenant, shall have any force or effect with respect to the grant and honoring of the Designation Rights or the rights under Section 2.9 of the Asset Purchase Agreement in accordance with this Sale Order and the Asset Purchase Agreement and assignments of Purchased Contracts by the Debtors in accordance therewith, because they constitute unenforceable antiassignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code. Upon assumption and assignment of any Designation Right Contract pursuant to the procedures set forth herein and in the Asset Purchase Agreement, the applicable Assignee shall enjoy all of the rights and benefits, and shall assume all obligations, under each such Purchased Contract as of the applicable Assumption Effective Date.

38.     Solely in connection with the Purchased Contracts listed on Schedule 2.5(a)(i) of Exhibit A, upon the applicable Assumption Effective Date, except as otherwise expressly agreed by the Purchaser and the applicable Designation Right Contract Counterparty, notwithstanding any provision in any Designation Right Contract that purports to prohibit, restrict or condition such action, upon the assumption and assignment of such Designation Right Contract in accordance with the terms of the Asset Purchase Agreement, (x) the applicable Assignee shall be authorized to: (i) use the applicable Lease Premises (as defined in the Asset Purchase Agreement), subject to section 365(b)(3) of the Bankruptcy Code, as a retail store (and related goods and services) upon consummation of the assumption and assignment of such Designation Right Contract to such Assignee in accordance with the terms of the Asset Purchase Agreement; (ii) operate such Lease Premises under the Purchaser's trade name or any other trade name which the Purchaser owns or is authorized to use (including any of the Debtors' trade names); (iii) make such alterations and modifications to the applicable Lease Premises (including signage,

together with appropriate changes to existing tenant signage in the respective shopping center or mall, including panels on all pylons, monuments, directional and other ground and off-premises signs where Sellers are presently represented) deemed necessary by such Assignee (subject to all applicable laws including all applicable municipal codes) as are necessary or desirable for such Assignee to conform such Lease Premises to the prototypical retail store (or such Assignee's typical retail store); (iv) remain "dark" with respect to such Lease Premises after such assumption and assignment until the date that is necessary to permit such Assignee to remodel, restock, re-fixture, change signage and/or until completion of the work described in clause (iii) above (so long as such date is not more than one hundred ~~fifty~~ (~~150~~100) days after the applicable Designation Assignment Date) or such later date as may be reasonably required for the restoration of the such Lease Premises following any applicable Casualty / Condemnation Event; and (v) exercise, utilize or take advantage of any renewal options and any other current or future rights, benefits, privileges, and options granted or provided to the Debtors under such Designated Agreement (including all of the same which may be described or designated as, or purport to be, "personal" to the Debtors or to a named entity in such Designated Agreement or to be exercisable only by the Debtors or by a named entity or an entity operating under a specific trade name)  and (y) neither the Purchaser nor the applicable Assignee shall have any responsibility or liability for any Excluded ~~Asset Sale Taxes and Excluded Asset Reorganization~~ Taxes.  For the avoidance of doubt, all rights of the counterparties to any applicable Designation Right Contract are fully reserved in connection with any of the foregoing actions.

39.    To the extent that any IP License is designated for assumption and assignment pursuant to the Asset Purchase Agreement, on the Assumption Effective Date, such agreement,

including the rights and obligations thereunder, will be deemed to have been assumed and assigned to the Purchaser as of the Closing Date.

40.    **Authorization to Purchase Certain Avoidance Actions.**  Pursuant to Section 2.1(g) of the Asset Purchase Agreement and this Sale Order, the Purchaser is authorized to and shall purchase and acquire all Avoidance Actions ~~and proceeds thereof~~ relating to or arising from all Purchased Contracts and the Debtors, and any other entity seeking to otherwise exercise any rights of the Debtors with respect to such Purchased Contracts or Avoidance Actions, shall be forever barred and precluded from pursuing any such Avoidance Actions related to the Purchased Contracts after the Closing Date or making any claim with respect to the proceeds of such Avoidance Actions.

41.    ***Ipso Facto* Clauses Ineffective**.  Except as otherwise specifically provided for by order of this Court or the Asset Purchase Agreement, the Purchased Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser or, for applicable Designated Agreements, the Assignee in accordance with their respective terms, including all obligations of the Purchaser or, for applicable Designated Agreements, the Assignee as the assignee of the Purchased Contracts, notwithstanding any provision in any such Purchased Contracts (including, without limitation, those of the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer. There shall be no, and all non-Debtor parties to any Purchased Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser, any defaults, breach, claim, pecuniary loss, rent accelerations, escalations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption or assignment of the Purchased Contracts or the Closing.

42.     Except as otherwise specifically provided for by order of this Court, upon the Debtors' assignment of the Purchased Contracts to the Purchaser (or an Assignee, as applicable) under the provisions of this Sale Order and full payment of all Cure Costs as required under section 365(b) of the Bankruptcy Code, no default shall exist under any Purchased Contracts, and no counterparty to any Purchased Contracts shall be permitted to declare a default by any Debtor or the Purchaser (or an Assignee, as applicable) or otherwise take action against the Purchaser (or an Assignee, as applicable) as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the relevant Purchased Contract. Any provision in an Purchased Contract that prohibits or conditions the assignment of such Purchased Contract or allows the counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, refuse to renew, or modify any term or condition upon such assignment, constitutes an unenforceable anti-assignment provision that is void and of no force and effect solely in connection with the transfer thereof pursuant to this Sale Order. The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Purchased Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Purchased Contract.

43.     **Statutory Mootness**. The Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to, and is hereby granted, the full rights, benefits, privileges, and protections of section 363(m) of the Bankruptcy Code. The Sale Transaction contemplated by the Asset Purchase Agreement is undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transaction shall neither affect the validity of the Sale Transaction nor the

transfer of the Purchased Assets owned by the Debtors to the Purchaser, free and clear of Claims, unless such authorization is duly stayed before the Closing of the Sale Transaction pending such appeal.    The Debtors and the Purchaser will be acting in good faith if they proceed to consummate the Sale Transaction at any time after entry of this Sale Order.

44.    **No Avoidance of Asset Purchase Agreement**.    Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.    Accordingly, the Asset Purchase Agreement and the Sale Transaction shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Asset Purchase Agreement or the Sale Transaction.

45.    **Waiver of Bankruptcy Rules 6004(h), 6006(d) and 7062**.    Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d) or 7062 or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.    Time is of the essence in closing the Sale Transaction and the Debtors and the Purchaser intend to close the Sale Transaction as soon as practicable.    Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the Closing Date, or risk its appeal will be foreclosed as moot.    This Sale Order constitutes a final order upon which the Debtors and the Purchaser are entitled to rely.

46.    **Distribution and Application of Sale Proceeds**.

(a)      At the Closing, the Purchaser shall pay to the Sellers (in accordance with the terms of the Asset Purchase Agreement), the balance of the purchase price remaining due and owing under the Asset Purchase Agreement.  The proceeds, if any, of the Sale Transaction shall be applied as provided in the Final DIP Order, including to repay in cash or pursuant to the Credit Bid on the Closing Date the DIP Obligations (as defined in the Final DIP Order) from the sale of those Purchased Assets upon which the DIP Lender has a first lien, including all costs and expenses of the DIP Lender set forth in the applicable pay off letter, without the need for any professional for the DIP Lender to deliver or serve any invoices to any other party.  The methodology for allocation of proceeds shall be as set forth in the Asset Purchase Agreement.  Upon receipt of the Cash Payment pursuant to the terms of the Asset Purchase Agreement, the Debtors shall hold the Cash Payment in a segregated account held at a third-party financial institution and shall not be commingled with the Debtors' other funds or used other than as expressly permitted in the Asset Purchase Agreement.  Any portion of the Cash Payment that is not used by the Sellers shall be promptly remitted to Purchaser in accordance with the terms of the Asset Purchase Agreement.  The Purchaser and its affiliates shall retain any security interests in amounts funded for the Wind Down Payments and the Estimated Professional Fees Amount to secure any claims for any cash remaining with the Sellers after payment of all allowed Administrative Expenses.

(b)      If any order under section 1112 of the Bankruptcy Code is entered in the cases, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that this Sale Order, including the rights granted to Purchaser hereunder, shall remain effective and, notwithstanding such conversion or dismissal, shall remain binding on parties in

interest.  This Sale Order shall not be modified by any chapter 11 plan confirmed in the cases or

by any subsequent orders of the Court.

47.    **Binding Effect of Sale Order**.  The terms and provisions of the Asset Purchase

Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit

of, the Debtors, their estates and their creditors, non-debtor affiliates, any affected third parties,

all holders of equity interests in the Debtors, all holders of any claims, whether known or

unknown, against the Debtors, any holders of Claims against or on all or any portion of the

Purchased Assets owned by the Debtors, including, but not limited to all contract counterparties,

leaseholders, governmental units, and any trustees, examiners, administrators, responsible

officers, estate representatives, or similar entities for the Debtors, if any, subsequently appointed

in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy

Code of any of the Debtors' chapter 11 cases, and each of their respective affiliates, successors

and assigns.  The Asset Purchase Agreement and the Sale Order shall inure to the benefit of the

Debtors, their estates and creditors, the Purchaser and their respective successors and assigns.

The Asset Purchase Agreement, the Sale Transaction and this Sale Order shall not be subject to

rejection or avoidance by the Debtors, their estates, their creditors or any trustee, examiner or

receiver.

48.    **Conflicts; Precedence**.  In the event that there is a direct conflict between the

terms of this Sale Order, the Asset Purchase Agreement, and any documents executed in

connection therewith, the provisions contained in this Sale Order, the Asset Purchase Agreement

and any documents executed in connection therewith shall govern, in that order.   Nothing

contained in any chapter 11 plan hereafter confirmed in these chapter 11 cases, any order

confirming such plan, or in any other order of any type or kind entered in these chapter 11 cases

(including, without limitation, any order entered after any conversion of any or all of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code) or in any related proceeding shall alter, conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

49.    **Modification of Asset Purchase Agreement**.  The Asset Purchase Agreement and Related Agreements, documents or other instruments executed in connection therewith, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; <u>provided</u> that any such modification, amendment or supplement does not materially change the terms of the Asset Purchase Agreement or Related Agreements, documents or other instruments, except as to the signing party.

50.    **Bulk Sales; Taxes**.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes) shall apply in any way to the transactions contemplated by the Asset Purchase Agreement, the Sale Motion or this Sale Order.  Except as otherwise expressly provided in the Asset Purchase Agreement, all obligations of the Debtors relating to taxes, whether arising under any law, by the Asset Purchase Agreement, or otherwise, shall be the obligation of and fulfilled and paid by the Debtors.

51.    **Lease Deposits and Security**.  The Purchaser shall not be required, pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Purchased Contract to the extent not previously provided by the Debtors.  All timely Filed Objections that have asserted requests pursuant to section 365(l) of the Bankruptcy Code or otherwise, to provide any additional deposit or security with respect to any Purchased

-48-

Contract other than the Purchased Contracts are hereby adjourned to a hearing at a future date with all parties' rights reserved.

52.    **Automatic Stay**.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Asset Purchase Agreement, and Related Agreements, documents or other instruments. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

53.    **Retention of Jurisdiction**.  This Court shall retain exclusive jurisdiction to, among other things, interpret, enforce and implement the terms and provisions of this Sale Order and the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), to adjudicate disputes related to this Sale Order or the Asset Purchase Agreement (and such other related agreements, documents or other instruments) and to enforce the injunctions set forth herein.

54.    **Governmental Units**.  Nothing in this Order or the Asset Purchase Agreement releases, nullifies, precludes or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations (including but not limited to environmental laws or regulations), and any associated liabilities for penalties, damages, cost recovery, or injunctive relief that any entity would be subject to as the owner, lessor, lessee, or operator of the property after the date of entry of this Order.  Nothing contained in this Order or in the Asset Purchase Agreement shall in any way diminish the obligation of any entity, including the Debtors, to comply with environmental laws.  Nothing in this Order or the Asset Purchase Agreement authorizes the transfer to the Purchaser of any licenses, permits, registrations, or governmental

authorizations and approvals without the Purchaser's compliance with all applicable legal

requirements under non-bankruptcy law governing such transfers.


Tendered by:

DELCOTTO LAW GROUP PLLC

/s/  Dean A. Langdon, Esq.
KY Bar No.40104
Laura Day DelCotto, Esq.
KY Bar No. 81763
200 North Upper Street
Lexington, KY 40507
Telephone:  (859) 231-5800
Facsimile:   (859) 281-1179
dlangdon@dlgfirm.com
ldelcotto@dlgfirm.com
COUNSEL FOR DEBTORS AND
DEBTORS IN POSSESSION